No. 23-15087

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

COALITION ON HOMELESSNESS; TORO CASTAÑO; SARAH CRONK;
JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA
SANDOVAL; NATHANIEL VAUGHN,

*Plaintiffs-Appellees*

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:22-cv-05502-DMR
Hon. Donna M. Ryu

_____

**APPELLANTS' OPENING BRIEF
(PRELIMINARY INJUNCTION APPEAL)**

_____

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
WAYNE SNODGRASS
Deputy City Attorney
MEREDITH B. OSBORN
Chief Trial Deputy

JAMES M. EMERY
EDMUND T. WANG
KAITLYN M. MURPHY
RYAN C. STEVENS
MIGUEL A. GRADILLA
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:  (415) 554-4628 (Emery)
Facsimile:   (415) 554-4699
Email: jim.emery@sfcityatty.org

Attorneys for Defendants and
Appellants CITY AND COUNTY OF
SAN FRANCISCO, et al.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT .....................................................5

ISSUES PRESENTED......................................................................5

STATEMENT OF THE CASE...........................................................6

    I.    Background Facts ................................................................6

        A.    Overview Of San Francisco's Homelessness Response System ....................................................................6

            1.    Coordinated Entry .........................................7

            2.    Street Outreach .............................................7

            3.    Temporary Shelter And Crisis Intervention .....8

            4.    Problem Solving ...........................................8

            5.    Homelessness Prevention ...............................9

            6.    Supportive Housing ......................................9

            7.    Housing Ladder ...........................................9

            8.    Effects Of Covid-19.....................................10

        B.    HSOC Encampment Resolutions............................11

            1.    Planning .....................................................11

             2.    Advance Notice ...........................................12

             3.    Advance Assessment Of Interest....................13

             4.    Day Of The Encampment Resolution..............13

        C.    Employee Interactions With Persons Experiencing Homelessness Outside Of HSOC Resolutions. ........17

    II.    Plaintiffs' Allegations And Evidence......................................19

        A.    Allegations And Evidence Regarding Enforcement.................19

        B.    Alleged Fourth Amendment Violations...................21

PROCEDURAL HISTORY................................................................21

    I.    Briefing And Discovery Prior To Preliminary Injunction .................21

II.      Preliminary Injunction Order And Motion For Clarification ............23

III.     San Francisco's Policy Change In Response To The Injunction ........26

STANDARD OF REVIEW ...................................................................27

SUMMARY OF ARGUMENT ..............................................................28

ARGUMENT ........................................................................................31

I.       The Injunction Exceeded What The Eighth Amendment And
         This Court's Precedents Require.........................................................31

         A.      The District Court Adopted A Broad Injunction That
                 Misapplied *Martin* By Construing The Eighth
                 Amendment As A Collective Right. .......................................31

         B.      Even Under A Narrower Interpretation The Injunction
                 Would Remain Unconstitutional And Unworkable.................36

                 1.      The Injunction Fails To Consider The Limited
                         Geographic Scope Of An Encampment Resolution .......36

                 2.      The Injunction Further Fails To Acknowledge San
                         Francisco Police Code Section 169 Is Limited To
                         Tents And Other Structures And Section 168 Is
                         Limited To Daytime Hours.............................................40

                 3.      The Injunction Is Unworkable Because It Requires
                         San Francisco To Know The Total Number Of
                         Residents Experiencing Homelessness And The
                         Total Number Of Available Shelter Beds Every
                         Night. ............................................................................44

         C.      San Francisco Should Not Be Required To Guess At The
                 Meaning And Scope Of The Injunction...................................47

                 1.      The District Court Failed To Define "Involuntarily
                         Homeless."......................................................................48

                 2.      The District Court Failed To Define "Threatening
                         To Enforce." ...................................................................52

II.      The District Court Improperly Elevated San Francisco's Policy
         To A Constitutional Standard.............................................................54

CONCLUSION .....................................................................................58

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Ayotte v. Planned Parenthood of N. New England*
  546 U.S. 320 (2006) ............................................................................33

*Blake v. City of Grants Pass*
  No. 1:18-CV-01823-CL, 2019 WL 3717800 (D.Or. Aug. 7, 2019),
  *aff'd sub nom. Johnson v. City of Grants Pass*,
  50 F.4th 787 (9th Cir. 2022)................................................................44

*Califano v. Yamasaki*
  442 U.S. 682 (1979) ............................................................................47

*Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*
  No. 2021-1839, 2022 WL 1530491 (Fed. Cir. May 16, 2022) ............50

*Carlos-Kahalekomo v. Cnty. of Kauai*
  No. CV 20-00320 JMS-WRP, 2020 WL 4455101 (D. Haw. Aug. 3, 2020) .......40

*Case v. Kitsap County Sheriff's Dep't*
  249 F.3d 921 (9th Cir. 2001) ...............................................................54

*City of Canton, Ohio v. Harris*
  489 U.S. 378 (1989) ............................................................................56

*Columbia Pictures Indus., Inc. v. Fung*
  710 F.3d 1020 (9th Cir. 2013) .............................................................50

*Davis v. Scherer*
  468 U.S. 183 (1984) ............................................................................54

*Devereaux v. Perez*
  218 F.3d 1045 (9th Cir. 2000), *on reh'g en banc sub nom.*
  *Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001)...........................54

*Dymo Indus. v. Tapeprinter, Inc.*
  326 F.2d 141 (9th Cir. 1964) ...............................................................28

*Federal Trade Comm'n v. Enforma Nat. Prods., Inc.*
  362 F.3d 1204 (9th Cir. 2004) .............................................................27

*Fitzpatrick v. Little*
   No. 1:22-CV-00162-DCN, 2023 WL 129815 (D. Idaho Jan. 9, 2023) ..............40

*Frank v. City of St. Louis*
   458 F. Supp. 3d 1090 (E.D. Mo. 2020) ................................40

*Fund for Empowerment v. City of Phoenix*
   No. CV-22-02041-PHX-GMS, 2022 WL 18213522 (D. Ariz. Dec. 16, 2022)...34

*General Electric Co. v. American Wholesale Co.*
   235 F.2d 606 (7th Cir. 1956) ..................................28

*Gomes v. Cnty. of Kauai*
   481 F. Supp. 3d 1104 (D. Haw. 2020) ..........................39

*GoTo.com, Inc. v. Walt Disney Co.*
   202 F.3d, 1199 (9th Cir. 2000) ...............................27

*Granny Goose Foods, Inc. v. Bhd. of Teamsters
   & Auto Truck Drivers Loc. No. 70 of Alameda Cnty*.
   415 U.S. 423 (1974) .........................................27

*Haines v. Kerner*
   492 F.2d 937 (7th Cir. 1974) ............................ 28, 32

*Hutchinson v. City of Valdosta*
   227 U.S. 303 (1913) .........................................33

*Inghram v. Wright*
   430 U.S. 651 (1977) .........................................46

*Int'l Rectifier Corp. v. IXYS Corp.*
   383 F.3d 1312 (2004) ........................................56

*Jacobson v. Commonwealth of Massachusetts*
   197 U.S. 11 (1905) ..........................................33

*Johnson v. City of Grants Pass*
   50 F.4th 787 (9th Cir. 2022)..................................... *passim*

*Jones v. City of Los Angeles*
   444 F.3d 1118 (9th Cir. 2006),
   vacated, 505 F.3d 1006 (9th Cir. 2007)..........................32

*Juliana v. United States*
 947 F.3d 1159 (9th Cir. 2020) .............................................................................57

*Manzanillo v. Jacquez*
 555 F. App'x 651 (9th Cir. 2014) ........................................................................54

*Martin v. City of Boise*
 920 F.3d 584 (9th Cir. 2019) ..................................................................... *passim*

*McCormack v. Hiedeman*
 694 F.3d 1004 (9th Cir. 2012) .............................................................................33

*Munaf v. Green*
 553 U.S. 674 (2008) ............................................................................................28

*Nat. Res. Def. Council, Inc. v. Winter*
 508 F.3d 885 (9th Cir. 2007) ...............................................................................33

*Nat'l-Arnold Magnetics Co. v. Wood*
 46 F. App'x 416 (9th Cir. 2002)................................................................... 49, 50

*NLRB v. Express Publ'g Co.*
 312 U.S. 426 (1941) ............................................................................................56

*Peregrine Myanmar Ltd. v. Segal*
 89 F.3d 41 (2d Cir. 1996) ....................................................................................53

*Pottinger v. City of Miami*
 810 F. Supp. 1551 (S.D. Fla. 1992)......................................................................43

*Powell v. State of Tex.*
 392 U.S. 514 (1968) ............................................................................................47

*Premier Commc'ns Network, Inc. v. Fuentes*
 880 F.2d 1096 (9th Cir. 1989) .............................................................................50

*Price v. Brown*, No. CV 112-059, 2012 WL 2863357
 (S.D. Ga. May 31, 2012), *report and recommendation adopted*,
 No. CV 112-059, 2012 WL 2862194 (S.D. Ga. July 11, 2012)...........................52

*Roman v. MSL Cap., LLC*, No. EDCV 17-2066 JGB (SPX), 2019 WL 3017765
 (C.D. Cal. July 9, 2019), aff'd, 820 F. App'x 592 (9th Cir. 2020) .......................56

*Schneider v. State of New Jersey, Town of Irvington*
   308 U.S. 147 (1939) ............................................................................37

*Shipp v. Schaaf*
   379 F. Supp. 3d 1033 (N.D. Cal. 2019) ............................................39

*Sullivan v. City of Berkeley*
   383 F. Supp. 3d 976 (N.D. Cal. 2019).................................................55

*Union Pac. R.R. Co. v. Mower*
   219 F.3d 1069 (9th Cir. 2000)..................................................... 49, 53

*United States v. AMC Ent., Inc.*
   549 F.3d 760 (9th Cir. 2008).............................................................27

*United States v. Holtzman*
   762 F.2d 720 (9th Cir. 1985).............................................................50

*Whitley v. Albers*
   475 U.S. 312 (1986) .........................................................................32

*Winter v. Natural Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .............................................................................28

*Wynn Oil Co. v. Purolator Chemical Corp.*
   536 F.2d 84 (5th Cir. 1976)...............................................................50

*Zepeda v. U.S. I.N.S.*
   753 F.2d 719 (9th Cir. 1983).............................................................27

**Constitutional Provisions**
U.S. Const.
   Article III ..........................................................................................57
   Amend. VIII................................................................................*passim*

**Federal Statutes**
28 U.S.C.
   § 1292(a)(1) .......................................................................................5
   § 1331 ................................................................................................5
   § 1343 ................................................................................................5
   § 1367 ................................................................................................5

42 U.S.C.
 § 1983 ...................................................................................................56

**State Statutes & Codes**
Cal. Penal Code
 § 370 .............................................................................................. 3, 24
 § 372 ................................................................................... 3, 20, 24, 25
 § 647(e)............................................................................... 18, 20, 24

