No. 23-15087

IN THE

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

COALITION ON HOMELESSNESS; TORO CASTAÑO; SARAH CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID MARTINEZ; TERESA SANDOVAL; and NATHANIEL VAUGHN,

*Plaintiffs-Respondents*

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Northern District of California
Hon. Donna M. Ryu
Case No. 4:22-cv-05502-DMR

**BRIEF OF AMICI CURIAE THE NATIONAL HOMELESSNESS LAW CENTER, THE NATIONAL LOW INCOME HOUSING COALITION, THE NATIONAL COALITION FOR THE HOMELESS, AND THE NATIONAL ALLIANCE TO END HOMELESSNESS IN SUPPORT OF PLAINTIFFS AND RESPONDENTS AND IN OPPOSITION TO REVERSAL**

Deborah E. Arbabi (State Bar No. 167275)
  darbabi@crowell.com
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614

Telephone: 949.263.8400
Facsimile: 949.232.8414

Alice Hall-Partyka (State Bar No. 318196)
  ahallpartyka@crowell.com
Emmanuel Hurtado (State Bar No. 336137)
  ehurtado@crowell.com
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
Telephone: 213.622.4750
Facsimile: 213.622.2690

Attorneys for *Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A), *Amici Curiae*, the National Law Center on Homelessness and Poverty (dba the National Homelessness Law Center), the National Low Income Housing Coalition, the National Coalition for the Homeless, and National Alliance to End Homelessness (collectively, "*Amici*") state that they are all nonprofit organizations with no parent organization and in which no person or entity owns stock.

## STATEMENT REGARDING CONSENT TO FILE

Plaintiffs-Respondents consent to the filing of this brief. *Amici* also contacted counsel for Defendants-Appellants and requested their consent to file this brief. Counsel for Defendants-Appellants indicated that they do not oppose the submission of this brief by *Amici*. Both parties have therefore consented to this filing.

## STATEMENT REGARDING PREPARATION OF BRIEF

No counsel for any party authored this brief in whole or in part, and no party or person other than *Amici* and their counsel contributed any money to prepare or submit this brief.

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ........................................................3

STATEMENT REGARDING CONSENT TO FILE ...........................................3

STATEMENT REGARDING PREPARATION OF BRIEF .................................3

TABLE OF CONTENTS ...................................................................................4

TABLE OF AUTHORITIES ..............................................................................5

I.     INTRODUCTION ...............................................................................11

II.    IDENTITY AND INTERESTS OF *AMICI CURIAE* .........................12

III.   THE DISTRICT COURT'S ORDER SHOULD BE AFFIRMED.....14

     A.    Homelessness is Involuntary—It is a Structural Issue .............15

         1.    Homelessness is Caused by Inadequate Affordable Housing .................................................................................15

         2.    Homelessness is Not Caused by Mental Illness or Substance Abuse .............................................................18

         3.    Homelessness is Undercounted Nationwide ..................20

         4.    Marginalized Communities are Disproportionately Impacted .......................................................................22

         5.    Plaintiffs Do Not Have Access to Adequate Shelter......24

     B.    The City Cannot Shift its Evidentiary Burden to the Plaintiffs 27

     C.    Punishing Homelessness Serves No Legitimate Policy Goal...29

         1.    Punishing Homelessness Undermines Public Safety .....30

         2.    Punishing Homelessness Wastes Limited Public Resources .......................................................................33

     D.    Preserving *Martin* and Ending the Criminalization of Homelessness is Necessary to Protect the Constitutional Rights of Homeless Persons .................................................................35

IV.   CONCLUSION .................................................................................38

CERTIFICATE OF WORD COUNT ..................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Federal Cases

*Bell v. City of Boise*,
993 F. Supp. 2d. 1237 (D. Idaho 2014) (No. 1:09-cv-00540-REB).............36, 37

*Coal. on Homelessness v. City & Cnty. of S.F.*,
No. 22-CV-05502-DMR, 2022 WL 17905114 (N.D. Cal. Dec. 23,
2022) ......................................................................................................24, 28, 29

*Fund for Empowerment v. City of Phx.*,
No. CV-22-02041-PHX-GMS, 2022 WL 18213522 (D. Ariz. Dec.
16, 2022) ...........................................................................................................28

*Johnson v. City of Grants Pass*,
50 F.4th 787 (9th Cir. 2022) ..............................................................................27

*Jones v. City of Los Angeles*,
444 F.3d 1118 (9th Cir. 2006), *vacated on other grounds*, 505 F.3d
1006 (9th Cir. 2007).......................................................................................27, 28

*Lavan v. City of L.A.*,
693 F.3d 1022 (9th Cir. 2012) ....................................................................36, 37

*Martin v. City of Boise*,
920 F.3d 584 (9th Cir.), *cert. denied sub nom. City of Boise, Idaho
v. Martin*, 140 S. Ct. 674 (2019).......................................................12, 20, 28, 37

*Mathews v. Eldridge*,
424 U.S. 319 (1976)...........................................................................................37

*Pottinger v. City of Miami*,
359 F. Supp. 3d 1177 (S.D. Fla. 2019) ..............................................................30

*See v. City of Fort Wayne,* 2016 U.S. Dist. LEXIS 185598, at *27
(N.D. Ind. June 16, 2016), *adopted* 2017 U.S. Dist. LEXIS 49956
(N.D. Ind., Mar. 31, 2017) ................................................................................37

**State Statutes**

Penal Code Section 647(e).........................................................................29

**Other Authorities**

Ann Oliva, Why Expanding Housing Choice Vouchers Is Essential to
    Ending Homelessness, Testimony Before the House Financial
    Services Committee (June 9, 2021),
    https://www.cbpp.org/research/housing/why-expanding-housing-
    choicevouchers-is-essential-to-ending-homelessness .........................................17

Annie Leomporra & Megan Hustings, *Vulnerable to Hate: A Survey
    of Bias-Motivated Violence Against People Experiencing
    Homelessness in 2016-2017*, NAT'L COAL. FOR THE
    HOMELESS 9 (2018), https://nationalhomeless.org/wp-
    content/uploads/2018/12/hate-crimes-2016-171.pdf...........................................33

Bethany Rodgers & Taylor Stevens, *Nearly 80% of the money
    budgeted for Operation Rio Grande was used for policing, jail
    beds and court costs*, The Salt Lake Tribune, Dec. 14, 2020,
    https://www.sltrib.com/news/politics/2020/12/13/nearly-money-
    budgeted/..........................................................................................................34

Cause of Homelessness; Nat'l Low Income Housing Coalition, Out of
    Reach: The High Cost of Housing 2022 2 (2022) ("*Out of Reach*"),
    https://nlihc.org/sites/default/files/2022_OOR.pdf ....................................*passim*

Chris Herring et al., Pervasive Poverty: How the Criminalization of
    Poverty Perpetuates Homelessness, SOC'Y FOR THE STUD. OF
    SOC. PROBS. 9 (2019) ("*Pervasive Poverty*"),
    https://static1.squarespace.com/static/5b391e9cda02bc79baffebb9/t
    /5cc1c0569140b7fb43b1af44/1556201561950/Pervasive+Penality
    +social+problems+%281%29+%281%29.pdf .............................................22, 35

