No. 23-15087

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

COALITION ON HOMELESSNESS; TORO CASTAÑO; SARAH
CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID
MARTINEZ; TERESA SANDOVAL; NATHANIEL VAUGHN,

*Plaintiffs-Appellees,*

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:22-cv-05502-DMR
Hon. Donna M. Ryu

**BRIEF OF *AMICI CURIAE* HEALTHCARE PROVIDERS IN SUPPORT OF
PLAINTIFFS-APPELLEES**

ROHIT K. SINGLA
Rohit.Singla@mto.com
J. MAX ROSEN
Max.Rosen@mto.com
ALEX C. WERNER
Alex.Werner@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
Telephone: (213) 683-9100

*Counsel of Record for Amici Curiae*
Drs. Sharad Jain, Harrison Alter, Nicholas
Iverson, Hemal Kanzaria, Elaine Khoong,
Margot Kushel, John Landefeld, Katherine
Lupton, Lisa Ochoa-Frongia, Naomi
Schoenfeld, Farah Shaheen, Sara Teasdale,
Melody Tran-Reina

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF AMICI CURIAE ............................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 3

ARGUMENT ...................................................................................... 5

    I.    A GROWING NATIONAL CONSENSUS RECOGNIZES THE DIRECT AND INDIRECT HEALTH CONSEQUENCES OF SWEEPS .......................................................................... 5

    II.    STAFF FREQUENTLY SEIZE AND DESTROY VITAL MEDICATION DURING ENCAMPMENT SWEEPS, WHICH EXACERBATES AND PERPETUATES CHRONIC HEALTH CONDITIONS ...................................................................... 8

    III.    STAFF CONDUCTING SWEEPS ALSO SEIZE AND DESTROY the MEDICAL EQUIPMENT, BASIC SURVIVAL GEAR, AND SENTIMENTAL ITEMS OF INVOLUNTARILY HOMELESS INDIVIDUALS, WHICH IN TURN EXACERBATES NUMEROUS MEDICAL PROBLEMS ..................................................................... 11

    IV.    THE DISPLACEMENT AND ISOLATION CAUSED BY SWEEPS SEPARATES INDIVIDUALS FROM HEALTH CARE AND SUPPORTIVE SERVICES, FURTHER FOSTERING NEGATIVE MEDICAL OUTCOMES ...................... 13

CONCLUSION .................................................................................... 15

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

### OTHER AUTHORITIES

Anna Gorman, *'Medieval' Diseases Flare As Unsanitary Living Conditions Proliferate*, Kaiser Health News (Mar. 12, 2019), available at https://kffhealthnews.org/news/medieval-diseases-flare-as-unsanitary-living-conditions-proliferate/ ................................................8

Anna Gorman & Harriet Blair Rowan, *The Homeless Are Dying In Record Numbers On The Streets Of L.A.*, Kaiser Health News (Apr. 24, 2019), available at https://kffhealthnews.org/news/the-homeless-are-dying-in-record-numbers-on-the-streets-of-l-a/ ..........................15

Anna Maria Barry-Jester, *Sweeps Of Homeless Camps In California Aggravate Key Health Issues*, National Public Radio, available at https://www.npr.org/sections/health-shots/2020/01/10/794616155/sweeps-of-homeless-camps-in-california-aggravate-key-health-issues (Jan. 10, 2020).......................................9

Antoinette B. Coe et al., *Medication Adherence Challenges among Patients Experiencing Homelessness in a Behavioral Health Clinic*, Research in Social and Administrative Pharmacy, May-June 2015, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3733792/ .............................10

Center for Disease Control, *Homeless Service Sites & Correctional Facilities*, last updated Nov. 29, 2022, accessible at https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html........................................7

Diane Qi et al., *Health Impact of Street Sweeps from the Perspective of Healthcare Providers*, 37 J. General Internal Medicine 3707 (2022).........................................................................................10, 11, 12