Cal. Welf. & Inst. Code
 § 5150 ...................................................................................................14

**San Francisco Statutes, Codes & Ordinances**
S.F. Park Code
 § 3.13 ...................................................................................................43

S.F. Police Code
 § 148(a).............................................................................. 3, 20, 24
 § 168 ........................................................................................ *passim*
 § 168(d)..................................................................................42
 § 168(b).......................................................................... 25, 42
 § 168(f)(1)..............................................................................25
 § 169 .............................................................. 3, 25, 29, 40, 41
 § 169(b)(1).............................................................................41
 § 169(c)........................................................................... 25, 40
 § 169(d)..................................................................................41

**Rules**
Fed. R. App. P.
 Rule 4(a)(1)(A) .......................................................................5

Fed. R. Civ. P.
 Rule 65.............................................................................30, 48
 Rule 65(d) .................................................................. *passim*

**Other References**
Adriana Rezal, SFChronicle.com, *Data shows one promising sign that San
 Francisco homelessness crisis is improving* (Nov. 16, 2022), available at
 https://www.sfchronicle.com/sf/article/exiting-homelessness-
 data-17586982.php ...............................................................1

S.F. Rec. & Park. *Who We are*, available at https://sfrecpark.org/419/Who-We-Are
 (last visited Feb. 20, 2023) ...................................................43

U.S. Dep't of Hous. & Urban Dev., 2019 Annual Homeless Assessment Report to Congress (2022) available at https://www.huduser.gov/portal/datasets /ahar/2022-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html ................46

**INTRODUCTION**

Like nearly every major American city, the City and County of San Francisco ("San Francisco" or "City") faces a homelessness crisis, exacerbated in recent years by the influx of opioids on the streets. San Francisco has made major commitments of resources to address that crisis. Those commitments are seeing promising results. An increase in the number of permanent supportive housing placements and programs like San Francisco's Rapid Rehousing program have led to a decrease in the number of San Franciscans experiencing homelessness from 2019 to 2022.[1] But the district court's ruling, requiring that San Francisco provide housing for every person experiencing homelessness before it can enforce many of its most important laws as to particular encampments, places San Francisco in an impossible situation. The ruling ignores the careful balance San Francisco constructed between providing compassionate services and offers of shelter to individuals experiencing homelessness, and the need to maintain its public spaces and safeguard all of its residents and businesses.

San Francisco has an entire department, the Department of Homelessness and Supportive Housing ("HSH"), *solely* focused on providing shelter and housing

---

[1] https://www.sfchronicle.com/sf/article/exiting-homelessness-data-17586982.php.

to persons experiencing homelessness.[2] HSH has an annual budget of $672 million. Its latest analysis suggests that San Francisco would need an *additional* $1.45 billion to shelter everyone experiencing homelessness within the City. Combined, this would total *more than a third* of San Francisco's general fund budget. Request for Judicial Notice ("RJN"), Exhibit A, p. 20. But tripling its already significant expenditures on this crisis is unrealistic.

As a result, San Francisco's elected policy makers must balance the needs of those experiencing homelessness with the needs of all San Franciscans for safe and clean public spaces. Thousands of persons experiencing homelessness sleep on City streets in sleeping bags, tents, and makeshift structures. These encampments block sidewalks, prevent employees from cleaning public thoroughfares, and create health and safety risks. Local businesses and residents also need to use these same public spaces. Often encampments exist just outside of apartment buildings, schools, and other community buildings, forcing families with children and persons with disabilities to navigate them. San Francisco's poorest and most vulnerable neighborhoods are unfortunately often those wrestling hardest with the challenges encampments present.

---

[2] San Francisco uses the terms "homelessness" and "persons experiencing homelessness" in its brief, as those are the terms used in the underlying district court injunction.

San Francisco implemented a process of "encampment resolutions" to reconcile these competing interests. Encampment resolutions allow the City to clean and secure streets and other public spaces for the public's use, while also offering services and shelter to individuals experiencing homelessness.

Plaintiffs, a group of homeless advocates and people experiencing homelessness, challenge this process. They accuse San Francisco of violating the Eighth and Fourth Amendments through its policies for cleaning and securing public property, including the policies surrounding encampment resolutions.

Relying on an erroneous reading of *Martin v. City of Boise*, 920 F.3d 584 (9th Cir. 2019), and its progeny, the district court misapplied the facts in this case. That misapplication led it to grant a sweeping preliminary injunction that prohibits San Francisco from enforcing or threatening to enforce three sections of the California Penal Code and two sections of the San Francisco Police Code[3] that collectively prohibit sitting, sleeping, lying, or camping on public property ("sit/sleep/lie laws") until the City has enough shelter capacity for every resident experiencing homelessness. Notably, none of the Plaintiffs have ever been cited or

---

[3] These include California Penal Code Sections 370, 372, and 647(e) and San Francisco Police Code sections 168 and 169. 1-ER-50. The district court also enjoined San Francisco from using California Penal Code section 148(a) to enforce or threaten to enforce any of the other referenced sections. *Id*.

arrested for violating those laws. The injunction also limited the process by which San Francisco can remove bulky or abandoned property from its sidewalks.

By prohibiting San Francisco from using its law enforcement authority to require residents living in encampments to move to other, more suitable locations, the district court effectively empowered persons experiencing homelessness to determine where encampments will be located. According to the Plaintiffs and the apparent scope of the order, San Francisco cannot enforce validly enacted sit/sleep/lie laws even against an individual who already has an assigned shelter bed, or who has been offered a shelter bed but refused to accept it. The district court's statements have gone so far as to imply the injunction limits the level of police presence San Francisco may have on its own streets, under the view that an officer's presence might be interpreted as a threat of enforcement. The district court order also has the practical effect of pressuring San Francisco into diverting resources from its housing-first policy, focused on permanent stable housing, to a shelter-first approach, focused on temporary emergency shelter. Neither the Constitution nor this Court's precedents support such judicial overreach.

This Court should vacate the injunction because the district court misapplied the law, and in doing so, exceeded its jurisdiction. Although San Francisco agrees addressing homelessness is an urgent concern, the injunction, which needlessly

rends control of the issue from elected policy makers and places it with the court, is not a solution the law supports.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. On December 23, 2022, the district court issued a two-pronged preliminary injunction requiring San Francisco to cease enforcing or threatening to enforce sit/sleep/lie laws against the involuntarily homeless and enjoining San Francisco from violating its own policy regarding the handling of abandoned property, referred to as a "Bag and Tag" policy. 1-ER-050. San Francisco filed a timely notice of appeal. 11-ER-2636-37; *see* FRAP 4(a)(1)(A). This Court has jurisdiction over the appeal of the district court's interlocutory order under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

This appeal presents the following issues:

1.     Did the district court err by examining Eighth Amendment rights through a collective, rather than an individual, lens?

2.     Did the district court err when it enjoined enforcement of sit/sleep/lie laws in all areas of San Francisco?

3.     Did the district court err when it prohibited San Francisco from enforcing the sections of the San Francisco Police Code that control tents on public property and establish time and place restrictions on camping?

4. Did the district court err when it imposed an unworkable formula for assessing how long the injunction will remain in effect?

5. Did the district court err under Rule 65(d) of the Federal Rules of Civil Procedure by failing to define the terms "involuntarily homeless" and "threaten to enforce" to give San Francisco fair notice of all enjoined conduct, and then summarily denying on procedural grounds San Francisco's request for clarification?

6. Did the district court err by improperly conflating a technical violation of San Francisco's own "Bag and Tag" policy with a civil rights violation?

## STATEMENT OF THE CASE

### I. Background Facts

#### A. Overview Of San Francisco's Homelessness Response System

San Francisco's response to the homelessness crisis is managed by its Department of Homelessness and Supportive Housing ("HSH"), with an annual budget of $672 million. 5-ER-1041. While significant, this figure does not reflect the total amount San Francisco spends on homeless services and supportive housing, because it excludes the value of other departments' contributions to homeless-serving programs, including the Department of Public Health ("DPH"), the Department of Public Works ("DPW"), the Department of Emergency Management ("DEM"), the Police Department ("SFPD"), and the Fire Department

("SFFD"). All of these departments partner with HSH to provide homeless

services. 5-ER-1040.

The collective efforts of these departments have had a measurable impact on

the number of San Franciscans facing homelessness. Between 2019 and 2022, San

Francisco increased its shelter bed capacity and reduced the number of unsheltered

homeless persons by 15 percent. 5-ER-1040-1041. San Francisco did so through a

coordinated and compassionate array of supportive services, the core components

of which are: (1) coordinated entry; (2) street outreach; (3) temporary shelter and

crisis intervention; (4) problem-solving; (5) homelessness prevention; (6)

supportive housing; and (7) the housing ladder. 5-ER-1041.

### 1. Coordinated Entry

Coordinated entry is the "front door" for connecting households

experiencing homelessness to the resources needed to resolve their housing crisis.

Last year, HSH's Coordinated Entry program conducted 8,743 assessments. 5-ER-

1042.

### 2. Street Outreach

San Francisco's Homeless Outreach Team ("SFHOT") provides citywide

outreach seven days a week, connecting individuals living outside with available

and appropriate resources, through outreach, engagement, and case management.

SFHOT works collaboratively with DPH's Street Medicine team to address

medical and behavioral health needs of people experiencing homelessness. During

the 2021 fiscal year, SFHOT made 1,652 shelter placements through this citywide outreach work. In addition, SFHOT made approximately 1,000 placements in coordination with HSOC encampment resolutions. 5-ER-1041. Specialized outreach teams also provide services-first alternatives to law enforcement for 911 calls or 311 calls from the public. 5-ER-1041.

### 3. Temporary Shelter And Crisis Intervention

HSH's temporary shelter inventory includes navigation centers, transitional housing, cabins, trailers, Shelter-in-Place hotels, other forms of congregate, non-congregate, and semi-congregate shelters, stabilization beds, and safe sleep sites. By the end of 2022, when the preliminary injunction papers were filed, HSH planned to open approximately 1,000 shelter beds through a combination of new programs and reopening or expanding programs that had been closed or curtailed during the pandemic. 5-ER-1042.

### 4. Problem Solving

HSH's Problem Solving Program focuses on clients who do not require ongoing support, but who can benefit from a timely intervention, such as a one-time flexible grant to help resolve their homelessness or to reconnect with a support network. 5-ER-1042.

### 5. Homelessness Prevention

Last year, HSH's Homelessness Prevention Program disbursed $4.7 million to households needing assistance with back rent, future rent, and/or move-in costs. 5-ER-1042.