Comm. on the Elimination of Racial Discrimination, *Concluding
    Observations*, CERD/C/USA/CO/7-9, at ¶ 12 (Aug. 29, 2014),
    https://digitallibrary.un.org/record/786227?ln=en .............................................36

Elizabeth Hopper, Ellen Bassuk & Jeffrey Olivet, *Shelter from the Storm: Trauma-Informed Care in Homelessness Service Settings*, The Open Health Servs. and Pol'y J., 80-100 (2010), https://www.homelesshub.ca/sites/default/files/cenfdthy.pdf ............................ 20

Gale Holland, *L.A. Spends $100 Million a Year on Homelessness, City Report Finds*, L.A. Times, Apr. 16, 2015, https://www.latimes.com/local/lanow/la-me-ln-homeless-cao-report-20150416-story.html ................................................................................. 34

Gary Warth, L.A. Times, Cause of Homelessness? It's Not Drugs or Mental Illness, Researchers Say (July 11, 2022) ("*Cause of Homelessness*"), https://www.latimes.com/california/story/2022-07-11/new-book-links-homelessness-city-prosperity ........................................ 15

Guy John & Chris Chamberlain, Homelessness and Substance Abuse: Which Comes First? ("*Homelessness and Substance Abuse*") 349, https://www.researchgate.net/publication/233885377_Homelessnes s_and_Substance_Abuse_Which_Comes_First ........................................... 19, 20

Helen R. Kanovsky, *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions*, U.S. Dep't of Hous. and Urban Dev. (2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHA STANDCR.PDF .................................................................................................... 31

Joint Ctr. for Hous. Stud. of Harvard Univ., *The State of The Nation's Housing* (2022) ("*State of The Nation's Housing*"), at 6, https://www.jchs.harvard.edu/sites/default/files/reports/files/Harva rd_JCHS_State_Nations_Housing_2022.pdf ................................................. 17, 23

Joshua Howard et al., *At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane,* HOMELESS RIGHTS ADVOCACY PROJECT 10 (2015), https://digitalcommons.law.seattleu.edu/hrap/10 ............................................... 30

Letter from Lisa Foster, Dir., Off. for Access to Just., U.S. Dept. of Just., to Seattle City Council Members (Oct. 13, 2016), at 3, https://.documentcloud.org///DOJ-ATJ-Letter-to-Seattle-City-Council-102016-13-.pdf.......................................................................................... 37

Madeline Bailey et al., *No Access to Justice: Breaking the Cycle of Homelessness and Jail*, VERA INSTITUTE, August 2020, at 6, https://www.vera.org/downloads/publications/no-access-to-justice.pdf................................................................................37

Mallory Moench, *Thousands live homeless on S.F. streets. Some say there's no easy way to get a shelter bed*, S.F. Chron., Jan. 14, 2023, https://www.sfchronicle.com/sf/article/homeless-shelter-bed-unhoused-17717206.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=share-by-email&utm_medium=email ...........................14

National Law Center on Homeless & Poverty, *Don't Count on It: How the HUD Point-in-Time Count Underestimates the Homelessness Crisis in America* 6 (2017) ("*Don't Count On It*"), https://homelesslaw.org/wp-content/uploads/2018/10/HUD-PIT-report2017.pdf................................................................................21

Nat'l All. to End Homelessness, *Addressing Post-Traumatic Stress Disorder Caused by Homelessness*, https://housingmatterssc.org/wp-content/uploads/2018/11/PTSD-and-Homelessness.pdf ..............................................................19

Nat'l Coalition for the Homeless, *20 Years of Hate: Reporting on Bias-Motivated Violence against People Experiencing Homelessness in 2018-2019* (2020), https://nationalhomeless.org/wp-content/uploads/hate-crimes-2018-2019_web.pdf. ..............................................................13

Nat'l Law Center on Homelessness & Poverty, *Housing Not Handcuffs 2019: Ending the Criminalization of Homelessness in U.S. Cities* (Dec. 2019), http://nlchp.org/wp-content/uploads/2019/12/HOUSING-NOT-HANDCUFFS-2019-FINAL.pdf ...........................................................................*passim*

Nat'l Law Center on Homelessness & Poverty, *Tent City, USA: The Growth of America's Homeless Encampments and How Communities are Responding* (2017), https://homelesslaw.org/wp-content/uploads/2018/10/Tent_City_USA_2017.pdf.........................................12

PIT and HIC Counts (sfgov.org), https://hsh.sfgov.org/about/research-and-reports/pit-hic/#2022-pit ......................................................14, 22

Rachel A. Adcock et al., *Too High A Price: What Criminalizing Homelessness Costs Colorado*, UNIVERSITY OF DENVER STRUM COLLEGE OF LAW: HOMELESS ADVOCACY POLICY PROJECT 25 (Feb. 16, 2016), https://www.law.du.edu/documents/homeless-advocacy-policyproject/2-16-16-Final-Report.pdf ............................................................34

Ruby Aliment, Sara Rankin & Kaya Lurie, Seattle Univ. Sch. of Law: Homeless Rights Advocacy Project, *No Pets Allowed: Discrimination, Homelessness, and Pet Ownership* (2016), http://digitalcommons.law.seattleu.edu/hrap/3 ....................................................26

Sonya Acosta and Erik Gartland, Ctr. on Budget and Pol'y Priorities, *Families Wait Years for Housing Vouchers Due to Inadequate Funding*, https://www.cbpp.org/research/housing/families-wait-years-for-housing-vouchers-due-to-inadequate-funding ....................................18

Stephen Metraux et al., *Assessing Homeless Population Size Through the Use of Emergency and Transitional Shelter Services in 1998: Results from the Analysis of Administrative Data from Nine US Jurisdictions*, 116 Pub. Health Rep. 344 (2001), https://www.researchgate.net/publication/11335917_Assessing_Homeless_Population_Size_Through_the_Use_of_Emergency_and_Transitional_Shelter_Services_in_1998_Results_from_the_Analysis_of_Administrative_Data_from_Nine_US_Jurisdictions ...................................21

Suzanne Skinner & Sara Rankin, Seattle Univ. Sch. of Law: Homeless Rights Advocacy Project, *Shut Out: How Barriers Often Prevent Meaningful Access to Emergency Shelter* (2016), https://digitalcommons.law.seattleu.edu/hrap/6 .................................................25

Tom McGhee, *Crimes Against Homeless People Up 42 Percent in Denver and Suburban Cops Say That's Pushing Transients into Their Towns*, Denver Post (Jan. 15, 2018, 7:32 AM)........................................33

U.S. Dep't of Hous. and Urb. Dev., Off. of Pol'y and Dev. and Rsch., *Understanding Encampments of People Experiencing Homelessness and Community Responses: Emerging Evidence as of Late 2018* (Jan. 7, 2019), https://www.huduser.gov/portal/publications/Understanding-Encampments.html ...............................................................................................25

U.S. Dep't of Housing and Urban Development, The 2022 Annual
    Homelessness Assessment Report (AHAR) to Congress 11 (Dec.
    2022) (*"2022 AHAR"*),
    https://www.huduser.gov/portal/sites/default/files/pdf/2022-
    AHAR-Part-1.pdf ............................................................................................... 14