Erin McCormick, *'Homelessness Is Lethal': US Deaths Among Those Without Housing Are Surging*, The Guardian (Feb. 7, 2022), available at https://www.theguardian.com/us-news/2022/feb/07/homelessness-is-lethal-deaths-have-risen-dramatically........................................................................................8

Health Resources & Services Administration, *National Health Care for the Homeless Council*, available at https://www.hrsa.gov/library/national-health-care-homeless-council ..................................................................................................6

Jamie Suki Chang et al., *Harms of Encampment Abatements on the Health of Unhoused People*, SSM - Qualitative Research in Health (Dec. 2022), available at https://www.sciencedirect.com/science/article/pii/S2667321522000269 ..................................................................................7, 12, 14, 15

Joshua A. Barocas et al., *Population-Level Health Effects of Involuntary Displacement of People Experiencing Unsheltered Homelessness Who Inject Drugs in US Cities*, Journal of the American Medical Association, Apr. 10, 2023, available at https://jamanetwork.com/journals/jama/fullarticle/2803839 ...........................4, 7

Margot Kushel, *Involuntary Displacement—Making a Bad Situation Worse*, Journal of the American Medical Association, Apr. 10, 2023, available at https://jamanetwork.com/journals/jama/fullarticle/2803840 ...............................7

Marisa Westbrook & Tony Robinson, *Unhealthy by Design: Health & Safety Consequences of the Criminalization of Homelessness*, 30 Journal of Social Distress and Homelessness 107 (2021) ...............................7, 8

National Health Care for the Homeless Council, *Impact of Encampment Sweeps on People Experiencing Homelessness* (December 2022), available at https://nhchc.org/wp-content/uploads/2022/12/NHCHC-encampment-sweeps-issue-brief-12-22.pdf ..............................................................................6, 14

National Health Care for the Homeless Council, *Who We Are*, available at https://nhchc.org/who-we-are/ ..........................................................6

National League of Cities, *An Overview of Homeless Encampments for City Leaders* (Jan. 2022), available at https://www.nlc.org/resource/an-overview-of-homeless-encampments/. ...................................................................................14

Nuala Sawyer, *Sweeps of Homeless Camps in S.F. Are Creating A Public Health Crisis*, Center for Health Journalism (Mar. 21, 2019), available at https://centerforhealthjournalism.org/2019/03/14/sweeps-homeless-camps-sf-are-creating-public-health-crisis ........................................... 9

Sahar S. Eshtehardi et al., *Sociodemographic Determinants of Nonadherence to Depression and Anxiety Medication among Individuals Experiencing Homelessness*, 18 Int'l J. Env. Research & Pub. Health 7958 (2021), available at https://www.mdpi.com/1660-4601/18/15/7958 ................................................. 10

Sam Levin, *'We Have Failed': How California's Homelessness Catastrophe Is Worsening*, The Guardian (Mar. 22, 2022), available at https://www.theguardian.com/us-news/2022/mar/22/california-homelessness-crisis-unhoused-and-unequal ........................................................................................... 3

Thomas Fuller, *A Rising Tally of Lonely Deaths on the Streets*, New York Times (Apr. 18, 2022) .......................................................... 8, 15

United States Interagency Council on Homelessness, *About USICH*, available at https://www.usich.gov/about-usich/ ................................................. 6

United States Interagency Council on Homelessness, *ALL IN: The Federal Strategic Plan to Prevent and End Homelessness*, available at https://www.usich.gov/All_In.pdf ..................................................... 6

## INTEREST OF AMICI CURIAE

*Amici curiae*, Drs. Sharad Jain, Harrison Alter, Nicholas Iverson, Hemal Kanzaria, Elaine Khoong, Margot Kushel, John Landefeld, Katherine Lupton, Lisa Ochoa-Frongia, Naomi Schoenfeld, Farah Shaheen, Sara Teasdale, and Melody Tran-Reina, submit this brief supporting the affirmance of the decision of the district court.[1]