### 6. Supportive Housing

HSH devotes more than half of its annual budget to supportive housing, offering permanent solutions to homelessness. 5-ER-1043. Last year, HSH moved 2,057 households into supportive housing and maintained approximately 11,000 households in existing permanent supportive housing. *Id*. And HSH acquired six sites for permanent supportive housing, which will provide 625 additional units with over 1,100 bedrooms. *Id*. HSH's newest supportive housing project at 1064 Mission Street offers 256 units of supportive housing, with on-site services and a culinary job training and education program. *Id*.

### 7. Housing Ladder

HSH's Housing Ladder Program offers opportunities for tenants in supportive housing, when appropriate, to move up the "ladder" to subsidized housing using lower levels of support services. 5-ER-1039-44. Last year, HSH opened the Abigail Hotel on McAllister Street as a new Housing Ladder site. 5-ER-1043.

### 8. Effects Of Covid-19

The Covid-19 pandemic prompted significant changes in San Francisco's response to homelessness, as compared both to the City's response immediately prior to the pandemic and to the City's current response as the pandemic wanes. For this reason, data around homelessness issues and supportive housing during Covid-19 has limited utility in assessing the City's current practices.

For example, to comply with Covid-19 health guidelines, HSH was required to reconfigure its congregate shelters, reducing their capacity by 70% in the 2020-2021 timeframe, which led HSH to open a new congregate shelter site. 5-ER-1043. The first Shelter-in-Place ("SIP") hotel sites opened in April 2020 to provide temporary non-congregate shelter for people experiencing homelessness who were most vulnerable to Covid-19. At its highest capacity, San Francisco's SIP Hotel Program provided 2,288 rooms across 25 sites. *Id.* HSH opened a SIP trailer site at Pier 94 with a capacity of 116 trailers. *Id.* Isolation and Quarantine (IQ) sites provided safe places for people with Covid-19 to recover. The City managed as many as 538 IQ hotel rooms and shelter beds. *Id.* The Safe Sleep Program created tent sites where people could sleep a safe distance apart from each other, off the public sidewalks, with services available. At its peak, the Safe Sleep Program offered five tent sites. *Id.*

As the City emerges from Covid-19, HSH is winding down the Shelter-in-Place Hotel program. HSH now maintains two SIP hotel sites accommodating

approximately 400 guests. 5-ER-1043-44. HSH will add one of those sites to its permanent supportive housing inventory and will continue to operate the trailer site at Pier 94 as a long-term program. *Id*. HSH has closed three of the Safe Sleep Sites and plans to maintain two sites with a combined capacity for approximately 60 guests. *Id*.

### B. HSOC Encampment Resolutions.
#### 1. Planning

San Francisco's Healthy Streets Operation Center ("HSOC") conducts several homeless encampment resolutions ("HSOC engagements") each week, each of which can cover an area of up to a few City blocks. The goals of HSOC engagements are to (1) conduct outreach to clients, (2) offer services and housing to clients, (3) remove hazardous or abandoned tents, structures, and vehicles, and (4) clean and secure the site. 5-ER-1052.

HSOC engagements are planned and coordinated in advance across multiple departments, including SFPD, DPW, DEM, DPH, and/or SFFD. Each week the HSOC Director circulates a proposed schedule of times and locations for the next week's engagements, including projected shelter needs for clients likely present at each engagement. The Director finalizes the schedule on Wednesday after consulting with the participating departments. 5-ER-1052. The projected shelter needs are sent to HSH's guest placement services team, which uses the data to inform HSH's shelter allocations for the following week. 5-ER-1052.

## 2. Advance Notice

Each weekend, typically on Saturdays, SFHOT outreach workers conduct outreach at each of the scheduled encampments. 2-ER-173; 2-ER-188-89. The SFHOT weekend staff provide the occupants of the encampment verbal notice of the upcoming HSOC resolution, assess them for housing and interest in shelter or other services, explain the process for accessing shelter, explain what to expect on the day of the resolution, and post written notices of the upcoming HSOC resolution in and around the encampment. 2-ER-173; 2-ER-189.

The written notice includes the date and location of the upcoming resolution and informs occupants that "During the encampment resolution, we will provide access to shelter, safe sleeping villages, and/or hotels based on eligibility." 5-ER-1066. The written notice further informs encampment occupants:

> Please also note that during the resolution, the Department of Public Works will clean the sidewalks and street. **Any personal property that is left at the encampment will be removed and taken to the Publics Works Operations Yard at 2323 Cesar Chavez Street**.

*Id*. (original emphasis). The written notice also informs encampment occupants what types of items will *not* be stored but may be discarded:

> Please be advised that the following types of items will not be stored and may be discarded: (1) items that present an immediate threat to public health or safety (i.e., items that are soiled or infested with vermin, and needles), (2) items that are evidence of a crime, (3) trash, (4) perishable food, and (5) bulky items (i.e., furniture, mattresses, sheds, structures, and pallets), except for tents and operational bicycles, walkers, crutches, wheelchairs.

*Id.* The written notice also explains how to retrieve property that has been collected and stored. *See id.*

### 3.   Advance Assessment Of Interest

Also in advance of each HSOC engagement, outreach specialists visit the encampment, engage those on-site to assess interest in available treatment or services, and remind people of the upcoming HSOC engagement. 5-ER-1053. This advance report ensures San Francisco is equipped to provide behavioral health resources matching the needs of the clients during the encampment resolution. 5-ER-1053, 5-ER-1073-74.

### 4.   Day Of The Encampment Resolution

During HSOC resolutions, San Francisco offers encampment occupants shelter and provides them additional time to pack up and move their belongings. On the morning of HSOC resolutions, SFHOT outreach workers again conduct outreach at the encampment. *See* 2-ER-173, 189. The Encampment Resolution Team ("ERT") – SFHOT outreach workers assigned to staff HSOC resolutions – arrives at the encampment at 7:00 a.m. and begins engaging encampment occupants by 7:30 a.m. 2-ER-173; 2-ER-189; 5-ER-1053-54; *see also* 5-ER-1047. ERT reminds encampment occupants of the timeframe and process of the HSOC resolution, and – as discussed with encampment occupants the weekend prior – offers to connect them to various services, including shelter. 2-ER-173, 2-ER-189. The DPH street medicine team provides a range of services at HSOC encampment

resolutions, including: (a) assisting with de-escalation, crisis management, and

5150 assessments[4]; (b) engaging all clients with reported or observed behavioral

health symptoms; (c) assessing clients for interest in services and determining

appropriate referrals; and (d) completing referrals and linkage to services. 5-ER-

1073. ERT informs encampment occupants that shelter is available, and if an

individual is interested, ERT takes their information, including their preference for

any specific shelter or type of shelter. 2-ER-189. By around 8:30 a.m., HSH

communicates to HSOC the specific available shelter space allocated to HSOC that

day, so that those who have expressed interest can be matched to a shelter bed. 5-

ER-1054; 2-ER-189; 2-ER-173.

ERT then reengages with encampment occupants to match those interested

in shelter with an appropriate placement. 2-ER-173, 189; 5-ER-1054. At 9:30 a.m.,

HSH confirms shelter availability. 2-ER-173, 190; 5-ER-1054. Throughout the

HSOC resolution, field staff, including ERT, are in regular communication with

HSH about who is interested in shelter and any specific shelter needs or

preferences. 2-ER-174, 189; 5-ER-1054. If an encampment occupant is interested

in shelter, HSH confirms they are not already housed or sheltered in a San

---

[4] California Welfare & Institutions Code § 5150 permits the involuntary 72-hour commitment of a person who, "as a result of a mental health disorder, is a danger to others, or to themselves." Cal. Welf. & Inst. Code § 5150 (West).

Francisco-supported program. 2-ER-190; 5-ER-1054.[5] Throughout the HSOC resolution – including before the 8:30 a.m. allocation and continuing after the 9:30 a.m. confirmation – HSOC-affiliated staff try to obtain the specific and/or additional shelter allocations requested by encampment occupants. 2-ER-174, 190; 5-ER-1054. Beginning around 9:30 a.m., HSOC arranges transportation for those individuals who have accepted a shelter placement. 2-ER-174, 190; 5-ER-1054.

DPW typically does not arrive at the encampment until 8:00 a.m. or later, and will not begin cleaning up an encampment until after ERT has conducted outreach, typically around 9:30 or 10:00 a.m. *See* 2-ER-174; 5-ER-1047, 1055. While DPW waits for ERT to conduct outreach, and for instructions to begin cleaning at the encampment, DPW performs a variety of other street-cleaning duties around the perimeter of the encampment that do not displace those at the encampment. 5-ER-1047.

DPW is in regular communication with ERT and the HSOC Incident Commander about ERT's outreach, including who has left the encampment and who needs more time to pack up their belongings. 2-ER-158, 174; 5-ER-1047. DPW stores and discards items left behind pursuant to its policy and procedure for the removal and temporary storage of personal items collected from public

---

[5] It is not uncommon for someone who has already accepted a shelter placement to nevertheless be residing in an encampment rather than in their shelter. 2-ER-190.

property, known as its "Bag and Tag" policy. *See* 5-ER-1047. The policy provides

that:

> a.      Upon inspection by street-cleaning staff, unattended personal property—where neither the owner nor anyone who states that they have been designated by the owner to watch the property is present—will be collected and stored for retrieval.
>
> b.      Except as described below, all unattended personal property that is collected for storage will be bagged and tagged upon collection and taken to the Public Works Operations Yard for storage.

3-ER-409. The policy authorizes DPW to discard "Items that present an immediate

health or safety risk"; "Perishable items, perishable food"; "Contraband, illegal

items"; "Trash, garbage, and/or debris"; and "Abandoned property." 3-ER-410.

The policy defines "Abandoned property" as follows:

> Abandoned property is property that does not have any signs of ownership or does not appear to have any value or use. Examples of abandoned property may include such things as a broken tent sitting by itself on a sidewalk with no other belongings, clothes that are strewn across a sidewalk or other area, broken items, and trash.

3-ER-410. The policy further advises DPW staff that:

> •      Temporarily unattended property is different from abandoned property, which may be immediately discarded. In determining if property is abandoned, staff should evaluate the facts and circumstances surrounding the items. Unattended property is not abandoned if it is accompanied by signs of ownership – for example, an unattended tent that is filled with personal belongings or items that are being stored in an orderly manner (i.e., packed up, wrapped or covered) are not abandoned.
>
> •      In addition, if there is a third party present who states they have been designated to watch or secure the items during the owner's temporary absence, the items are not abandoned and are attended property (see below).
>
> •      By contrast, abandoned items are unaccompanied by objective indications of ownership, for example, an empty or broken tent sitting by itself on a sidewalk with no other belongings, a bag of clothes open and strewn across a sidewalk,

> or items that are broken, disheveled, surrounded by trash or
> show other signs of neglect.

3-ER-409 (Distinguishing between unattended and abandoned property).