United Nations Human Rights Comm., *Concluding Observations*
    (Apr. 23, 2014), https://documents-dds-
    ny.un.org/doc/UNDOC/GEN/G14/426/73/PDF/G1442673.pdf?Op
    enElement; .......................................................................................................... 36

United Nations Human Rights Council, *Guidelines for the
    Implementation of the Right to Adequate Housing: Report of the
    Special Rapporteur on Adequate Housing as a Component of the
    Right to an Adequate Standard of Living, and on the Right to Non-
    Discrimination in This Context*, at ¶ 30, U.N. Doc. A/HRC/43/43
    (Dec. 26, 2019),
    https://digitallibrary.un.org/record/3872412?ln=en# ........................................ 36

United Nations Human Rights Council, *Report of the Special
    Rapporteur on Extreme Poverty and Human Rights on His Mission
    to the United States of America*, at ¶ 45, U.N. Doc.
    A/HRC/38/33/Add.1 (May 4, 2018), https://socialprotection-
    humanrights.org/wp-content/uploads/2018/06/G1812530.pdf .......................... 36

## I.    INTRODUCTION

The National Homelessness Law Center, the National Low Income Housing Coalition, the National Coalition for the Homeless, and the National Alliance to End Homelessness respectfully submit this brief as *Amici Curiae* in support of Plaintiffs and Respondents – Toro Castaño, Sarah Cronk, Joshua Donohoe, Molique Frank, David Martinez, Teresa Sandoval, and Nathaniel Vaughn, and the Coalition on Homelessness. *Amici* have spent decades analyzing how government policies and practices around the country, including ordinances and enforcement actions like the ones that Plaintiffs are challenging here, impact unsheltered persons and their rights. As a result, *Amici* are uniquely positioned to provide the Court with data, information, and expertise that are directly relevant to deciding this appeal.

*Amici* ask this Court to affirm the preliminary injunction issued by the district court enjoining Defendants and Appellants – the City and County of San Francisco, San Francisco Police Department, San Francisco Department of Public Works, San Francisco Department of Homelessness and Supportive Housing, San Francisco Fire Department, and San Francisco Department of Emergency Management (collectively, the "City" or "San Francisco") – from "enforcing or threatening to enforce [certain] . . . laws and ordinances to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property."[1] As described herein,

---

[1] Preliminary Injunction p. 50.

the injunction should be affirmed because (i) unsheltered homelessness is a structural issue that is inherently involuntary; (ii) the City holds the evidentiary burden to prove the availability of adequate shelter and has not met that burden; (iii) punishing homelessness serves no legitimate policy goal, and (iv) preserving the Ninth Circuit's precedent in *Martin v. City of Boise* is necessary to protect the constitutional rights of homeless persons.

## II.    IDENTITY AND INTERESTS OF *AMICI CURIAE*

Founded in 1989, The National Homelessness Law Center ("The Law Center")[2] is a national nonprofit legal organization based in Washington, D.C. with the mission to end and prevent homelessness. In connection with this objective, the Law Center gathers information about state and local laws that impact homeless people nationwide, identifies best practices to address the root causes of homelessness, and litigates to safeguard the rights of homeless persons. In the course of this work, the Law Center has published numerous reports analyzing issues related to homelessness in the United States.[3]

---

[2] The Law Center was formerly known as the National Law Center on Homelessness & Poverty.

[3] The reports that the Law Center has produced in recent years are available at https://homelesslaw.org/publications/(last visited Apr. 10, 2023). *See* Nat'l Law Center on Homelessness & Poverty, *Housing Not Handcuffs 2019: Ending the Criminalization of Homelessness in U.S. Cities* (Dec. 2019), http://nlchp.org/wp-content/uploads/2019/12/HOUSING-NOT-HANDCUFFS-2019-FINAL.pdf ("*Housing Not Handcuffs*"); *see also* Nat'l Law Center on Homelessness & Poverty, *Tent City, USA: The Growth of America's Homeless Encampments and*

The National Low Income Housing Coalition ("NLIHC") is a national non-profit membership-based organization with over 1,000 organizational members across the United States, including housing developers and landlords, public housing agencies, state and local government bodies, nonprofit organizations, and individuals. NLIHC is dedicated to achieving racially and socially equitable public policy that ensures people with the lowest incomes have quality homes that are accessible and affordable in communities of their choice.

The National Coalition for the Homeless ("NCH") is a network of individuals and organizations united by a commitment to end homelessness. Founded in 1982, NCH has helped draft federal, state, and local legislation, works through policy advocacy, grassroots organizing, and public education. NCH has authored numerous reports on the causes and consequences of homelessness, including a report entitled *20 Years of Hate: Reporting on Bias-Motivated Violence against People Experiencing Homelessness in 2018-2019*.[4]

The National Alliance to End Homelessness ("NAEH") is a nonprofit organization founded in the 1980s by a bipartisan group of national leaders, concerned about the rise of homelessness across the country. Its mission is

---

*How Communities are Responding* (2017), https://homelesslaw.org/wp-content/uploads/2018/10/Tent_City_USA_2017.pdf ("*Tent City, USA*").

[4] Nat'l Coalition for the Homeless, *20 Years of Hate: Reporting on Bias-Motivated Violence against People Experiencing Homelessness in 2018-2019* (2020), https://nationalhomeless.org/wp-content/uploads/hate-crimes-2018-2019_web.pdf.

incorporated in its name: to end homelessness in the United States. The Alliance pursues this goal by analyzing and encouraging research and data collection to better understand the causes of and solutions to homelessness; working with a network of thousands of local leaders to understand how effective practices can be carried out; and advising leaders through local, state and federal advocacy efforts.

## III. THE DISTRICT COURT'S ORDER SHOULD BE AFFIRMED

Unsheltered homelessness is a national crisis that extends beyond San Francisco and the State of California. The U.S. Department of Housing and Urban Development ("HUD") found that 582,462 people were experiencing homelessness nationwide as of January 2022.[5] Forty percent of these individuals were "unsheltered," meaning that the individual's "primary nighttime location is a public or private place not designated for, or ordinarily used as, a regular sleeping accommodation for people (for example, the streets, vehicles, or parks)."[6] In San Francisco alone, 4,397 people were counted as experiencing unsheltered homelessness in 2022.[7] As striking as these numbers are, they only scratch the

---

[5] U.S. Dep't of Hous. and Urban Dev., The 2022 Annual Homelessness Assessment Report (AHAR) to Congress (Dec. 2022), at 11 ("*2022 AHAR*"), https://www.huduser.gov/portal/sites/default/files/pdf/2022-AHAR-Part-1.pdf.
[6] *Id.* at 5.
[7] PIT and HIC Counts (sfgov.org). However, San Francisco has only 3022 shelter beds, including winter spots, https://hsh.sfgov.org/about/research-and-reports/pit-hic/#2022-pit; Mallory Moench, *Thousands live homeless on S.F. streets. Some say there's no easy way to get a shelter bed*, S.F. Chron., Jan. 14, 2023, https://www.sfchronicle.com/sf/article/homeless-shelter-bed-unhoused-

surface on the impact of homelessness in the United States and in San Francisco.