*Amici* are healthcare providers from various areas of expertise, including internal medicine and primary care for vulnerable and under-resourced populations. *Amici* have conducted research and lectured on health inequities and disparities in health outcomes related to socioeconomic status. In addition, *amici* have reviewed relevant case-studies and literature on the health care needs and outcomes for unhoused individuals, and have first-hand experience providing such medical care. *Amici* believe that the Court's consideration of this appeal will be enhanced by a clearer understanding of the direct and indirect medical impacts associated with encampment abatement or "sweep" policies that, as the district court found in this case, can result in property destruction and leave unhoused

---

[1] All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a); Circ. Adv. Comm. N. to Rule 29-3 ("obtaining such consent relieves the Court of the need to consider a motion"). No counsel for a party authored this brief in whole or in part, and no party or party counsel contributed money to fund this brief. No person other than *amici curiae* made any monetary contribution to fund the preparation or submission of this brief.

individuals with no available shelter.  Accordingly, this brief surveys recent research and literature on the negative effects of sweeps on unhoused individuals and highlights studies that detail the detrimental health impacts associated with certain encampment abatement practices, such as those addressed by the district court.  *Amici* believe that the negative health impacts of certain encampment abatement and "sweep" policies detailed in this research may assist the Court in assessing the legality of those sweeps.

Dr. Sharad Jain, MD

Dr. Harrison Alter, MD, MS

Dr. Nicholas Iverson, MD

Dr. Hemal Kanzaria, MD, Msc

Dr. Elaine Khoong, MD, MS

Dr. Margot Kushel, MD

Dr. John Landefeld, MD

Dr. Katherine Lupton, MD

Dr. Lisa Ochoa-Frongia, MD

Dr. Naomi Schoenfeld, PhD, NP

Dr. Farah Shaheen, MD

Dr. Sara Teasdale, MD

Dr. Melody Tran-Reina, MD

## INTRODUCTION AND SUMMARY OF ARGUMENT

It is well-documented that California is experiencing a homelessness crisis. That crisis has worsened across the nation, and specifically within California, over the last decade.[2] As increasing numbers of individuals experience involuntary homelessness, they often seek shelter in makeshift encampments, frequently established in public spaces. In response, many municipalities have implemented policies to clear encampments through encampment abatement operations, informally known as sweeps.[3] These operations often seize and destroy key property (including medication, medical equipment, and outdoor survival gear), displace individuals into isolated and dangerous spaces, and consequently harm the health of affected individuals.

In this case, Plaintiffs-Appellees challenge aspects of San Francisco's sweeps, described by San Francisco as "homeless encampment resolutions."[4] In particular, Plaintiffs challenge San Francisco's inadequate provision of alternative

---

[2] *See* Sam Levin, *'We Have Failed': How California's Homelessness Catastrophe Is Worsening*, The Guardian (Mar. 22, 2022), available at https://www.theguardian.com/us-news/2022/mar/22/california-homelessness-crisis-unhoused-and-unequal (noting a 31% increase in California's unhoused population between 2010 and 2020, and a concurrent 57% increase in the unsheltered unhoused population).
[3] *Id.* ("Out of the 20 largest cities in California, the majority have either passed or proposed new laws banning camping in certain places or have ramped up encampment sweeps.").
[4] *See* 1-ER-0002 ("Order on Motion for Preliminary Injunction").

shelter to individuals displaced by sweeps and San Francisco's seizure and destruction of unhoused individuals' unabandoned personal property.

The factual record in this case is clear. As the district court in this case expressly found, San Francisco lacks sufficient shelter space to offer alternative shelter to displaced individuals during sweeps.[5] Moreover, as the district court further found, San Francisco's sweeps regularly result in the seizure and destruction of unabandoned personal property.[6] As that record—and a growing body of medical literature—make clear, these sweeps do more than simply clear public spaces. They displace unhoused individuals and destroy their medication, durable medical equipment, critical survival gear, and other essential property. The result is significantly increased morbidity and mortality for affected individuals.[7] The displacement of unhoused individuals and loss of vital property

---

[5] 1-ER-0037-38 ("Order on Motion for Preliminary Injunction") ("Plaintiffs assert, and Defendants concede, that San Francisco does not have adequate available shelter.... Despite San Francisco's indisputably insufficient stock of shelter beds, SFPD continues to cite, arrest, and force homeless individuals to vacate encampments and 'move along' under the threat of enforcement."); *see also* 1-ER-0042-43 ("Order on Motion for Preliminary Injunction") (finding that Defendants' argument that all displaced persons are offered shelter "lacks factual support").