When any items are bag-and-tagged, DPW staff provide information to owners about when and where to retrieve the items. 5-ER-1048. If no one is present, a written notice including the date, time, and location of removal, a description of items removed, the removing DPW staff member's name and vehicle number, and instruction for retrieval, is posted in the immediate vicinity of the removal. *Id.* San Francisco stores items that have been bag-and-tagged at the Public Works Operations Yard at 2323 Cesar Chavez Street for either 14 days for bulky items or 90 days for all other items. 3-ER-411; 5-ER-1048.

## C. Employee Interactions With Persons Experiencing Homelessness Outside Of HSOC Resolutions.

San Francisco employees also engage with individuals experiencing homelessness outside of HSOC encampment resolutions as part of the City's routine maintenance operations.

For instance, DPW staff, who are not law enforcement officers, perform routine street cleaning around the City and respond to calls for service from residents in response to specific issues. *See* 5-ER-1048. When one of these requests for service brings a DPW employee into contact with a person experiencing homelessness, the DPW employee generally cleans around an individual's belongings. *Id.*; *see also* 3-ER-409. DPW employees generally do not

move or remove people or property from City sidewalks unless either there are health or safety issues or the public right-of-way is inaccessible. *Id.*; *see also* 3-ER-409. On those occasions where health and safety or an inaccessible right-of-way require DPW employees to request a homeless resident move, individuals are asked only to move temporarily during street cleaning. 5-ER-1048; *see also* 3-ER-409, 410. DPW staff also provide time for the person to move their belongings and inform them that unremoved items will be bag-and-tagged or discarded in accordance with DPW policy. 5-ER-1048; *see also* 3-ER-409, 410.

SFPD officers also engage individuals experiencing homelessness outside of HSOC encampment resolutions because of their larger role in community policing. *See* 5-ER-1036-37. SFPD officers are trained to adhere to SFPD Bulletin 19-080, which provides, *inter alia*, that S.F. Municipal Police Code § 168 ("Sit/Lie" law) may be enforced only between 0700 hours and 2300 hours and that "Officers must secure appropriate shelter before taking enforcement action" under Penal Code § 647(e) (illegal lodging). 5-ER-1036-37; *see also* 8-ER-2028-2031.

SFHOT outreach workers also conduct outreach to individuals experiencing homelessness outside of HSOC encampment resolutions. 2-ER-174; 5-ER-1041, 1077. This outreach is specifically to offer services, connections, and/or referrals, and does not involve law enforcement, DPW, or any request to move (unless the clients are going to a shelter placement). 2-ER-174; 5-ER-1077.

## II.    Plaintiffs' Allegations And Evidence

Plaintiffs accused San Francisco of "pretextual weaponization of shelter [to] unconstitutionally punish involuntary homelessness." 7-ER-1583. Specifically, Plaintiffs alleged that, because San Francisco does not have enough shelter for every unhoused individual within city limits, "any criminal enforcement within the City is unconstitutional per se." 7-ER-1582. Plaintiffs alleged that any enforcement of lawfully enacted sit/sleep/lie laws against homeless individuals in San Francisco violates the Eighth Amendment. 7-ER-1581. Additionally, Plaintiffs alleged that San Francisco has a pattern of unlawfully discarding the belongings of people experiencing homelessness in violation of the Fourth Amendment.

### A.    Allegations And Evidence Regarding Enforcement

None of the Plaintiffs alleged that they had ever been arrested or cited for any offense related to the enforcement of the challenged sit/sleep/lie laws. 11-ER-2531-35, 7-ER-1557-1592. Instead, Plaintiffs rely on the declaration of Dr. Christopher Herring, a sociology professor. Dr. Herring offered a number of opinions about San Francisco's policies, but specifically criticized San Francisco for "police enforcement against homeless individuals despite the lack of available shelter, including citing and arresting individuals during camp clearances even when adequate shelter was not available or offered." 7-ER-1614-20. Dr. Herring's initial declaration relied on data gathered one or more years before the preliminary

injunction hearing. 7-ER-1614-20 (citing data from up to June of 2021 and as far back as 2014). In his supplemental declaration, submitted in a reply brief, Dr. Herring, for the first time, cited data from 2022. Specifically, Dr. Herring claimed in his supplemental declaration that "SFPD cited or arrested individuals for illegal lodging under Cal. Penal Code § 647(e), public nuisance under Cal. Penal Code § 372, and for failure to obey a law enforcement order to vacate or 'move along' at least 517 times in 2022—with the vast majority of citations and arrests falling under Cal. Penal Code §148(a)." 5-ER-947. Dr. Herring did not explain how many of these were arrests versus citations, or how many were §148(a) citations, which applies in numerous circumstances other than interactions with people experiencing homelessness. San Francisco was not afforded a sur-reply, and did not have the opportunity to counter this new evidence and analysis because it appeared for the first time in Plaintiffs' reply.

Plaintiffs also relied heavily on vague inadmissible hearsay. 7-ER-1669-1671 ("One individual … told us"); 7-ER-1675, 1677-1678 ("unhoused individuals reporting"; "I have spoken to"; "People reported"); 7-ER-1696, 1697-1698 ("I have spoken to people," "I learned of this in speaking with," "We learned what had happened by talking to," "I received text updates"); 7-ER-1702, 1703-04, 1705-07 ("I ordinarily could not be physically present," "I have heard countless reports," "Often, I hear people say," "I know from my conversations," "I arrived toward the

end of this sweep. I spoke with…," "I later learned," "Individuals reported to me," "He told us," "We heard that residents were told").

### B.     Alleged Fourth Amendment Violations

Plaintiffs did not dispute the constitutionality of San Francisco's "Bag and Tag" policy, which dictates how DPW should handle property belonging to persons experiencing homelessness. Instead, they pointed to sporadic incidents where Plaintiffs claim DPW failed to comply with its own policy as evidence of systematic violations. A total of eight declarants, out of an unhoused population of roughly 8,000 people, complained that DPW improperly damaged or destroyed their property. Three declarants described their property being confiscated and destroyed at an HSOC resolution in 2022. 7-ER-1726, 7-ER-1732, 8-ER-1832. Seven declarants, two of whom had also submitted declarations regarding HSOC resolutions, described being disturbed by DPW street-cleaning operations and their belongings, including tents, being damaged or destroyed during DPW street-cleaning operations in 2022. 7-ER-1718-19; 7-ER-1722-1723; 7-ER-1729; 7-ER-1732; 8-ER-1793-1796; 8-ER-1806-1807; 8-ER-1831-1832.

## PROCEDURAL HISTORY

### I.     Briefing And Discovery Prior To Preliminary Injunction

Plaintiffs filed their preliminary injunction motion at the same time as their complaint on September 27, 2022. 11-ER-2531-2635, 7-ER-1557-1592. Although

Plaintiffs explained they had "dedicated the last three years" to building their case and assembling supporting evidence, 7-ER-1565, including devoting over 10,000 hours of staff and volunteer time, 7-ER-1664-1665, they opposed San Francisco's request for additional time to respond to the motion.

The district court granted San Francisco four additional weeks (until November 15, 2022) to respond, but conditioned the extension on an interim order requiring San Francisco to provide 72-hour advance notice to Plaintiffs of any encampment resolutions, and to also produce to Plaintiffs certain information on a weekly basis while the preliminary injunction motion remained pending. 6-ER-1487-1490, 6-ER-1454-1455. The district court further required San Francisco to produce a year's worth of "relevant and related records" if it relied on any "individual or aggregated records" in its preliminary injunction opposition, and required that such records be collected, processed, and produced less than two days after San Francisco opposed the motion. 6-ER-1450-1452.

On November 15, 2022, San Francisco filed its opposition. 5-ER-1012-1034. San Francisco included declarations of nine percipient witnesses across multiple departments, setting forth in detail its policies and practices regarding homeless outreach, shelter placement, and police enforcement. 5-ER-1024-1033. San Francisco avoided relying on "individual or aggregated records" because much of Plaintiffs' evidence was remote in time and vague as to dates, making it difficult

to identify specific rebuttal evidence, and because of the impracticality of processing and producing a year's worth of "relevant and related records" less than 48 hours after filing the opposition, as the district court required. San Francisco objected to Plaintiffs' irrelevant and stale evidence, stretching back as far as the summer of 2018, well before the Covid-19 pandemic caused San Francisco to fundamentally alter its homelessness and law enforcement policies, and to Plaintiffs' heavy reliance on hearsay. 5-ER-1030-1033.

Plaintiffs filed their reply papers on December 2, 2022, pursuant to the extended briefing schedule, which included additional evidence. 3-ER-496-5-ER-935. San Francisco objected to Plaintiffs' reply evidence on December 13, 2022, nine days before the hearing date. 3-ER-488-493.

## II.    Preliminary Injunction Order And Motion For Clarification

The district court heard argument on December 22, 2022. 3-ER-358-404. Twenty-eight hours after the hearing, the district court issued its 50-page order enjoining San Francisco from enforcing or threatening to enforce state or local laws "to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property," and prohibiting San Francisco from violating its "Bag and Tag" policy embodied in DPW Procedure No. 16-05-08 (REV 03). 1-ER-50. The order stated that the injunction remains in place until San Francisco has enough shelter beds to house every person experiencing homelessness in the City. *Id.* It

also denied San Francisco's objections to the new evidence submitted with Plaintiffs' reply without offering San Francisco an opportunity for a sur-reply brief.

The injunction prohibits San Francisco from enforcing or threatening to enforce its sit/lie/sleep laws against "involuntarily homeless individuals," so long as the number of homeless people exceeds the number of available shelter beds. 1-ER-050. It states:

> Defendants are preliminarily enjoined from enforcing or threatening to enforce, or using California Penal Code section 148(a)[6] to enforce or threaten to enforce, the following laws and ordinances to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property:
>
> • California Penal Code section 647(e)[7];
> • California Penal Code section 370[8];
> • California Penal Code section 372[9];

---

[6] "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, … in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment." Cal. Penal Code § 148(a).

[7] "[E]very person . . . [w]ho lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control of it" is "guilty of disorderly conduct, a misdemeanor[.]" SFPD Enforcement Bulletin 2 demands that "[o]fficers must secure appropriate shelter before taking enforcement action under Penal Code Section 647(e)." Cal. Penal Code § 647(e) ; 8-ER-2028-2031.

[8] "Anything which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or by any considerable number of persons, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a public nuisance." Cal. Penal Code § 370.

[9] "Every person who maintains or commits any public nuisance, the punishment for which is not otherwise prescribed, or who willfully omits to perform any legal

• San Francisco Police Code section 168[10]; and
• San Francisco Police Code section 169[11].
1-ER-050.

The injunction also requires San Francisco to comply with the current version of its "Bag and Tag" policy, stating "Defendants are preliminary enjoined from violating San Francisco's bag and tag policy as embodied by DPW Procedure No. 16-05-08 (REV 03)." 1-ER-050.