## A. Homelessness is Involuntary—It is a Structural Issue

### 1. Homelessness is Caused by Inadequate Affordable Housing

Inadequate affordable housing is the primary cause of the homelessness crisis.[8]  Research shows that the biggest predictors of homelessness in a community are rental costs and vacancy rates.[9]  For this reason, addressing the homelessness crisis requires significant increases in investment in affordable housing.[10]

When minimum wage and average earnings are compared to the average cost of housing in the United States, it is abundantly clear that many people in the United States simply cannot afford a place to live. The average cost of housing in the United States far exceeds what a worker can afford working a minimum wage job. In fact, while the federal minimum wage remains at $7.25 an hour, NLIHC found that the wage needed for a full-time worker to afford a modest one-bedroom rental in 2022 was about *three times higher* than the minimum wage, at $21.25, and to afford a

---

17717206.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=share-by-email&utm_medium=email.

[8] *See* Gary Warth, *Cause of Homelessness? It's Not Drugs or Mental Illness, Researchers Say*, L.A. Times, July 11, 2022, ("*Cause of Homelessness*"), https://www.latimes.com/california/story/2022-07-11/new-book-links-homelessness-city-prosperity.

[9] *Id.*

[10] *Cause of Homelessness*; Nat'l Low Income Housing Coalition, *Out of Reach: The High Cost of Housing* (2022), at 2 ("*Out of Reach*"), https://nlihc.org/sites/default/files/2022_OOR.pdf.

modest two-bedroom rental was over *three and a half times higher*, at $25.82.[11] Moreover, individuals with disabilities relying on their Supplemental Security Income can only afford to pay monthly rent that is under a quarter of the average monthly fair market rent for a one-bedroom.[12]

In California, the housing crisis is particularly stark. California has "a shortage of more than 960,000 rental homes that are affordable and available for the state's lowest income families."[13] While minimum wage in California is higher, at $15 per hour, it is still patently insufficient for the rents in the state.[14] Across California, the wage needed for a full-time worker to afford a modest two-bedroom rental was $39.01, and, in San Francisco, the most expensive metropolitan area in NLIHC's report, that number skyrockets to a shocking $61.50.[15]

To the more than 40 percent of wage earners across the country who cannot afford a modest one-bedroom rental working one full-time job, or the almost 60 percent who cannot afford a modest two-bedroom rental with one full-time job, these are not just statistics.[16] A minimum wage worker must work *79 hours per week* to afford a one-bedroom rental, or *96 hours per week* to afford a two-bedroom rental.[17]

---

[11] *Out of Reach* at 1.

[12] *Out of Reach* at 2.

[13] *Out of Reach* at Preface, A.

[14] *Out of Reach* at CA-47.

[15] *Id.*

[16] *Id.* at 4.

[17] *Id.* at 1.

In California, these numbers are even higher, at *83 hours per week* for a one-bedroom and *104 hours per week* for a two-bedroom rental.[18] But permanently maintaining such hours is neither possible nor humane.

Instead, people spend more than they can sustainably afford on housing costs. In 2020, nearly half of renter households in the United States were cost-burdened, paying more than 30 percent of their incomes towards housing costs.[19] Half of those individuals were severely cost-burdened, meaning they spent more than half their incomes on shelter.[20] Cost-burdened households do not have sufficient income for other necessities, or any financial cushion for destabilizing life events.[21]

This issue is compounded by the limits on federal housing assistance, which is underfunded to meet the crisis at hand. Research has shown that housing vouchers are "highly effective at reducing homelessness, housing instability, and overcrowding, and at improving other outcomes for families and children."[22]

---

[18] *Id.* at CA-47.

[19] Joint Ctr. for Hous. Stud. of Harvard Univ., *The State of The Nation's Housing* (2022) ("*State of The Nation's Housing*"), at 6, https://www.jchs.harvard.edu/sites/default/files/reports/files/Harvard_JCHS_State_Nations_Housing_2022.pdf.

[20] *Id.*

[21] *Housing Not Handcuffs* at 30.

[22] Ann Oliva, Ctr. on Budget and Pol'y Priorities, *Why Expanding Housing Choice Vouchers Is Essential to Ending Homelessness, Testimony Before the House Financial Services Committee* (June 9, 2021), https://www.cbpp.org/research/housing/why-expanding-housing-choicevouchers-is-essential-to-ending-homelessness.

However, with current funding limitations, only one in four income-eligible households can receive federal housing assistance.[23] In 2019, "2 million households used vouchers to rent housing but more than 16 million unassisted renter households paid more than 30 percent of their income for housing or lived in substandard or overcrowded homes."[24] Families that receive vouchers on average spend close to two and a half years on waitlists first, and some housing agencies have wait times of up to eight years.[25] Federal housing assistance as currently funded cannot close the gap between income and housing costs.

## 2. Homelessness is Not Caused by Mental Illness or Substance Abuse

It is a common, but damaging, misconception that mental illness and substance use are the root cause of homelessness. They are not. As discussed in the previous section, the key driver of homelessness is a lack of affordable housing, which impacts already marginalized communities to a greater degree.

Although "people who are poor, addicted or mentally ill are more likely to experience homelessness . . . a disproportionate number of people with those

---

[23] *Out of Reach* at 2.
[24] Sonya Acosta and Erik Gartland, Ctr. on Budget and Pol'y Priorities, *Families Wait Years for Housing Vouchers Due to Inadequate Funding*, https://www.cbpp.org/research/housing/families-wait-years-for-housing-vouchers-due-to-inadequate-funding.
[25] *Id.*

conditions is not the cause of higher rates of homelessness in some areas."[26] Rather, these types of "individual vulnerabilities interact with housing markets to produce homelessness."[27] In other words, marginalized groups do disproportionately experience homelessness, but the factors on which they are marginalized are not causing the homelessness crisis. In one study, for instance, researchers reviewed *per capita* rates of homelessness in communities around the country in 2019 and compared that information with data on factors that are often considered to be causes of homelessness. The communities with higher per capita rates of homelessness had one thing in common—a lack of affordable housing.[28] Conversely, West Virginia and Arkansas, two of the states that have been hit hardest by our contemporaneous opioid epidemic, did not have high rates of homelessness, a finding which was specifically attributed to their comparatively lower housing costs.[29]

Studies have also found that mental illness and deleterious substance use often commence after an individual becomes homeless, as collateral effects of the multifaceted trauma that individuals experience upon becoming homeless.[30]

---

[26] *Cause of Homelessness*.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *See* Nat'l All. to End Homelessness, *Addressing Post-Traumatic Stress Disorder Caused by Homelessness*, https://housingmatterssc.org/wp-content/uploads/2018/11/PTSD-and-Homelessness.pdf; Guy Johnson & Chris Chamberlain, *Homelessness and Substance Abuse: Which Comes First?*, 61 Australian Soc. Work 342-356 (2008) ("*Homelessness and Substance Abuse*"),

According to one study, nearly two-thirds of homeless individuals with substance abuse problems developed those problems *after becoming homeless* as an adaptation.[31] Researchers have also identified homelessness as a cause of post-traumatic stress disorder, noting that "the rates of traumatic stress are extremely high, and may even be normative, among those experiencing homelessness."[32] These studies suggest that lack of affordable housing is the root cause of homelessness and that mental health and substance abuse are actually the result.