[6] 1-ER-0043-46 ("Order on Motion for Preliminary Injunction") (concluding that the evidence shows that San Francisco's Department of Public Works destroys unabandoned property).

[7] *See, e.g.*, Joshua A. Barocas et al., *Population-Level Health Effects of Involuntary Displacement of People Experiencing Unsheltered Homelessness Who Inject Drugs in US Cities*, JAMA (Apr. 10, 2023) at E7, available at https://jamanetwork.com/journals/jama/fullarticle/2803839 (finding significant effects on morbidity and mortality linked to sweeps and associated involuntary displacement for individuals experiencing unsheltered homeless who inject drugs).

create significant negative health impacts for those affected individuals—and by extension, for our community as a whole.

As Dr. Christopher J. Herring explained in his expert declaration below, San Francisco's sweeps give rise to move-along orders and confiscation or destruction of property that can harm unhoused individuals.[8] *Amici* are a group of medical professionals who believe that a thorough understanding of the myriad ways in which sweeps negatively impact the health of affected individuals will enable this Court to best assess the harm such policies incur and the balance of hardships and public interest in this case. An understanding of these medical harms underscores the correctness—as both a legal and equitable matter—of the district court's preliminary injunction.

## ARGUMENT

## I.   A GROWING NATIONAL CONSENSUS RECOGNIZES THE DIRECT AND INDIRECT HEALTH CONSEQUENCES OF SWEEPS

A growing national consensus of researchers, national advocacy groups, and government agencies has recognized the harm caused by overbroad sweeps. In the past few years, these groups have carefully documented the direct negative health impacts associated with sweeping practices that target unhoused individuals. For

---

[8] *See generally* 7-ER-1593-1645 ("Expert Declaration of Christopher John Herring, Ph.D. in Support of Plaintiffs' Motion for Preliminary Injunction").

instance, in its December 2022 Strategic Plan to Prevent and End Homelessness,

the U.S. Interagency Council on Homelessness[9] identified an increase in

communities clearing encampments without providing alternative shelter.[10]  The

Council on Homelessness specifically warned that such sweeps disrupt attempts to

end homelessness by causing property loss and destruction, breakdowns in

communication with healthcare and services providers, and trauma to unhoused

individuals.[11]  According to the National Health Care for the Homeless Council,[12]

encampment sweeps "damage health, well-being, and connections to care" for

affected individuals.[13]  Sociological and medical research both inside of and

beyond California similarly suggests that broad sweeps have "long term, serious

------------------------------

[9] The United States Interagency Council on Homelessness is an independent federal agency within the executive branch and is the only federal agency with a sole mission focused on preventing and ending homelessness in America.  The USCIH is advised by a council that represents, among others, heads of 20 other federal agencies.  *See* United States Interagency Council on Homelessness, *About USICH*, available at https://www.usich.gov/about-usich/.
[10] United States Interagency Council on Homelessness, *ALL IN: The Federal Strategic Plan to Prevent and End Homelessness* at 20 (December 2022), available at https://www.usich.gov/All_In.pdf.
[11] *Id.*
[12] The National Health Care for the Homeless Council is a network of more than 10,000 doctors, nurses, social workers, patients, and advocates, and identifies as "the premier national organization working at the nexus of homelessness and health care."  *See* National Health Care for the Homeless Council, *Who We Are*, available at https://nhchc.org/who-we-are/; Health Resources & Services Administration, *National Health Care for the Homeless Council*, available at https://www.hrsa.gov/library/national-health-care-homeless-council.
[13] National Health Care for the Homeless Council, *Impact of Encampment Sweeps on People Experiencing Homelessness* at 3 (December 2022), available at https://nhchc.org/wp-content/uploads/2022/12/NHCHC-encampment-sweeps-issue-brief-12-22.pdf.