The injunction did not define its term "involuntarily homeless," which was open to at least two possible interpretations. The broader interpretation is that every person in San Francisco remains involuntarily homeless until San Francisco has enough adequate shelter beds to offer a bed to each homeless resident, regardless of whether San Francisco has made an offer of shelter to a particular individual. The narrower interpretation is that a person is no longer involuntarily homeless when San Francisco makes an offer of adequate shelter to that person. The difference between these two interpretations is of monumental importance

---

duty relating to the removal of a public nuisance, is guilty of a misdemeanor." Cal. Penal Code § 372.

[10] "In the City and County of San Francisco, during the hours between seven (7:00) a.m. and eleven (11:00) p.m., it is unlawful to sit or lie down upon a public sidewalk, or any object placed upon a public sidewalk," punishable "by a fine of not less than $50 or more than $100 and/or community service" for the first offense. S.F., Cal., Police Code § 168(b), (f)(1).

[11] Section 169 and is "a non-criminal prohibition on encampments on City sidewalks that DPW, DPH, or DHSH may enforce." It provides that "[i]n the City and County of San Francisco, it is unlawful to place an Encampment upon a public sidewalk." S.F., Cal., Police Code § 169(c).

because San Francisco lacks enough shelter beds to offer shelter to every homeless individual, and bridging that gap would cost $1.45 billion. 3-ER-335.

San Francisco promptly sought clarification of the meaning of "involuntarily homeless" in the injunction through an administrative motion. 3-ER-316-22. In the alternative, San Francisco requested a briefing schedule on the motion for clarification. *Id.*

At a combined status conference and motion hearing on January 12, 2023, the district court denied San Francisco's motion for clarification, stating it was "procedurally improper as it seeks substantive relief beyond the scope of a motion for administrative relief." 2-ER-092-094. The court did not address San Francisco's alternative request for a briefing schedule. *Compare* 3-ER-316-22 *with* 2-ER-092-94.

Eleven days later on January 23, 2023, San Francisco filed its notice of appeal. 11-ER-2636-37.

### III.    San Francisco's Policy Change In Response To The Injunction

As a combined result of the injunction and the district court's failure to consider San Francisco's' request for clarification, San Francisco was forced to modify its policies regarding the SFPD's ability to enforce sit/sleep/lie laws anywhere in the City at any time, in order to avoid violating the injunction. The modified policy states that SFPD officers "may 'NOT use, enforce, or threaten to

enforce' the [laws enumerated in the injunction] to prohibit homeless individuals from sitting, lying, or sleeping on public property." RJN Exhibit B, SFPD Department Notice 23-007. It also states that if an officer asks a person leave an encampment the request must "make it clear there is no possibility of enforcement of the enumerated laws if the individual declines to move." *Id.*

## STANDARD OF REVIEW

This Court reviews "the legal premises underlying a preliminary injunction" de novo. *Federal Trade Comm'n v. Enforma Nat. Prods., Inc.,* 362 F.3d 1204, 1211 (9th Cir. 2004). Otherwise, the district court's entry of the preliminary injunction is reviewed for abuse of discretion. *Id.* (citing *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000)). Thus, this Court may vacate the preliminary injunction if the district court failed to apply the correct legal standard, rested the decision "on a clearly erroneous finding of fact that is material to the decision," or applied "an acceptable preliminary injunction standard in a manner that results in an abuse of discretion." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 724 (9th Cir. 1983). A district court "abuses its discretion by fashioning an injunction which is overly broad," *United States v. AMC Ent., Inc.*, 549 F.3d 760, 768 (9th Cir. 2008), or if it is too vague to provide "fair and precisely drawn notice of what the injunction actually prohibits." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 444 (1974).

Preliminary injunctions are "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Green*, 553 U.S. 674, 689-690 (2008)). The remedy requires "the exercise of a very far reaching power" that should not be "indulged except in a case clearly warranting it." *Dymo Indus. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964) (citing *Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956)).

## SUMMARY OF ARGUMENT

This Court should vacate the preliminary injunction because it misreads *Martin* and its progeny, which caused the district court to misapply the facts, and because it is unreasonably vague.

First, the injunction prohibits San Francisco from enforcing or threatening to enforce sit/sleep/lie laws against anyone experiencing homelessness unless or until San Francisco has sufficient shelter beds to house every person in the City experiencing homelessness, even against individuals to whom San Francisco has already offered adequate shelter. This is not the law. *Martin*, 920 F.3d at 616 (prohibiting enforcement against "homeless individuals who cannot obtain shelter"). The Eighth Amendment protects the rights of individuals and should not be defined collectively. *Haines v. Kerner*, 492 F.2d 937, 942 (7th Cir. 1974).

Second, even if the district court's injunction were narrowed to permit enforcement of sit/sleep/lie laws against an individual who has personally been

offered shelter, it would still be unconstitutional and unworkable. This Court's precedents only prohibit enforcement of sit/sleep/lie laws against a person experiencing homelessness who has nowhere else to go. *Johnson v. City of Grants Pass*, 50 F.4th 787, 793 (9th Cir. 2022) (affirming *Martin*). But that is not the case in the context of encampment resolutions. During an encampment resolution San Francisco does not prohibit an individual from sitting, sleeping, or lying on all public property, but only on those few blocks where the encampment resolution is set to occur. Enforcement of sit/sleep/lie laws under these circumstances is consistent with the Eighth Amendment rights of individuals experiencing homelessness. The injunction is additionally problematic because it impermissibly prohibits San Francisco from controlling tents and other structures on public property under San Francisco Police Code section 169, and also prohibits San Francisco from imposing reasonable time and place restrictions on public camping under San Francisco Police Code Section 168, both of which are permissible under *Martin* and *Grants Pass*.

Third, by its own terms, the injunction remains in effect until the total number of available shelter beds exceeds the total homeless population, even though it is logistically impossible for San Francisco to know the number of unsheltered residents and the total number of available beds every night. It is thus impossible for San Francisco to know when the injunction expires.

Fourth, the district court erred by using vague language to describe the critical questions of when and where the injunction applies, and then rejecting San Francisco's efforts at clarification. The injunction applies to those who are "involuntarily homeless" and prevents San Francisco from, among other things, "threatening to enforce" its sit/sleep/lie laws. Yet the district court failed to define either term. When San Francisco sought clarification, the district court denied the motion on procedural grounds, and refused to consider San Francisco's request in the alternative that the court issue a briefing schedule for a noticed motion on the issue. This lack of clarity is inconsistent with Rule 65 of the Federal Rules of Civil Procedure, which prohibits unreasonably vague orders.

Finally, the district court abused its discretion because it improperly elevated the standard set in San Francisco's "Bag and Tag" policy to the standards the Fourth Amendment sets. By enjoining San Francisco from any conduct that violates its current policy, the district court barred San Francisco from making lawful changes to that policy, and converted any minor or technical violation of the policy into a violation of a court order, contrary to settled Ninth Circuit law.

## ARGUMENT

I.   **The Injunction Exceeded What The Eighth Amendment And This Court's Precedents Require.**

   A.   **The District Court Adopted A Broad Injunction That Misapplied *Martin* By Construing The Eighth Amendment As A Collective Right.**

The Eighth Amendment prohibits the imposition of certain criminal penalties for sitting, sleeping, or lying on public property against a person who has nowhere else to go. *Martin*, 920 F.3d at 616-617 (prohibiting enforcement against "homeless individuals who cannot obtain shelter"); *Grants Pass*, 50 F.4th at 792 (affirming *Martin*). This Court has made clear, however, that the constraints *Martin* and *Grants Pass* impose on municipalities do not apply in the context of homeless individuals who either "have the means to pay" for shelter, or who have shelter offered "to them for free, but who chose not to use it." *Martin*, 920 F.3d at 617 n.8; *Grants Pass*, 50 F.4th at 792 n.2 (quoting *Martin* and excluding from the definition of "involuntarily homeless" "someone who has the financial means to obtain shelter, or someone who is staying in an emergency shelter"). A person is not "involuntarily homeless" if they are offered shelter before SFPD enforces or threatens to enforce a sit/sleep/lie law against them. *See Martin*, 920 F.3d at 617 n.8; *Grants Pass*, 50 F.4th at 792 n.2.[12]

---

[12] Not everyone experiencing homelessness chooses to accept an offer of shelter. There are also persons who obtain shelter space and choose to leave the space vacant in reserve and continue living as part of an encampment. 2-ER-190; 5-ER-1054.

This rule applies whether or not San Francisco has sufficient shelter beds to offer shelter to every *other* person experiencing homelessness in the city, because Eighth Amendment rights are held individually, not collectively. *Haines*, 492 F.2d at 942 (stating the Eighth Amendment provides a "constitutional guarantee[] of individual rights"); *Jones v. City of Los Angeles*, 444 F.3d 1118, 1148 (9th Cir. 2006) vacated, 505 F.3d 1006 (9th Cir. 2007) ("Here, there is no evidence of Eighth Amendment harm to any of the six homeless persons who prosecute this action and equitable relief cannot be based on alleged injuries to others") (Rymer, J., dissenting); *Whitley v. Albers*, 475 U.S. 312, 318 (1986) (applying the Eighth Amendment only to individuals convicted of crimes, not at the communal level).

Compliance with the Eighth Amendment must hinge on whether the *individual* against whom criminal enforcement is threatened or undertaken has access to adequate shelter. Yet, the injunction treats the Eighth Amendment as a collective right, prohibiting San Francisco from enforcing its sit/sleep/lie laws against a person experiencing homelessness even if San Francisco has first offered that individual shelter. By keeping its injunction in effect until the number of available shelter beds in San Francisco exceeds the number of individuals experiencing homelessness, the district court conflated an individual's Eighth Amendment right with a collective societal interest in shelter. 1-ER-50. As a practical matter, this means San Francisco can never enforce sit/sleep/lie laws on

public property until it spends over $1.45 billion to construct thousands of new shelter beds. The district court's all-or-nothing rule undercuts San Francisco's ability to regulate health and safety in its public spaces, in the service of a legal standard that is untethered to any individual's Constitutional rights, and despite San Francisco's regulatory interest in "reasonable regulations" to "protect the public health and the public safety." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905); *see also Hutchinson v. City of Valdosta*, 227 U.S. 303, 308 (1913) (recognizing there is nothing "to justify a court in interfering with so salutary a power and one so necessary to the public health").

This was an abuse of discretion because "[w]hen confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem" and "enjoin only the unconstitutional applications of a statute while leaving the other applications in force." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-329 (2006). Because the district court did not limit its solution to the problem presented, its overbroad injunction was an abuse of discretion. *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007) (injunctive relief that is not "narrowly tailored" is "an overbroad injunction" and constitutes an abuse of discretion); *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) ("A district court abuses its discretion by issuing an 'overbroad' injunction.").