### 3. Homelessness is Undercounted Nationwide

As this court has previously recognized,[33] the true number of individuals experiencing homelessness far exceeds the estimates made available by HUD. HUD

---

https://www.researchgate.net/publication/233885377_Homelessness_and_Substance_Abuse_Which_Comes_First.

[31] *Id*. at 349.

[32] Elizabeth Hopper, Ellen Bassuk & Jeffrey Olivet, *Shelter from the Storm: Trauma-Informed Care in Homelessness Service Settings*, The Open Health Servs. and Pol'y J., 80-100 (2010), https://www.homelesshub.ca/sites/default/files/cenfdthy.pdf

[33] This Court recently acknowledged the inherent shortcomings of PIT counts in its seminal *Martin v. City of Boise* decision, stating that:

> It is 'widely recognized that a one-night point in time count will undercount the homeless population,' as many homeless individuals may have access to temporary housing on a given night, and as weather conditions may affect the number of available volunteers the number of homeless people staying at shelters or accessing services on the night of the count.

920 F.3d 584, 604 (9th Cir. 2019), *cert. denied sub nom. City of Boise, Idaho v. Martin*, 140 S. Ct. 674 (2019).

determines the number of individuals experiencing homelessness through conducting a "point-in-time" or "PIT" count. In a PIT count, local organizations across the country count the numbers of individuals who are identified as experiencing homelessness on a particular night. Despite the massive community effort that goes into conducting these counts, they severely underestimate the scope of the homelessness crisis.[34] In fact, a 2001 study of administrative data from homeless service providers estimated that the actual number of homeless individuals is 2.5 to 10.2 times greater than what is typically obtained using a PIT count.[35] Similarly, a study of New York shelter users found that 31 percent slept in places that were "not visible" on the night of the count. The definition of homelessness used by HUD is also quite narrow and does not include, for instance, people who rely entirely on the charity of friends or family due to economic hardship or people temporarily compelled to remain in certain institutions. For these reasons, the HUD PIT counts should be considered conservative estimates—not accurate

---

[34] Nat'l Law Ctr. on Homeless & Poverty, *Don't Count on It: How the HUD Point-in-Time Count Underestimates the Homelessness Crisis in America* (2017) ("*Don't Count On It*"), at 6, https://homelesslaw.org/wp-content/uploads/2018/10/HUD-PIT-report2017.pdf.
[35] Stephen Metraux et al., *Assessing Homeless Population Size Through the Use of Emergency and Transitional Shelter Services in 1998: Results from the Analysis of Administrative Data from Nine US Jurisdictions*, 116 Pub. Health Rep. 344 (2001), https://www.researchgate.net/publication/11335917_Assessing_Homeless_Populat ion_Size_Through_the_Use_of_Emergency_and_Transitional_Shelter_Services_in _1998_Results_from_the_Analysis_of_Administrative_Data_from_Nine_US_Juris dictions

representations of the number of unsheltered persons in a given area.

### 4. Marginalized Communities are Disproportionately Impacted

The homelessness crisis is disproportionately felt by marginalized groups, including people of color, transgender people, people with mental illnesses, and people with disabilities, both nationwide and in San Francisco.[36] In 2022, for example, 38 percent of San Francisco's homeless population identified as Black, African American, or African, even though only 6 percent of the City's general population is Black.[37] Similarly, 30 percent of the homeless population identified as Hispanic/Latinx, even though only 16 percent of the City's population is Hispanic/Latinx. Adults with disabilities are also about four times more likely to experience housing insecurity than adults without disabilities.[38]

Policies that criminalize homelessness further contribute to racial inequity in the homelessness crisis. Within the homeless population, marginalized groups are more commonly cited, searched, and have property taken from them.[39] A study

---

[36] Chris Herring et al., *Pervasive Poverty: How the Criminalization of Poverty Perpetuates Homelessness*, Soc'y for The Stud. of Soc. Probs. (2019) ("*Pervasive Poverty*"), https://static1.squarespace.com/static/5b391e9cda02bc79baffebb9/t/5cc1c0569140 b7fb43b1af44/1556201561950/Pervasive+Penality+social+problems+%281%29+ %281%29.pdf.

[37] PIT and HIC Counts (sfgov.org), https://hsh.sfgov.org/about/research-and-reports/pit-hic/#2022-pit

[38] *Housing not Handcuffs* at 22.

[39] *Pervasive Poverty* at 7.

conducted in San Francisco found that "[m]embers of groups already disproportionately likely to be homeless also experienced disproportionate policing after becoming homeless . . . ."[40] That same study also found that people with mental disabilities are approached by the police at higher rates.[41]

The striking racial discrepancies in the homelessness population are driven by structural inequalities that are the "product of historical and ongoing systemic racism that has involved discrimination, economic exploitation, and unequal employment and housing opportunities."[42] Housing costs are even more unaffordable for the median Black worker and Latinx worker, who earn 23 percent and 25 percent less, respectively, than the median white worker.[43] In 2022, a study found that 32 percent of Hispanic renter households and 23 percent of Black rental households responded that they had lost employment income in the preceding four weeks, compared to just 15 percent of white and Asian renter households.[44] Moreover, even when poverty is controlled for, racist housing policies contribute to disproportionate rates of homelessness among people of color.[45] In short, structural racism, as manifested in

---

[40] *Id.*

[41] *Id.* at 9.

[42] *Out of Reach* at 9.

[43] *Id.*

[44] *State of The Nation's Housing* at 38.

[45] *Housing not Handcuffs* at 32.

income inequality and unequal employment and housing opportunities, is inextricably linked to homelessness.

### 5. Plaintiffs Do Not Have Access to Adequate Shelter

Here, as the lower court noted, "[it] is beyond dispute that homeless San Franciscans have no voluntary 'option of sleeping indoors,' and as a practical matter 'cannot obtain shelter.'" *Coal. on Homelessness v. City & Cnty. of S.F.*, No. 22-CV-05502-DMR, 2022 WL 17905114, at *24 (N.D. Cal. Dec. 23, 2022). Moreover, San Francisco failed to introduce convincing evidence—or any evidence at all—that the City actually possessed and adhered to a "policy of offering shelter before requiring any unhouse[d] person to vacate public property meets the requirements of the Eighth Amendment." *Coal. on Homelessness* 2022 WL 17905114, at *21. Indeed, the evidentiary record suggests that the opposite is true: irrespective of where the evidentiary burden lies at this stage of the litigation, there is more than sufficient evidence to support the district court's determination that Plaintiffs are involuntarily homeless due to San Francisco's severe shortage of shelter beds and other inadequate housing options.[46]

Moreover, even if the City were able to provide evidence that they offered shelter to Plaintiffs, they would also need to show that the shelter being offered was

---

[46] San Francisco only has about 3022 shelter beds, including winter spots, available. Mallory Moench, *Thousands live homeless on S.F. streets. Some say there's no easy way to get a shelter bed*, S.F. Chron., Jan. 14, 2023.