ramifications on people's health."[14]   A recent sociological study in Colorado

concluded that because of sweeping practices, "homeless persons lose sleep, seek

less safe sleeping conditions, experience increased stress, and find their physical

and mental health deteriorating."[15]   According to the Center for Disease Control,

because the risk of severe COVID-19 is elevated in the unsheltered unhoused due

to underlying medical conditions and difficulties accessing health care, "when

COVID-19 Community Levels are high, encampment enclosure should only be

conducted as part of a plan to rehouse people living in encampments."[16]   A study

published earlier this month that used population-level modelling across 23 U.S.

cities found that involuntary displacement from sweeps can lead to death for many

unsheltered people experiencing homelessness.[17]   Such harmful effects likely

impact all unsheltered unhoused individuals.[18]

---

[14] *See, e.g.,* Jamie Suki Chang et al., *Harms of Encampment Abatements on the Health of Unhoused People*, SSM – Qualitative Research in Health (Dec. 2022) at 9, available at https://www.sciencedirect.com/science/article/pii/S2667321522000269.

[15] *See* Marisa Westbrook & Tony Robinson, *Unhealthy by Design: Health & Safety Consequences of the Criminalization of Homelessness*, 30 Journal of Social Distress and Homelessness 107, 112 (2021).

[16] Center for Disease Control, *Homeless Service Sites & Correctional Facilities*, last updated Nov. 29, 2022, accessible at https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-correctional-settings.html.

[17] Barocas et al., supra note 7, at E7-E8 (finding that sweeps and related displacement could be associated with one quarter of all deaths among unsheltered people experiencing homelessness who inject drugs by 2028).

[18] Margot Kushel, *Involuntary Displacement—Making a Bad Situation Worse*, JAMA (Apr. 10, 2023) at E1, available at https://jamanetwork.com/journals/jama/fullarticle/2803840 ("[M]echanisms would have negative effects on all individuals who experience unsheltered homelessness,

In short, the consensus is clear. The types of sweeping practices employed by San Francisco in this case directly harm the health of unhoused individuals.

## II.   STAFF FREQUENTLY SEIZE AND DESTROY VITAL MEDICATION DURING ENCAMPMENT SWEEPS, WHICH EXACERBATES AND PERPETUATES CHRONIC HEALTH CONDITIONS

The reasons for this medical and policy consensus are numerous. As an initial matter, sweeps can result in the destruction of vital medication. Treatable disease represents a significant threat to unhoused individuals and a factor behind rising death tolls.[19] Preventable and treatable diseases are "among the biggest causes of premature homeless deaths."[20] Preventable disease poses particular risk for unhoused individuals in part due to the weakened immune systems of many due to stress, malnutrition, and sleep deprivation.[21] Sweeps worsen these conditions.[22]

---

not only those who use injection drugs.… [I]t is reasonable to assume that all people facing unsheltered homelessness and involuntary displacements would face increased risk of harm against a background of elevated baseline risk.").

[19] *See, e.g.*, Thomas Fuller, *A Rising Tally of Lonely Deaths on the Streets*, New York Times (Apr. 18, 2022) ("[M]any homeless people are dying young of treatable chronic illnesses like heart disease."); Anna Gorman, *'Medieval' Diseases Flare As Unsanitary Living Conditions Proliferate*, Kaiser Health News (Mar. 12, 2019), available at https://kffhealthnews.org/news/medieval-diseases-flare-as-unsanitary-living-conditions-proliferate/ (describing the impact of preventable infectious diseases on homeless individuals).