This Court vacated in part and remanded the district court's injunction in *Grants Pass* under similar circumstances, determining that "the district court must narrow its injunction to enjoin only those portions of the anti-camping ordinances that prohibit conduct protected by *Martin* and this opinion." *Grants Pass*, 50 F.4th at 813; *see also Fund for Empowerment v. City of Phoenix*, No. CV-22-02041-PHX-GMS, 2022 WL 18213522, at *7 (D. Ariz. Dec. 16, 2022) (where "the unsheltered outnumber available beds," the public entity must "inquir[e] as to whether individuals can practically obtain shelter" before enforcing criminal prohibitions against those individuals). The overbroad injunction was not permitted to stand in *Grants Pass* and it cannot stand here. An injunction that makes one person's Eighth Amendment right dependent on the availability of shelter beds for all other homeless persons in San Francisco, regardless of that one person's interest in or willingness to occupy those beds, violates the law.

Relying on an erroneous application of the requirements of *Martin* and *Grants Pass*, the district court required San Francisco to put on affirmative evidence that every resident of the encampment was given an adequate offer of shelter during every encampment resolution before any person was threatened with enforcement, or cited, or arrested for violating sit/sleep/lie laws. The district court criticized a City declarant because "he does not actually state that SFHOT offers shelter to every homeless individual facing closure of their encampment." 1-ER-

41. And the district court criticized the City for not "offer[ing] declarations from SFHOT members testifying from personal experience that they offered an available shelter bed to every homeless individual affected by an encampment closure who wanted to sleep indoors." 1-ER-039. This is more than the law requires. San Francisco does not need to show offers of shelter being made to all in order to illustrate its compliance with the Eighth Amendment.

Even if the City had tried to present evidence that it had offered shelter to every single person at every single encampment where anyone was subject to enforcement, the district court imposed an impractical discovery burden on San Francisco. 6-ER-1450-52. The district court required San Francisco to produce a year's worth of police enforcement data and shelter availability and placement data just two days after filing its opposition if San Francisco relied on any "individual records" to oppose the injunction. *Id.* In other words, not only did the district court demand an improper level of proof from San Francisco, but it made it a practical impossibility for San Francisco to present such evidence given the timeline.

Similarly, it was both unnecessary and impractical for the City to satisfy the district court's requirement for evidence of offers of shelter made in connection with enforcement of sit/sleep/lie laws because Plaintiffs did not present evidence of actual individuals who had been cited or arrested for these offenses. No plaintiff in this case alleges that they have ever been arrested or cited under the laws at issue.

Instead, Plaintiffs relied on sets of data asserting enforcement against the population at large. To rebut that data, San Francisco would have had to go back to every citation included in that data set and establish that person had been offered shelter. But it would be impossible for the City to connect the persons in that spreadsheet to the anonymized persons in Dr. Herring's data set. Had San Francisco been provided the names of people that Plaintiffs allege were the subject of illegal enforcement, it may have been able to bridge that gap, but because there were no such specific allegations, it was impossible for the City to make such a connection. But because the Eighth Amendment is an individual right, not a collective one, San Francisco should have never been forced to make such a showing at large, rather than addressing the claims of actual Plaintiffs at an individual level.

### B. Even Under A Narrower Interpretation The Injunction Would Remain Unconstitutional And Unworkable.

#### 1. The Injunction Fails To Consider The Limited Geographic Scope Of An Encampment Resolution

Even if the injunction permitted San Francisco to enforce its sit/sleep/lie laws after making an adequate offer of shelter to a person experiencing homelessness, the injunction would remain unconstitutional and unworkable. *Martin* hinged on whether the person against whom the anti-camping ordinance was enforced had somewhere else to go. San Francisco's HSOC encampment resolutions clear only a few City blocks. Enforcement of sit/sleep/lie laws at the

site of a resolution is consistent with the Eighth Amendment even if San Francisco makes no offer of shelter, because there are miles of other public space in the City to which an encampment resident may move. In other words, encampment residents, unlike the *Martin* plaintiffs, have somewhere else to go.

Encampments along San Francisco's nearly 800 miles of streets can build up trash and debris and block the right-of-way for pedestrians. *See e.g.*, 5-ER-1164, 1169.; 6-ER-1200, 1221, 1225, 1235-1238, 1241, 1243, 1247. It falls to San Francisco to protect public safety in the face of sidewalk encampments, including through removing hazardous or abandoned property as well as cleaning and securing the sidewalk after campers have been relocated. 5-ER-1052. This is a right and a responsibility. *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 160-161 (1939) ("Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for the movement of people and property, the primary purpose to which the streets are dedicated" while at the same time respecting "the constitutional liberty of one rightfully upon the street."). San Francisco manages this process through HSOC encampment resolutions, and its policy provides that the locations where a planned resolution will occur is posted days in advance of the resolution. 2-ER-173, 2-ER-189, 2-ER-192-93, 2-ER-194-95. Prior to the injunction, when an individual living in an encampment chose not to move to another public space either in response to the

advance notices or on the day of the resolution itself, SFPD had the authority to threaten to cite or to cite an individual for a violation of San Francisco's sit/sleep/lie laws to effect the resolution. The injunction took away that power by enjoining enforcement of the relevant laws in all of San Francisco's public spaces. 1-ER-050.

Although the district court granted San Francisco permission to ask people to temporarily move for cleaning, as soon as the cleaning is complete there is no way for San Francisco to prevent people from re-occupying the same space and continuing to engage in the conduct that created the health hazard in the first place. It simply is not the law that homeless residents are free to dictate the location of their encampments to the exclusion of local governments that are charged with making those same public locations safe and accessible to all. Each HSOC encampment resolution covers at most a few blocks of City property. Enforcing the sit/sleep/lie laws at the sites of encampment resolutions does not prevent residents experiencing homelessness from sitting, sleeping, or lying elsewhere in San Francisco limits, but only in those areas where the encampment resolution is scheduled to occur. For that reason, the district court should have permitted San Francisco to enforce sit/sleep/lie laws as part of HSOC encampment resolutions, even if it limited the application of those laws elsewhere. The resulting injunction was overbroad because it forbade the geographically limited and focused

enforcement that occurs during an encampment resolution. Those encampment resolutions do not leave an individual with "nowhere else" to go, which was the motivating concern in *Martin*. *Martin*, 920 F.3d at 590 (Berzon, J., concurring). Nothing in the Constitution or this Court's precedent requires San Francisco to surrender its streets, sidewalks, and other public areas to encampments and thereby abdicate its responsibility to provide clean, safe, and accessible public space to *all* residents. *Martin's* "holding is a narrow one" that does not "allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Martin*, 920 F.3d at 617, n.8. The key question is whether the individual to be cited "had a choice in the matter." *Id*. at 617. An individual who remains at an encampment after notice of a resolution has been posted, rather than moving to other available public space in San Francisco, has just such a choice.

District courts following *Martin* have affirmed policies that prohibit sitting, lying, camping, or sleeping in certain areas of a city, regardless of the total number of homeless residents, so long as the policies do not prohibit those same activities everywhere. *See e.g., Grants Pass,* 50 F.4th at 812 n.33 (collecting cases); *Shipp v. Schaaf*, 379 F. Supp. 3d 1033, 1037 (N.D. Cal. 2019) (rejecting Eighth Amendment claim where city posted 72-hour notice prior to action); *Gomes v. Cnty. of Kauai*, 481 F. Supp. 3d 1104, 1109 (D. Haw. 2020) (dismissing Eighth Amendment claim and holding public entity could clear out a specific homeless

encampment because *Martin* does not "establish a constitutional right to occupy public property indefinitely at Plaintiffs' option"); *Carlos-Kahalekomo v. Cnty. of Kauai*, No. CV 20-00320 JMS-WRP, 2020 WL 4455101, at \*3 (D. Haw. Aug. 3, 2020) (dismissing post-*Martin* lawsuit because anti-camping ordinance was limited in geography and time of day); *Fitzpatrick v. Little*, No. 1:22-CV-00162-DCN, 2023 WL 129815, at \*5 (D. Idaho Jan. 9, 2023) (dismissing claim regarding statute that only prohibited camping in areas immediately surrounding the capitol); *Frank v. City of St. Louis*, 458 F. Supp. 3d 1090, 1094 (E.D. Mo. 2020) (dismissing claim where ordinance was limited to certain areas of the city). This is because individuals who have the capacity to sleep in other public spaces do not face the Hobson's choice the Court confronted in *Martin*. *Martin*, 920 F.3d at 594 (Smith, J., dissenting). The district court abused its discretion by departing from such precedent here.

### 2. The Injunction Further Fails To Acknowledge San Francisco Police Code Section 169 Is Limited To Tents And Other Structures And Section 168 Is Limited To Daytime Hours.

In addition to enjoining enforcement of three sections of the California Penal Code, the injunction also enjoined San Francisco from enforcing sections 169 and 168 of the San Francisco Police Code. 1-ER-050. This was error.

Section 169 provides: "it is unlawful to place an Encampment upon a public sidewalk." S.F., Cal., Police Code § 169(c). San Francisco voters enacted section

169 when they approved Proposition Q in the November 2016 general election. Section 169 is directed exclusively to tents and other structures on public sidewalks. This prohibition against Encampments on public sidewalks is Section 169's sole substantive prohibition.

Proposition Q defines "Encampment" as "a tent or any structure consisting of any material with a top or roof or any other upper covering or that is otherwise enclosed by sides that is of sufficient size for a person to fit underneath or inside while sitting or lying down." S.F., Cal., Police Code § 169(b)(1). Section 169 further requires San Francisco to offer shelter to any person before removing that person's Encampment or ordering that person to remove an Encampment. *Id.* § 169(d).

In *Grants Pass*, this Court held the Eighth Amendment does not recognize any right to erect a tent or other structure on public property. The majority expressly repudiated the dissent's concern that the opinion "establish[es] 'the right to use (at least) a tent.'" *Grants Pass*, 50 F.4th at 812 n.34 (citing *id.* at 830 n.15 (Collins, J., dissenting)). The majority opinion rejected the dissent's assertion as "obviously false." *Id.*

Thus, this Court held in *Grants Pass*, in the strongest terms, that the Eighth Amendment does not create a right to erect a tent on public property. San Francisco Police Code section 169 reaches only tents and other structures on public

sidewalks. Accordingly, section 169 does not implicate any conduct protected by the Eighth Amendment, and the injunction's prohibition against San Francisco's use of section 169 is therefore overbroad and unlawful.

It was also inappropriate for the district court to enjoin enforcement of San Francisco Police Code section 168. San Francisco voters enacted section 168 when they approved Proposition L in the November 2010 general election. Section 168 imposes a time restriction when a person may sit or lie on a public sidewalk. Section 168 provides: "during the hours between seven (7:00) a.m. and eleven (11:00) p.m., it is unlawful to sit or lie down upon a public sidewalk, or any object placed upon a public sidewalk." S.F., Cal., Police Code § 168(b). This time restriction on sitting or lying on public sidewalks is section 168's sole substantive prohibition. Proposition L authorizes enforcement of section 168 only if the unlawful conduct continues after a peace officer notifies the person their conduct is unlawful. *Id.* § 168(d).