actually accessible under *Martin*. Merely alleging the theoretical availability of shelter space is insufficient. According to a 2018 study conducted by HUD, there has been a recent increase in the number of homeless encampments, which have formed "in response to the absence of other, desirable options for shelter."[47] In addition to the severe shortages of affordable housing across the country, the study determined what the Law Center has verified repeatedly through independent empirical research: that "shortcomings in the shelter system" are one of the primary explanations for the sudden increase in homelessness and, accordingly, homeless encampments.[48] This is partially because emergency shelters routinely turn people away—even when there are available shelter beds—due to admission criteria that render them practically inaccessible.[49] For example, certain types of shelters have strict entry and exit times that are incompatible with people's daily routines, including work schedules, medical appointments, job interviews, and other necessary activities for those who are trying to get back on their feet.[50] Many shelters also impose restrictions which effectively require homeless individuals to be

---

[47] U.S. Dep't of Hous. and Urb. Dev., Off. of Pol'y and Dev. and Rsch., *Understanding Encampments of People Experiencing Homelessness and Community Responses: Emerging Evidence as of Late 2018* (Jan. 7, 2019), https://www.huduser.gov/portal/publications/Understanding-Encampments.html
[48] *Id*.
[49] Suzanne Skinner & Sara Rankin, Seattle Univ. Sch. of Law: Homeless Rights Advocacy Project, *Shut Out: How Barriers Often Prevent Meaningful Access to Emergency Shelter* (2016), https://digitalcommons.law.seattleu.edu/hrap/6/.
[50] *Id*.

separated from their partners, family members, and pets.[51] These types of criteria render many shelters inaccessible for people in need—even when they have available space.

The City also attempts to argue that the district court's injunction is "unworkable" because the City has no way of knowing the precise number of individuals that require shelter at any given moment. Op. Br. at 44. However, the fact that HUD's PIT counts are generally inaccurate only serves to underscore San Francisco's lack of available shelter space. While *Amici* agree with the City that the counts provided by HUD do not "correlate with current conditions,"[52] the reality is that those counts significantly underestimate the scope of homelessness. In other words, if San Francisco does not even have enough shelter beds to provide for the number of individuals *undercounted* by HUD, it certainly does not have enough shelter beds for all of the people who are actually experiencing homelessness in the City. Thus, the City's argument that the preliminary injunction requires a "daily count of both the homeless population and shelter beds available" cannot be taken seriously, at least not until the City can demonstrate that there is sufficient housing available for, at least, the individuals identified in HUD's PIT estimates.

---

[51] Ruby Aliment, Sara Rankin & Kaya Lurie, Seattle Univ. Sch. of Law: Homeless Rights Advocacy Project, *No Pets Allowed: Discrimination, Homelessness, and Pet Ownership* (2016), http://digitalcommons.law.seattleu.edu/hrap/3.

[52] Defs' Appeal Br. at 45

**B.     The City Cannot Shift its Evidentiary Burden to the Plaintiffs**

Defendants claim that "San Francisco does not need to show offers of shelter being made to all [plaintiffs] in order to illustrate its compliance with the Eighth Amendment." Op. Br. at 35. Instead, they suggest that it is Plaintiffs' burden to demonstrate that they are involuntarily homeless. But the City's attempt to shift this burden onto homeless individuals is not only unsupported by the case law—it is also unsound as a matter of public policy and judicial economy.

In *Johnson v. City of Grants Pass*, the Ninth Circuit observed that the question of burden need not be decided in a case where—as here—the "undisputed evidence demonstrates" a lack of "adequate alternative shelter." 50 F.4th 787, 811 n.32 (9th Cir. 2022). The Court also expressly recognized that "*Martin* did not hold homeless persons bear the burden of demonstrating they are involuntarily homeless." *Id.* at 811 n.31. Similarly, in *Jones v. City of Los Angeles*, this Court rejected the municipal defendants' argument that homeless individuals should bear the burden of asserting a necessity defense by showing that their actions were involuntary because "the practical realities of homelessness make the necessity defense a false promise for those charged with violating" the challenged ordinances. 444 F.3d 1118, 1131 (9th Cir. 2006), *vacated on other grounds*, 505 F.3d 1006 (9th Cir. 2007) (noting that homeless individuals, "who may suffer from . . . unemployment, and poverty, are unlikely to have the knowledge or resources to assert" such a defense). Those same

considerations apply here.

Plaintiffs have provided undisputed evidence that "[v]oluntary access to shelter has been functionally inaccessible to unhoused people in San Francisco since the onset of the pandemic in April 2020." 2022 WL 17905114, at *24. Therefore, the onus should be on the City to show that the challenged ordinances do not criminalize "conduct that is an unavoidable consequence of being homeless—namely, sitting, lying, or sleeping on the streets." *Martin*, 920 F.3d at 617 (quoting *Jones*, 444 F.3d at 1137); *see also Fund for Empowerment v. City of Phx.*, No. CV-22-02041-PHX-GMS, 2022 WL 18213522, at *3 (D. Ariz. Dec. 16, 2022) (recognizing that where the relevant "ordinances provide a criminal sanction," the City "appropriately" "bears the burden of confirming that shelter space is not practically available to an individual before charging that person with violating" those ordinances). To hold otherwise would require those with the fewest resources to prove an impossible negative—*i.e.*, that there is no place in the entire City for them to go—while paradoxically alleviating the party with actual capacity to establish the availablility of housing of its evidentiary burden.

Indeed, San Francisco's own policies governing its actions with respect to encampment closures and other agency interactions with homeless individuals memorialize the City's constitutional obligations. SFPD Enforcement Bulletin 2 requires "[o]fficers . . . [to] secure appropriate shelter before taking enforcement

action under Penal Code Section 647(e)." *Coal. on Homelessness*, 2022 WL
17905114, at *4 (emphasis in original) ("[o]fficers shall notify [HSOC] and secure
shelter or a navigation center bed."). The bulletin also instructs that "[i]f there is no
shelter or navigation center bed available, officers may not issue a citation or seize
the encampment/tent." *Id.* Similarly, San Francisco's Bag and Tag policy requires
officers to determine whether property is attended or unattended before storing or
discarding it. Notwithstanding San Francisco's failure to comply with these
requirements, both of these policies make it clear that the City carries the burden of
ensuring that their enforcement actions are in alignment with their constitutional
obligations under the Fourth and Eighth Amendments.

### C. Punishing Homelessness Serves No Legitimate Policy Goal

The City concocts a false dilemma in arguing that San Francisco's
encampment resolutions and related policies are justified because the City must
balance "the needs of those experiencing homelessness with the needs of all San
Franciscans for safe and clean public spaces." Op. Br. at 2. Enforcing laws that
punish people because they are unhoused and have no other place to go undermines
cities' ability to meet any of those needs. Indeed, such laws—ironically known as
"quality of life laws"—do nothing more than worsen the quality of life for all

(whether homeless or not).[53] *See Pottinger v. City of Miami*, 359 F. Supp. 3d 1177, 1180–81 (S.D. Fla. 2019) ("[B]oth sides agree that arresting the homeless is never a solution because, apart from the constitutional impediments, it is expensive, not rehabilitating, inhumane, and not the way to deal with the 'chronic' homeless."). These laws undermine public safety and waste limited public resources.