[20] Erin McCormick, *'Homelessness Is Lethal': US Deaths Among Those Without Housing Are Surging*, The Guardian (Feb. 7, 2022), available at https://www.theguardian.com/us-news/2022/feb/07/homelessness-is-lethal-deaths-have-risen-dramatically (analyzing data from across 20 jurisdictions gathered from local governments and service providers).

[21] Gorman, supra note 19 ("People living on the streets or in homeless shelters are vulnerable to such outbreaks because their weakened immune systems are worsened by stress, malnutrition, and sleep deprivation.").

[22] *See* Westbrook & Robinson, supra note 15, at 112.

Broad sweep operations negatively impact the health of unhoused individuals through destruction of property, including critical medication.[23]  Where staff conduct sweeps without providing notice and without preserving property—as the district court found occurs in this case—medication is often discarded.[24] Sweeps thus make it difficult for unhoused individuals to preserve and retain their medications, with obvious health detriments.[25]

These effects are well-documented.  In one recent study, San Francisco healthcare providers who worked with unhoused individuals described the significant health impacts on unhoused individuals caused by property losses

---

[23] 1-ER-0045 ("Order on Motion for Preliminary Injunction") ("The individual Plaintiffs' declarations clearly describe specific incidents in which DPW has seized and/or destroyed personal property that was not abandoned, such as…medication[.]").  *See* 7-ER-1624 ("Expert Declaration of Christopher John Herring, Ph.D. in Support of Plaintiffs' Motion for Preliminary Injunction"), ¶ 92; 7-ER-1729 ("Declaration of David Martinez"), ¶¶ 4-5 (describing DPW's disposal of, among other attended property, four different congestive heart failure medications while the declarant attended a medical appointment).

[24] *See, e.g.*, Anna Maria Barry-Jester, *Sweeps Of Homeless Camps In California Aggravate Key Health Issues*, National Public Radio, available at https://www.npr.org/sections/health-shots/2020/01/10/794616155/sweeps-of-homeless-camps-in-california-aggravate-key-health-issues (Jan. 10, 2020) (describing the destruction and loss of one individual's hepatitis C medicine over his protests).

[25] Nuala Sawyer, *Sweeps of Homeless Camps in S.F. Are Creating A Public Health Crisis*, Center for Health Journalism (Mar. 21, 2019), available at https://centerforhealthjournalism.org/2019/03/14/sweeps-homeless-camps-sf-are-creating-public-health-crisis ("[O]ne recurring result of these sweeps is the difficulty unhoused people have in holding on to their medical prescriptions. When bags and tents are thrown into the trash, medication often goes with them. This can be antibiotics for staph infections, antidepressants, or the vital, life-saving cocktail of drugs that treat Hepatitis C.").

associated with sweeps.[26]  Providers specifically noted the loss of necessary

medications and emphasized the difficulty of replacing medications, with one

physician pointing out that due to various barriers unhoused individuals face, loss

of medication might lead unhoused patients to not be on their medications for

"weeks to even months."[27]  Providers explained that this loss of medication

interferes with effective management of infectious disease and can exacerbate

chronic health conditions.[28]

Destruction or loss of medication is particularly significant for unhoused

individuals suffering from chronic illness.  Medication nonadherence, caused in

part by unique barriers such as a lack of secure storage space for medication,

contributes to premature morbidity and mortality among unhoused individuals.[29]

Destruction of medication at the hands of staff during sweeps worsens existing

---

[26] Diane Qi et al., *Health Impact of Street Sweeps from the Perspective of Healthcare Providers*, 37 J. General Internal Medicine 3707, 3709 (2022).
[27] *Id.* at 3709.
[28] *Id.* at 3710.  Providers described sweeps as exacerbating or complicating (among other diseases) hypertension, asthma, congestive heart failure, diabetes, seizure disorders.  *Id.*
[29] *See* Sahar S. Eshtehardi et al., *Sociodemographic Determinants of Nonadherence to Depression and Anxiety Medication among Individuals Experiencing Homelessness*, 18 Int'l J. Env. Research & Pub. Health 7958 at 2 (2021), available at https://www.mdpi.com/1660-4601/18/15/7958; *see also* Antoinette B. Coe et al., *Medication Adherence Challenges among Patients Experiencing Homelessness in a Behavioral Health Clinic*, Research in Social and Administrative Pharmacy, May-June 2015, at 6-7, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3733792/ ("Lost or stolen medication was another patient-related reason for medication [non]adherence in this group of homeless patients.").

barriers to medication adherence and effective treatment for this vulnerable

population.