In *Martin*, this Court emphasized the narrow scope of its holding, stressing that it was *not* requiring cities to "allow anyone who wishes to sit, lie, or sleep on the streets ... at any time and at any place." *Martin*, 920 F.3d at 617. The Court recognized that "[e]ven where shelter is unavailable, an ordinance prohibiting sitting, lying, or sleeping outside at particular times or in particular locations might well be constitutionally permissible." *Id.* at 617 n.8. The Eighth Amendment is

implicated only when "'the homeless plaintiffs do not have a single place where they can lawfully be.'" *Id.* at 617 (quoting *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1565 (S.D. Fla. 1992)).

Police Code section 168 embodies the exact type of time restriction that the Court in *Martin* refused to proscribe. Under section 168, the sidewalks are available for sitting and lying and sleeping between 11 p.m. and 7 a.m. every day. Encampment resolutions never occur between these hours. And during the day, people may spend their time in San Francisco's 3400 acres of recreational and open space within San Francisco's public parks. See https://sfrecpark.org/419/Who-We-Are.[13] Section 168 does not create a circumstance where a person experiencing homelessness lacks "a single place where they can lawfully be." *Martin*, 920 F.3d at 617. Accordingly, the time restriction embodied in section 168 does not run afoul of the Eighth Amendment, and the injunction's prohibition against San Francisco's use of section 168 is therefore overbroad and unlawful.

---

[13] San Francisco Park Code section 3.13 prohibits sleeping in the parks only "between the hours of 8:00 p.m. and 8:00 a.m." S.F., Cal., Park Code § 3.13. See 1-ER-3.

3. **The Injunction Is Unworkable Because It Requires San Francisco To Know The Total Number Of Residents Experiencing Homelessness And The Total Number Of Available Shelter Beds Every Night.**

The district court's decision to make dissolution of the injunction contingent on San Francisco confirming that its number of available shelter beds exceeds the number of people in the City experiencing homelessness on a given night is unworkable because there is no real-time data on the number of people experiencing homelessness in San Francisco, and because the injunction does not explain what makes a shelter bed "available" to an individual. The district court placed its injunction in effect until the number of available shelter beds in San Francisco exceeds the number of residents experiencing homelessness. Even if it were possible for San Francisco to muster the $1.45 billion necessary to create additional shelter for all of its residents experiencing homelessness, the City lacks clear instructions as to the precise number of beds to create.

Courts typically rely on the Department of Housing and Urban Development's ("HUD") Point In Time homeless counts ("PIT Count") to identify the size of a jurisdiction's homeless population.[14] *Blake v. City of Grants Pass*, No. 1:18-CV-01823-CL, 2019 WL 3717800, at *2 (D. Or. Aug. 7, 2019), *aff'd sub nom. City of Grants Pass*, 50 F.4th 787 ("HUD requires local homelessness assistance and prevention networks to conduct a PIT Count each year as a

---

[14] Plaintiffs' expert opines that even the PIT Count is an inaccurate measure of the number of homeless residents of a jurisdiction. 7-ER-1602.

condition of federal funding."); *see also Martin*, 920 F.3d at 604 n.1. These annual or biennial counts take considerable time and resources to conduct, and necessarily reflect backward-looking data that will not always correlate with current conditions. The PIT Count may over-count an individual who San Francisco has since placed in supportive housing, and it may under-count a person experiencing homelessness who moves to San Francisco from another jurisdiction after the count was conducted. This is not a mere hypothetical. The lead plaintiff in *Martin* was not a habitual homeless resident of Boise. He lived in Post Falls, Idaho, but "return[ed] frequently to Boise to visit his minor son," and camped while visiting. *Martin*, 920 F.3d at 606. Martin himself, therefore, would not have been included in Boise's PIT Count.

The same uncertainty applies to counting "available" shelter beds. Some shelters limit their beds to individuals of a certain gender, while other may have a limited number of mental health beds or addiction beds available. 7-ER-1605-07, 1612. This means that even in circumstances where San Francisco is able to ascertain the total number of shelter beds in the City, it would need more granular data to determine the number of beds available that are appropriate for an individual. Not only is this more than the Eighth Amendment requires, it is functionally unworkable for a City trying to plan its compliance with an injunction.

The injunction requiring a daily count of both the homeless population and shelter beds available is especially impractical given the growing number of homeless individuals in America and the unprecedented concentration of homeless Americans in the Ninth Circuit. Three of the ten states with the largest homeless populations (California, Washington, Oregon) are in the Ninth Circuit, and California alone is home to more than one-quarter of the nation's homeless population. U.S. Dep't of Hous. & Urban Dev., 2019 Annual Homeless Assessment Report to Congress (2022) https://www.huduser.gov/portal/datasets/ahar/2022-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html; *see also* 5-ER-1040-41. The number of homeless individuals in San Francisco is an order of magnitude greater than in Ada County, the jurisdiction that this Court considered in *Martin*.[15]

Although the Eighth Amendment "imposes substantive limits on what can be made criminal and punished," the limitation is "one to be applied sparingly." *Inghram v. Wright*, 430 U.S. 651, 667 (1977). That is because the Eighth Amendment summons up "essential considerations of federalism," by prohibiting states from engaging in "fruitful experimentation" in the areas of criminal law, which "has always been thought to be the province of the States." *Powell v. State*

---

[15] The PIT Count in *Martin* reflected 753 homeless individuals in Ada County in 2014 and 867 in 2016. *Martin*, 920 F.3d at 604. San Francisco's PIT count showed 8,035 homeless individuals in 2019 compared to 7,754 in the 2022 count. 7-ER-1575.

*of Tex.*, 392 U.S. 514, 536-537 (1968). The injunction exceeds this Court's precedent and the Eighth Amendment's requirements, and prevents San Francisco from fully exercising its regulatory authority to respond to issues of public health and homelessness.

All residents of San Francisco—homeless and housed—share a single finite resource: the public right-of-way. The sidewalks are home to many of San Francisco's residents experiencing homelessness (and their personal belongings), while they also serve as the access way for wheelchair-bound pedestrians who need a passable sidewalk, children traveling to school, and business owners who require accessible store fronts, in addition to the broader community of residents and visitors who live and work in San Francisco and use the sidewalks to walk to work, shop, or for exercise. The district court did not address this interest and in doing so abused its discretion because injunctive relief "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

### C. San Francisco Should Not Be Required To Guess At The Meaning And Scope Of The Injunction.

The injunction applies to those who are "involuntarily homeless," without explicitly defining that term. It also enjoins San Francisco not only from actually enforcing sit/sleep/lie laws, but also from threatening to enforce those laws, without providing San Francisco any direction to determine what kind of statement

or action would qualify as a "threat." This level of ambiguity conflicts with Rule 65 of the Federal Rules of Civil Procedure.

### 1. The District Court Failed To Define "Involuntarily Homeless."

Although the district court appears to have adopted a formula-based approach to defining who in San Francisco is involuntarily homeless, the preliminary injunction contains language suggesting that the district court did not rule on whether or not the formula approach controls. The district court acknowledged San Francisco argued in opposition to the motion for a preliminary injunction that an individual offered shelter is not involuntarily homeless under *Martin* and *Grants Pass*. 1-ER-42. It nevertheless found that it "need not decide whether Defendants' reading of *Martin* and *Grants Pass* is correct." 1-ER-42. San Francisco filed a motion for clarification in light of this language in the district court's order, because the injunction requires San Francisco to determine, in the first instance, whether a person meets the district court's definition of "involuntarily homeless." 3-ER-316-22. Specifically, San Francisco asked the district court "to clarify that a particular individual is not 'involuntarily homeless' where San Francisco has offered that individual adequate temporary shelter." 3-ER-317. In connection with that motion, Plaintiffs argued for a formula approach that would render everyone in San Francisco involuntarily homeless unless or until the City secured sufficient shelter beds for every person experiencing

homelessness. *Compare* 3-ER-316-22 *with* 2-ER-207-214. Despite this ambiguity, for a second time, the district court declined to provide any guidance on its intended definition. 2-ER-092-094. This was legal error and an abuse of discretion, especially given the parties' conflicting interpretations, one of which would prevent San Francisco from enforcing the sit/sleep/lie laws even against someone to whom the City had already offered shelter unless San Francisco spends $1.45 billion to create shelter beds for every person in the City experiencing homelessness. 3-ER-335.

In *Union Pac. R.R. Co. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000), the Court reversed and vacated an injunction in favor of the plaintiff employer against the defendant former employee on similar grounds. The district court had enjoined the former employee "'from disclosing or revealing to any person any information or communication of a confidential nature…'" *Id.* at 1072-73. Although the district court gave several examples of what sorts of information would be confidential, it "did not identify what other information might be of a 'confidential nature.'" *Id.* at 1073. This Court found this language too vague and reversed the lower court's decision, holding the injunction lacked "sufficiently precise terms to identify the information being protected." *Id.* at 1077.

In *Nat'l-Arnold Magnetics Co. v. Wood*, 46 F. App'x 416, 421 (9th Cir. 2002), the Court similarly reversed a lower court for failing to include enough

specificity in the injunction. The injunction was not specific enough because it "did not include the territorial limitation of San Bernardino County, which the district court found to be the appropriate territory." The preliminary injunction also "failed to clarify when [Defendant] was enjoined in his official, as opposed to his personal, capacity." *Id*. Because the injunction did not include those items of information, the Court found that the order did not provide the enjoined parties with sufficient notice of the scope of their restricted conduct. *Id*.

Numerous courts both in and out of this Circuit similarly required courts issuing preliminary injunctions to use precise language so that the parties are not left guessing at the boundaries of enjoined conduct. *See e.g., Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, No. 2021-1839, 2022 WL 1530491, at *3 (Fed. Cir. May 16, 2022); *Premier Commc'ns Network, Inc. v. Fuentes*, 880 F.2d 1096, 1100 (9th Cir. 1989) (finding a portion of an injunction ambiguous for failing to specify what actions must be enjoined); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1048 (9th Cir. 2013) (overruling a lower court injunction prohibiting the use of [copyright] "Infringement-Related Terms" as too vague under Rule 65(d)); *United States v. Holtzman*, 762 F.2d 720, 726-27 (9th Cir. 1985) (vacating an injunction that that contained two paragraphs that were inconsistent); *Wynn Oil Co. v. Purolator Chemical Corp.*, 536 F.2d 84 (5th Cir. 1976) (injunction restraining

defendants from "slandering and disparaging the Wynn Oil Co. and its products" held impermissibly vague).