### 1. Punishing Homelessness Undermines Public Safety

Quality of life laws, which include both criminal and civil penalties, undermine public safety in a number of ways. *First*, they contribute to a cycle of recidivism by prolonging and worsening the problem of homelessness.[54] Although supportive housing services have been shown to reduce recidivism rates, individuals leaving jails and prisons are ten times more likely than the general population to experience homelessness.[55] Indeed, employers often refuse to hire individuals with criminal convictions. Likewise, landlords often refuse to rent to individuals with criminal histories.[56] For example, a nationwide study found that 79 percent of "returning prisoners were denied housing or [were] deemed ineligible for it at some

---

[53] *See* Joshua Howard et al., Seattle Univ. Sch. of Law: Homeless Rights Advocacy Project, *At What Cost: The Minimum Cost of Criminalizing Homelessness in Seattle and Spokane* (2015), https://digitalcommons.law.seattleu.edu/hrap/10.
[54] *Housing Not Handcuffs* at 65.
[55] *Id.*
[56] *Id.* at 15.

point upon [their] re-entry."[57] Incarceration can also result in the suspension of social security benefits, and regardless of the severity of the crime, criminal convictions can render people ineligible for federally subsidized housing programs.[58]

When unhoused individuals are arrested or cited for engaging in life-sustaining activities, such as resting or sleeping outside, they are often not able to physically appear in court because of a lack of funds and lack of transportation. Without a mailing address or access to computers and the internet, it is also exceedingly difficult for unhoused individuals to find their case information, pay their fees, or discern the date and time of their scheduled court appearances.[59] Even civil penalties contribute to the harmful cycle of homelessness and criminalization. In addition to the financial hardships they create among people who already struggle to pay for their basic needs, civil citations requiring appearances in court can lead to arrest warrants for failure to appear, and even incarceration.[60] Moreover, citations that carry civil penalties do not trigger the right to counsel, meaning that someone

---

[57] *Id.* at 31. Although HUD limits the extent to which an individual's criminal history can be a factor in denying a housing application, discriminatory practices continue. Helen R. Kanovsky, *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions*, U.S. Dep't of Hous. and Urban Dev. (2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF
[58] *Housing Not Handcuffs* at 64.
[59] *Id.*
[60] *Id.* at 52.

experiencing homelessness who is arrested or cited under a civil statute is not appointed a public defender to help them navigate the process.[61] Unpaid civil fines can also ruin a person's credit history and thus become a direct bar to housing access in competitive rental markets where credit history is a factor in tenant selection.[62] Instead, quality of life laws force ex-offenders back into jails and prisons, which only serves to exacerbate the homelessness crisis.

*Second*, quality of life laws erode the small amount of trust that remains between homeless individuals and law enforcement officials. This erosion of trust not only increases the risk of confrontations between law enforcement and homeless individuals, but it also makes it less likely that homeless individuals—who are often witnesses to actual street crime—will cooperate with law enforcement.[63] This is true regardless of whether any of the Plaintiffs "have ever been cited or arrested for violating" San Francisco's "sit/sleep/lie laws" because the City's enforcement actions, which are subject to the preliminary injunction in this case, depend on the existence of these ordinances. Op. Br. at 3. Even the mere threat of enforcement, which is also at issue here, creates distrust, breeds hostility, and limits the effectiveness of police departments across the country.

*Finally*, by preventing homeless individuals from engaging in life-sustaining

---

[61] *Id.*

[62] *See id.*

[63] *Id.* at 65.

activities, quality of life laws inculcate and perpetuate the notion that the lives of homeless individuals are less important than the lives of the general population.[64] This dehumanization, in turn, makes homeless individuals more vulnerable to violence. For example, between 2013 and 2017, Denver saw a 42 percent increase in the number of reported crimes against homeless individuals after the city enacted an "urban camping ban," which appears to have pushed many of those individuals into nearby suburbs.[65] San Francisco's policy of sweeping encampments, seizing personal property, and forcibly displacing homeless individuals is no different.

### 2.    Punishing Homelessness Wastes Limited Public Resources

Enforcing quality of life laws is a staggeringly expensive endeavor nationwide that diverts already scarce resources from efforts that provide services to homeless individuals and that reduce unsheltered homelessness. As of 2015, for example, Los Angeles spent approximately $100 million annually on homelessness, but nearly $87

---

[64] According to the National Coalition for the Homeless, one of the first national community-based organizations to focus on homelessness, approximately 13,000 unhoused individuals die as a result of violence each year. Annie Leomporra & Megan Hustings, *Vulnerable to Hate: A Survey of Bias-Motivated Violence Against People Experiencing Homelessness in 2016-2017*, Nat'l Coal. for The Homeless (2018), at 9, https://nationalhomeless.org/wp-content/uploads/2018/12/hate-crimes-2016-171.pdf.

[65] *Housing Not Handcuffs* at 66; Tom McGhee, *Crimes Against Homeless People Up 42 Percent in Denver and Suburban Cops Say That's Pushing Transients into Their Towns*, Denver Post (Jan. 15, 2018, 7:32 AM), https://www.denverpost.com/2018/01/14/crimes-against-homeless-people-up-42-percent-in-denver-and-suburban-cops-say-thats-pushing-transients-into-their-towns/.

million of that amount went towards policing criminal and civil quality of life laws, while only $13 million went towards providing housing and services to the country's largest unsheltered population.[66] This problem is not just limited to California. Between 2010 and 2014, Denver spent over $3.23 million enforcing five of its anti-homelessness ordinances.[67] Likewise, Operation Rio Grande, a large-scale homeless arrest campaign in Salt Lake City, Utah, cost taxpayers an estimated $55.3 million, nearly 80 percent of which was spent on law enforcement activities. Less than $10 million went towards more permanent solutions such as housing, social services, and shelter.[68]

Clearances of homeless encampments (often referred to as "sweeps" or "clean-ups") are also expensive. Indeed, sweeps drain millions of dollars from governments across the country each year. Los Angeles, for example, spends over $30 million per year on sweeps.[69] Sweeps are not only expensive, they are also

---

[66] Gale Holland, *L.A. Spends $100 Million a Year on Homelessness, City Report Finds*, L.A. Times, Apr. 16, 2015, https://www.latimes.com/local/lanow/la-me-ln-homeless-cao-report-20150416-story.html; *Housing Not Handcuffs* at 71.
[67] Rachel A. Adcock et al., *Too High A Price: What Criminalizing Homelessness Costs Colorado*, Univ. of Denver, Sturm College of Law: Homeless Advocacy Pol'y Project (Feb. 16, 2016), at 25 https://www.law.du.edu/documents/homeless-advocacy-policyproject/2-16-16-Final-Report.pdf.
[68] Bethany Rodgers & Taylor Stevens, *Nearly 80% of the money budgeted for Operation Rio Grande was used for policing, jail beds and court costs*, The Salt Lake Tribune, Dec. 14, 2020, https://www.sltrib.com/news/politics/2020/12/13/nearly-money-budgeted/.
[69] *Housing Not Handcuffs* at 71.

wasteful of precious public resources. Because they cannot afford housing, or even access temporary emergency shelter in most instances, homeless people subject to an encampment sweep simply move to other public spaces, inevitably leading to yet another sweep. Sweeps perpetuate a relentless cycle, in which cities expend resources for no long-term gain and leave many homeless persons worse off for having lost their personal property, connection to outreach workers or other social service providers, or protective social networks. In fact, studies have shown that homeless people who are simply displaced from their encampments to other public spaces, rather than to housing, are often driven into more dangerous environments and situations.[70]

### D. Preserving *Martin* and Ending the Criminalization of Homelessness is Necessary to Protect the Constitutional Rights of Homeless Persons

As homelessness and the prevalence of encampments increase, so, too, do camping and sleeping bans and the inhumane sweeps that are used to enforce them.[71]

---

[70] *See Pervasive Poverty* at 10 (noting that "[m]any of those interviewed reported experiencing violence and insecurity directly related to a camp eviction" and that multiple women "reported being sexually assaulted immediately following a police move-along order.")