### III. STAFF CONDUCTING SWEEPS ALSO SEIZE AND DESTROY THE MEDICAL EQUIPMENT, BASIC SURVIVAL GEAR, AND SENTIMENTAL ITEMS OF INVOLUNTARILY HOMELESS INDIVIDUALS, WHICH IN TURN EXACERBATES NUMEROUS MEDICAL PROBLEMS

Indiscriminate disposal of property in encampments dispossesses individuals

of not only medication, but also durable medical equipment, basic survival gear,

and valued sentimental items.  Loss of this property particularly harms those who

are already sick or unwell.

In one survey, San Francisco healthcare providers noted that patients'

important durable medical equipment, such as walkers, wheelchairs, canes, and

crutches, were often destroyed or lost in sweeps.[30]  These provider perspectives

echo the experience of at least one individual Plaintiff in this case, whose

prosthetics were destroyed in a sweep and who has not since been able to replace

them.[31]

Lost medical equipment hinders individuals' ability to maintain their own

health.  One San Francisco provider explained that loss of mobility equipment such

as walkers can lead individuals to miss healthcare appointments, miss meals, and

---

[30] Qi et al., supra note 26, at 3710.
[31] *See* 7-ER-1732 ("Declaration of Teresa Sandoval"), ¶ 6.

otherwise be unable to meet their basic needs while increasing their vulnerability and resulting risk of injury due to violence from others.[32]

Sweeps can also result in the destruction and loss of important survival gear such as tents, backpacks, blankets, and tarps. In the same survey, healthcare providers emphasized the negative health impacts of these losses. As the providers explained, losing these pieces of basic survival gear critical to surviving life outside "can make people who are already ill much more sick, and risk them needing hospitalization or, failing that, dying[.]"[33]

Sweeps destroy more than utilitarian items; they also result in the destruction of sentimental items. That too can create significant mental and physical health problems for unhoused individuals. The destruction of personal items of sentimental value causes "psychological distress, and emotional trauma" that can worsen existing health conditions and overall mental health.[34] One study, by way of example, detailed a sweep in which a mother's final picture of her deceased son was seized and then discarded over her fervent protests.[35] The psychological effect and trauma of such destruction—only one example of many—is clear.

---

[32] Qi et al., *supra* note 26, at 3709-10.
[33] Qi et al., *supra* note 26, at 3709-10.
[34] *See, e.g.*, Chang et al., *supra* note 14, at 3.
[35] *See id.*

Sweeping operations often destroy or remove property that is critical for both functional and emotional purposes. This wholesale property destruction and loss "sever[s] people from possessions, resources, and social supports needed to sustain health."[36] At a basic level, sweeps "harm[] the physical and emotional health of unhoused people by dispossessing them of the belongings they need to survive outdoors."[37]

## IV. THE DISPLACEMENT AND ISOLATION CAUSED BY SWEEPS SEPARATES INDIVIDUALS FROM HEALTH CARE AND SUPPORTIVE SERVICES, FURTHER FOSTERING NEGATIVE MEDICAL OUTCOMES

In addition to destroying vital property, sweeps also displace unhoused individuals from places where they have established safety, shelter, and community. Conducting sweeps without offering a reasonable sheltered alternative is both unethical and unhealthy. Conducting sweeps without offers of alternative shelter predictably separates unhoused individuals from supportive environments.[38] This displacement disperses individuals, fragmenting community and social connections that may provide support, and often separates individuals