The purpose of these specificity requirements is to prevent just the type of confusion and ambiguity the district court created here. San Francisco is left guessing at what the injunction actually enjoins. For example, is someone who has been offered a shelter bed, but has declined the offer, "involuntarily homeless" and hence exempt from enforcement of those laws? Is someone who has a shelter bed assigned to them, but nonetheless chooses to sleep on the street, "involuntarily homeless" and thus protected from enforcement? San Francisco posed these questions to the district court, both in the initial preliminary injunction briefing and in its motion for clarification, but in both instances the district court refused to provide the requested clarity.

The costs of this uncertainty are already apparent. As a result of the district court's refusal to clarify its order, San Francisco has been forced to abide by the broadest reading of the injunction. In order to avoid the risk of contempt, the SFPD has revised its policies. RJN Exhibit A, Exhibit B. Rule 65(d) of the Federal Rule of Civil Procedure requires that San Francisco be given clear notice of the precise conduct it is enjoined from engaging in, and the district court simply failed to provide such guidance, despite multiple opportunities to do so.

### 2. The District Court Failed To Define "Threatening To Enforce."

Not only did the district court enjoin enforcement of multiple statutes and local ordinances, it also enjoined San Francisco from "threatening to enforce" those laws. 1-ER-050. The injunction itself provides no guidance as to what constitutes a "threat of enforcement." The district court suggested to the parties at a subsequent hearing that the mere presence of police officers, regardless of their specific conduct or words (if any), could constitute a threat of enforcement.

> My other big concern has to do with the police presence… that day five police officers and six unhoused individuals. So, we have a near equal, you know, ratio of law enforcement to unhoused individuals…I think that there is a – you know, the potential perceived threat – reasonably perceived threat if you have a high level of law enforcement engagement… a reasonable person might think 'gosh, I better move or I'm going to get in trouble with the police.

2-ER-082-83. This is concerning because San Francisco needs the ability to have SFPD officers present at encampment resolutions to ensure the safety of all involved, including the safety of the City employees performing the resolution.

Other circuits have found language barring "threats" of certain actions to be inadequately specific to support an injunction. In *Price v. Brown*, No. CV 112-059, 2012 WL 2863357, at *1 (S.D. Ga. May 31, 2012), *report and recommendation adopted*, No. CV 112-059, 2012 WL 2862194 (S.D. Ga. July 11, 2012), the plaintiff requested an injunction requiring that he not be moved out of a nursing unit and that "any other threats made by Defendants not be fulfilled." The court

found that such a "vague request regarding Defendants' 'threat's [did] not conform to the specificity requirement of Rule 65(d)." *Id at *3*; *see also Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996) (an injunction that bars threats of spurious lawsuits not compliant with Rule 65(d)).

Just as the prohibition on the disclosure of information of a "confidential nature" was too vague to support an injunction in *Mower*, *supra*, the district court's prohibition on a "threat" to enforce, without any definition of that term, is too vague to be reasonably understood. Especially in light of the district court's comments that any police presence in the area of an encampment resolution could be interpreted as a threat of enforcement, San Francisco can only guess at what level of police activity, even if it is accompanied by no spoken words, the district court might deem to be an inherent threat of enforcement.[16] Nor does the district court's meaning of its term "threat" appear to be tethered to any legal precedent. This leaves San Francisco in the impossible position of not knowing what conduct it may engage in without potentially violating the injunction. San Francisco cannot safely police its streets while under an injunction that potentially prohibits any police presence that could cause a hypothetical "reasonable person" to believe they

---

[16] Police presence during encampment resolutions is necessary to de-escalate tensions and protect City employees even if the officers are not there to enforce sit/sleep/lie laws. 2-ER-162; 2-ER-184.

need to move to avoid enforcement. This is precisely the sort of guessing game that Rule 65(d) prohibits.

## II. The District Court Improperly Elevated San Francisco's Policy To A Constitutional Standard.

By enjoining San Francisco from "violating San Francisco's bag and tag policy" the district court improperly conflated a violation of department policy with a violation of the Constitution and by doing so exceeded the court's jurisdiction. 1-ER-049. It is well established that a violation of a department policy does not amount to a violation of the Constitution. *See e.g. Manzanillo v. Jacquez*, 555 F. App'x 651, 653 (9th Cir. 2014); *Davis v. Scherer*, 468 U.S. 183, 194 & n.12 (1984); *Case v. Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 929-30 (9th Cir. 2001); *Devereaux v. Perez*, 218 F.3d 1045, 1056 (9th Cir. 2000), *on reh'g en banc sub nom. Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001). The district court, however, transformed San Francisco's "Bag and Tag" policy into a pronouncement of federal law. As a secondary effect, the district court effectively prohibited San Francisco from making any changes to the "Bag and Tag" policy during the pendency of the preliminary injunction. It is undisputed that the "Bag and Tag" policy is constitutional, however, there are a number of ways in which a deviation from San Francisco's "Bag and Tag" policy would still comport with constitutional standards.

One key manner in which San Francisco's "Bag and Tag" policy exceeds constitutional minimums is that it requires 72 hours' advance written notice before any pre-planned encampment resolutions. 3-ER-410. While courts have found 72-hours' notice is *sufficient* to satisfy due process, it is not necessary –less than 24-hours' notice can satisfy due process. *See, e.g., Sullivan v. City of Berkeley*, 383 F. Supp. 3d 976, 984 (N.D. Cal. 2019) ("even if less than 24-hours' notice to leave a public space was provided on certain occasions, plaintiffs have failed to raise a triable issue as to whether this would violate due process when the encampment did, in fact, receive notice and a reasonable opportunity to pack up their belongings before Berkeley collected any remaining unattended property.") Therefore, San Francisco could potentially give far less notice than its policy requires, and still comply with constitutional standards.

Further, San Francisco's "Bag and Tag" policy includes a number of operational elements, none of which are constitutionally required. The policy states that owners may retrieve their items "Monday through Friday, 9 a.m. to 3 p.m." 3-ER-423. Under the injunction, however, if due to staffing issues DPW has to close the retrieval center early, or an employee is running late and opens the retrieval center late, San Francisco is in violation of a federal injunction. Similarly, the "Bag and Tag" policy requires San Francisco to conduct annual trainings on the policy, but the Constitution contains no such annual training requirement. *City of Canton,*

*Ohio v. Harris*, 489 U.S. 378, 388, (1989) ("[T]he inadequacy of [public entity] training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference.") The policy is full of numerous such operational elements that should be left to San Francisco to administer, so long as minimum constitutional requirements are followed.

To the extent the court views San Francisco's "Bag and Tag" policy as not exceeding constitutional minimums, the injunction would essentially be an "obey the law" injunction, which the Ninth Circuit has denounced as overly broad and noncompliant with the specificity requirements of Rule 65(d). *See Int'l Rectifier Corp.*, 383 F.3d at 1316 (noting the "Supreme Court has denounced broad injunctions that merely instruct the enjoined party not to violate a statute") (citing *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435-36 (1941)); *Roman v. MSL Cap., LLC*, No. EDCV 17-2066 JGB (SPX), 2019 WL 3017765, at *4-5 (C.D. Cal. July 9, 2019), aff'd, 820 F. App'x 592 (9th Cir. 2020) (denying permanent injunction "to prevent future violations of the fair housing laws" because such an "obey the law" injunction is disfavored and at odds with Rule 65(d)).

Although San Francisco fully intends to comply with its "Bag and Tag" policy, the district court exceeded its authority by enjoining San Francisco from any conduct that departs from the policy. It is San Francisco's role to determine what is the best policy; the court's jurisdiction is limited to only determining

whether or not those policies are lawful. Furthermore, San Francisco may need to adjust its "Bag and Tag" policy to respond to changing circumstances in the future. At present, however, San Francisco can make no amendments to the "Bag and Tag" policy without the district court's permission. By transforming a violation of policy to a violation of law, and effectively preventing San Francisco from making any policy changes, the district court exceeded the limits of Article III. See *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020) ("it is beyond the power of an Article III court to order, design, supervise, or implement the plaintiffs' requested remedial plan").

/ / /

/ / /

# CONCLUSION

For the foregoing reasons, the Court should reverse the decision of the district court and vacate the preliminary injunction.

Dated:  February 21         Respectfully submitted,

DAVID CHIU
City Attorney
YVONNE R. MERÉ
WAYNE SNODGRASS
MEREDITH B. OSBORN
JAMES M. EMERY
EDMUND T. WANG
KAITLYN M. MURPHY
RYAN C. STEVENS
MIGUEL A. GRADILLA
Deputy City Attorneys

By: _s/James M. Emery_
JAMES M. EMERY

Attorneys for Defendants and Appellants
CITY AND COUNTY OF SAN
FRANCISCO; SAN FRANCISCO
POLICE DEPARTMENT; SAN
FRANCISCO DEPARTMENT OF
PUBLIC WORKS; SAN FRANCISCO
DEPARTMENT OF HOMELESSNESS
AND SUPPORTIVE HOUSING; SAN
FRANCISCO FIRE DEPARTMENT;
SAN FRANCISCO DEPARTMENT OF
EMERGENCY MANAGEMENT;
MAYOR LONDON BREED; SAM
DODGE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**   23-15087

The undersigned attorney or self-represented party states the following:

☒  I am unaware of any related cases currently pending in this court.

☐  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

☐  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

Dated:  February 21, 2023

DAVID CHIU
City Attorney
YVONNE R. MERÉ
WAYNE SNODGRASS
MEREDITH B. OSBORN
JAMES M. EMERY
EDMUND T. WANG
KAITLYN M. MURPHY
RYAN C. STEVENS
MIGUEL A. GRADILLA
Deputy City Attorneys

By: s/James M. Emery
JAMES M. EMERY

Attorneys for Defendants and Appellants
CITY AND COUNTY OF SAN
FRANCISCO; SAN FRANCISCO POLICE
DEPARTMENT; SAN FRANCISCO
DEPARTMENT OF PUBLIC WORKS;
SAN FRANCISCO DEPARTMENT OF
HOMELESSNESS AND SUPPORTIVE
HOUSING; SAN FRANCISCO FIRE
DEPARTMENT; SAN FRANCISCO
DEPARTMENT OF EMERGENCY
MANAGEMENT; MAYOR LONDON
BREED; SAM DODGE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  23-15087

I am the attorney or self-represented party.

This brief contains 13,103 words, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☒ complies with the word limit of Cir. R. 32-1.

☐ is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an amicus brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

☐ it is a joint brief submitted by separately represented parties;

☐ a party or parties are filing a single brief in response to multiple briefs; or

☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated _____.

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Signature s/James M. Emery                    Date February 21, 2023
*(use "s/*[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

## <u>CERTIFICATE OF SERVICE</u>

I, Pamela Cheeseborough, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECFsystem on February 21, 2023.

### APPELLANTS' OPENING BRIEF

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed February 21, 2023, at San Francisco, California.


*s*/Pamela Cheeseborough
Pamela Cheeseborough