[71] The Law Center has tracked laws criminalizing homelessness across all measured categories since 2006. As of 2019, 72 percent of cities had at least one law prohibiting camping in public, a 92 percent increase from 2006 and a 15 percent increase from 2016. In the same year, 51 percent of cities had at least one law restricting sleeping in public, a 50 percent increase from 2006 and an 18 percent increase from 2016. Enforcement of these types of laws often leads to

Sweeps and associated destruction of property are devastating.[72] These types of sweeps can also result in the destruction of critical documents such as social security cards or birth certificates, further compounding the existing barriers for unsheltered individuals attempting to access government services or to obtain housing. Not only do they strip unhoused individuals of their dignity, stability, and what few personal belongings they may have, but they also risk violating their constitutional rights.[73]

---

encampment sweeps, property confiscation, and other activities such as the ones challenged in this action. *See Housing Not Handcuffs*.

[72] *See Lavan v. City of L.A.,* 693 F.3d 1022, 1026 (9th Cir. 2012) (noting that a homeless person's property, however meager it may seem to an outsider, "represent[s] everything they own."); *see also Housing Not Handcuffs* at 40-41 (writing that for unsheltered individuals, property loss is "the greatest threat" to their survival.").

[73] There is also widespread recognition that the criminalization of homelessness violates international law, and the United States has been repeatedly called upon to remedy these violations. *See, e.g.* United Nations Human Rights Comm., *Concluding Observations*, CCPR/C/USA/CO/4, at ¶ 19 (Apr. 23, 2014), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G14/426/73/PDF/G1442673.pdf?OpenElement; Comm. on the Elimination of Racial Discrimination, *Concluding Observations*, CERD/C/USA/CO/7-9, at ¶ 12 (Aug. 29, 2014), https://digitallibrary.un.org/record/786227?ln=en; United Nations Human Rights Council, *Report of the Special Rapporteur on Extreme Poverty and Human Rights on His Mission to the United States of America*, at ¶ 45, U.N. Doc. A/HRC/38/33/Add.1 (May 4, 2018), https://socialprotection-humanrights.org/wp-content/uploads/2018/06/G1812530.pdf; United Nations Human Rights Council, *Guidelines for the Implementation of the Right to Adequate Housing: Report of the Special Rapporteur on Adequate Housing as a Component of the Right to an Adequate Standard of Living, and on the Right to Non-Discrimination in This Context*, at ¶ 30, U.N. Doc. A/HRC/43/43 (Dec. 26, 2019), https://digitallibrary.un.org/record/3872412?ln=en#. Furthermore, the United States has itself acknowledged punishment of homelessness as a violation of human rights. In 2014, the U.S. Department of Justice filed a brief in *Bell v. Boise*

Unsheltered individuals, like anyone else, have "a compelling ownership interest in their personal property" and are entitled to due process of law when facing property deprivation. *See v. City of Fort Wayne,* Cause No. 1:16-cv-00105-JVB-SLC, 2016 U.S. Dist. LEXIS 185598, at *27 (N.D. Ind. June 16, 2016), *adopted* 2017 U.S. Dist. LEXIS 49956 (N.D. Ind., Mar. 31, 2017); *see also Lavan*, 693 F.3d at 1031. This interest outweighs the minor procedural burden on the City to provide adequate notice and process before conducting sweeps. *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

Decisions, such as *Martin*, which safeguard rights of homeless individuals in this circuit also serve an essential function by requiring government actions to comply with constitutionally accepted standards. People who are unhoused are 11 times more likely to be arrested than those who are housed.[74] But they are also less likely to have access to legal counsel and the courts because of the many barriers

---

(later *Martin v. Boise*) stating, "[i]t should be uncontroversial that punishing conduct that is a universal and unavoidable consequence of being human violates the Eighth Amendment." Statement of Interest of the United States, *Bell v. City of Boise*, 993 F. Supp. 2d. 1237 (D. Idaho 2014), https://www.justice.gov/opa/file/643766/download. In 2016, the Department later affirmed that its position in *Bell* was an "acknowledgement of the human rights of people experiencing homelessness." Letter from Lisa Foster, Dir., Off. for Access to Just., U.S. Dep't of Just., to Seattle City Council Members (Oct. 13, 2016), at 3, https://assets.documentcloud.org/documents/3141894/DOJ-ATJ-Letter-to-Seattle-City-Council-10-13-2016.pdf.

[74] Madeline Bailey et al., *No Access to Justice: Breaking the Cycle of Homelessness and Jail*, Vera Institute (Aug. 2020), at 6, https://www.vera.org/downloads/publications/no-access-to-justice.pdf.

presented by homelessness and poverty. Without this preliminary injunction, Plaintiffs, and thousands of others who are similarly situated in San Francisco, would effectively be stripped of their ability to seek judicial recourse when their constitutional rights to life, liberty, and property are threatened. Given the inherent power imbalances and other systemic issues which prevent homeless individuals from enforcing their own rights on a day-to-day basis, it is the government's responsibility to enact (and comply with) policies which recognize those rights, and the City's failure to do so should not go unchecked. Rather, for the thousands of unsheltered San Francisco residents who are subject to criminalization policies, the jeopardization of their already tenuous access to justice is of utmost importance.

## IV. CONCLUSION

For the foregoing reasons, *Amici* respectfully request that this Court affirm the district court's injunction.

Dated: April 11, 2023          CROWELL & MORING LLP

By:     s/ Deborah E. Arbabi
      Deborah E. Arbabi
      Alice Hall-Partyka
      Emmanuel Hurtado
      Attorneys for *Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | No. 23-15087

The undersigned attorney or self-represented party states the following:

◉ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/Emmanuel Hurtado | **Date** | 4/11/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | No. 23-15087

I am the attorney or self-represented party.

**This brief contains** | 6,434 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Emmanuel Hurtado | **Date** | 4/11/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## <u>CERTIFICATE OF SERVICE</u>

I, Jennifer Tai, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on April 11, 2023.

**BRIEF OF AMICI CURIAE THE NATIONAL HOMELESSNESS LAW CENTER, THE NATIONAL LOW INCOME HOUSING COALITION, THE NATIONAL COALITION FOR THE HOMELESS, AND THE NATIONAL ALLIANCE TO END HOMELESSNESS IN SUPPORT OF PLAINTIFFS AND RESPONDENTS AND IN OPPOSITION TO REVERSAL**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed April 11, 2023, at Los Angeles, California.

　　　　　　　　　　　　　　　s/ Jennifer Tai
　　　　　　　　　　　　　　Jennifer Tai