---

[36] *Id.* at 9.
[37] *See id.* at 3.
[38] *See* 7-ER-1624 ("Expert Declaration of Christopher John Herring, Ph.D. in Support of Plaintiffs' Motion for Preliminary Injunction"), ¶ 93.

from basic sanitation or waste disposal infrastructure.[39] Further, sweeping without providing shelter "effectively push[es] unhoused people into acutely risky places that are isolated, [and] remote."[40] Indeed, one study found that such sweeps often serve as "the underlying reason [unhoused] people relocated into more isolated, hazardous, and remote spaces."[41]

Similarly, displacement forces individuals into isolation that can break their connections with social services, outreach groups, and healthcare providers.[42] For example, after sweeps were implemented with inadequate shelter in Santa Clara, California, "[m]edical teams encountered persistent issues locating patients in [new] encampments."[43] Providers lost the opportunity to engage vulnerable individuals in follow-up care—a documented effect of such sweeps.[44] The district court's finding that San Francisco staff execute sweeps without being able to offer adequate alternative shelter thus makes clear the profound mental and physical

---

[39] *See* National League of Cities, *An Overview of Homeless Encampments for City Leaders* (Jan. 2022) at 6-7, available at https://www.nlc.org/resource/an-overview-of-homeless-encampments/.
[40] Chang et al., supra note 14, at 5.
[41] Chang et al., supra note 14, at 9.
[42] *See* 7-ER-1625 ("Expert Declaration of Christopher John Herring, Ph.D. in Support of Plaintiffs' Motion for Preliminary Injunction"), ¶ 94.
[43] Chang et al., supra note 14, at 6.
[44] *See* National Health Care for the Homeless Council, *Impact of Encampment Sweeps on People Experiencing Homelessness*, supra note 13, at 3 (explaining that providers "often cannot find their patients after a sweep, and have no knowledge of where they might have gone" and that thus "the opportunity to engage someone in additional care … has now been lost").

health problems that these sweeps can create—and that the district court's preliminary injunction will help to ameliorate.[45]

## CONCLUSION

Unhoused individuals are dying at accelerating rates in cities across the country.[46] Research suggests that sweeping practices are far more than a mere inconvenience for affected individuals. Instead, sweeps constitute "a key structural factor explaining the soaring numbers of people who are dying while unhoused[.]"[47] The specific practices at issue in this case—displacement without alternative shelter and indiscriminate destruction of property, including medication, durable medical equipment, and survival gear—directly and indirectly harm the health of this vulnerable group.

*Amici* respectfully submit that such research further confirms that the district court's order should be affirmed.

---

[45] *See* 1-ER-0039-43 ("Order on Motion for Preliminary Injunction").
[46] *See* Anna Gorman & Harriet Blair Rowan, *The Homeless Are Dying In Record Numbers On The Streets Of L.A.*, Kaiser Health News (Apr. 24, 2019), available at https://kffhealthnews.org/news/the-homeless-are-dying-in-record-numbers-on-the-streets-of-l-a/ (noting rising death rates in among unhoused individuals in L.A. County); Fuller, supra note 19 (describing a 200% increase in the rate of homeless deaths in Los Angeles County from 2015-2020); *id.* (noting officials and advocates that are "alarmed by the rising number of [homeless] deaths" in Austin, Denver, Indianapolis, Nashville, and Salt Lake City.).
[47] *See* Chang et al., supra note 14, at 9 (noting a consistent annual increase and nearly 240% cumulative increase in the number of unhoused people dying annually in Santa Clara County between 2011 and 2020, and a concurrent increase in encampment abatement practices).

15

DATED:  April 11, 2023          MUNGER, TOLLES & OLSON LLP


By:    */s/ Alex C. Werner*
ALEX C. WERNER
J. MAX ROSEN
ROHIT K. SINGLA
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105
Telephone: (213) 683-9100
*Attorneys for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s): No. 23-15087**

I am the attorney or self-represented party.

**This brief contains** _____3,497_____ **words,** excluding the items exempted by

Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint
brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   s/ *Alex C. Werner*_____   **Date**   4/11/23