No. 23-15087

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COALITION ON HOMELESSNESS, et al.,
*Plaintiffs-Appellees*

vs.

CITY AND COUNTY OF SAN FRANCISCO, et al.,
*Defendants-Appellants*

On Appeal from the United States District Court for the Northern District of
California
Case No. 4:22-cv-05502-DMR
Before the Honorable Donna M. Ryu

BRIEF FOR THE NATIONAL POLICE ACCOUNTABILITY PROJECT
(NPAP) AND LAW ENFORCEMENT ACTION PARTNERSHIP (LEAP) AS
*AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

Lauren Bonds
Keisha James
Eliana Machefsky
National Police Accountability Project
2022 St. Bernard Avenue, Suite 310
New Orleans, LA 70116
504-220-0401
fellow.npap@nlg.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for *amici curiae* respectfully submits the National Police Accountability Project (NPAP) and Law Enforcement Action Partnership (LEAP) state they are non-profit organizations, they have no parent corporation, and no publicly held corporation owns ten percent or more of their stock because they have no stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................III

INTEREST OF AMICI CURIAE.........................................................................1

SUMMARY OF THE ARGUMENT....................................................................2

ARGUMENT ......................................................................................................3

I. THE DISTRICT COURT IS NOT REQUIRED UNDER RULE 65 TO OUTLINE EVERY POLICE-CIVILIAN INTERACTION THAT WOULD CONSTITUTE A PROHIBITED THREAT OF ENFORCEMENT AND THE SAN FRANCISCO POLICE DEPARTMENT IS CAPABLE OF UNDERSTANDING WHEN ITS PRESENCE WOULD VIOLATE THE PRELIMINARY INJUNCTION ORDER.................................................3

A. RULE 65 DOES NOT REQUIRE COURTS TO PROVIDE DETAILED PLANS TO POLICE ON HOW TO END THEIR ILLEGAL ACTIVITY. .................................................4

B. LAW ENFORCEMENT AGENCIES ACROSS THE COUNTRY HAVE BEEN ABLE TO UNDERSTAND INJUNCTIONS PROHIBITING LAW ENFORCEMENT OFFICERS FROM THREATENING ENFORCEMENT EVEN WHEN THE TERM IS NOT DEFINED IN THE ORDER...................................................................................................7

II. THE DISTRICT COURT'S ORDER PROMOTES THE VALID PUBLIC POLICY GOAL OF LIMITING POLICE PRESENCE IN INTERACTIONS WITH UNHOUSED PEOPLE. ...........................................................................................11

A. CRIMINALIZING THE INVOLUNTARILY UNHOUSED AND INDISCRIMINATELY DESTROYING THEIR UNABANDONED PROPERTY IS A COUNTERPRODUCTIVE STRATEGY FOR ADDRESSING HOMELESSNESS. ..........................................................12

B. CRIMINAL ENFORCEMENT OF CAMPING BANS IS A POOR USE OF LAW ENFORCEMENT RESOURCES...................................................................15

CONCLUSION...................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Atlantic Coast Demolition v. Board of Chosen Freeholders*, 893 F. Supp. 301 (3d. Cir. 1995) ........................................................................................5

*Cavalier v. Cnty. Of San Diego*, 2015 U.S. Dist. LEXIS 80754 (S.D. Cal. May 13, 2015) ........................................................................................9

*Clary v. City of Cape Girardeau*, 165 F. Supp. 3d 808 (E.D. Mo. 2016) .............7

*Dayton v. City & Cnty. of Denver*, 2023 U.S. Dist. LEXIS 1957 (D. Colo. Jan. 5, 2023) ......................................................................................10

*Dempsey v. McQueeney*, 387 F. Supp. 333 (D.R.I. 1975) ...............................8

*Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520 (S.D.N.Y. 2006)...............10

*Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004) ....................4

*Houser v. Hill*, 278 F. Supp. 920 (M.D. Ala. 1968)........................................7

*In re Lorillard Tobacco Co.*, 370 F.3d 982 (9th Cir. 2004) ................................8

*Michigan v. Chesternut*, 486 U.S. 567 (1988) ..............................................6

*Missouri v. Jenkins*, 495 U.S. 33 (1990) ...................................................4

*NAACP v. Thompson*, 357 F.2d 831 (5th Cir. 1966).......................................7

*People v. Springer*, 92 A.D. 2d 209 (NY 2d App. Div. 1983) .............................9

*Spring Garden United Neighbors v. City of Phila.*, 614 F. Supp. 1350 (E.D. Pa. 1985) ........................................................................................8

*State v. Davis*, 2013 NMSC 028 (2013)....................................................9

*Stone v. City and County of San Francisco*, 1992 U.S. App. LEXIS 15374 (9th Cir. Jul. 9, 1992)............................................................................5

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) .................................9

*Williams v. Wallace*, 240 F. Supp. 100 (M.D. Ala. 1965) .....................................7

**Statutes**

Cal. Elec. Code § 18544 (West 2020)...................................................10

N.J. Stat. § 19:6-15.1(b) ...................................................................10

**Other Authorities**

Aaron Ross Coleman, *Police reform, defunding, and abolition, explained*, VOX (Jul. 16, 2020) ............................................................................16

Chris Herring, Dilara Yarbrough, and Lisa Marie Alatorre, *Pervasive Penalty: How the Criminalization of Poverty Perpetuates Homelessness*, 67 SOC. PROBLEMS 1 (2019) ..........................................................13, 14, 15

Gary Warth, *Cause of homelessness? It's not drugs or mental illness, researchers say*, LOS ANGELES TIMES (Jul. 11, 2022) ..........................................................12

HOUSING NOT HANDCUFFS 2019: ENDING THE CRIMINALIZATION OF HOMELESSNESS IN U.S. CITIES, NATIONAL LAW CENTER ON HOMELESSNESS & POVERTY (2019) ..........................................................................................14, 15

Jeff Asher and Ben Horwitz, *How Do the Police Actually Spend Their Time?*, THE NEW YORK TIMES (Nov. 8, 2021 ..............................................................16

Jesse Justin Cuevas, *The Hidden Psychology of Constitutional Criminal Procedure*, 37 Cardozo L. Rev. 2161 (2016)........................................................9

Ji Seon Song, *Policing the Emergency Room*, 134 Harv. L. Rev. 2646 (2021)......9

Marcus Green, *New LMPD traffic stop policy seeks to improve 'perception' of bias*, WRDB (May 13, 2019) ..............................................................................9

North Dakota Highway Patrol, Criminal Investigation Policy 4-3(G) (Oct. 29, 2018) ................................................................................................................10

Roge Karma, *We train police to be warriors—and then send them out to be social workers*, VOX (Jul. 31, 2020) ............................................................................16

Sean E. Goodison et al., *The Law Enforcement Response to Homelessness: Identifying High-Priority Needs to Improve Law Enforcement Strategies for Addressing Homelessness*, RAND CORPORATION (2020) ..................................15

*The Police Response to Mass Demonstrations*, POLICE EXECUTIVE RESEARCH FORUM (2018) ................................................................................................10

## INTEREST OF AMICI CURIAE[1]

**The National Police Accountability Project (NPAP)** was founded in 1999 by members of the National Lawyers Guild to address misconduct by law enforcement officers through coordinating and assisting civil rights lawyers. NPAP has approximately 550 attorney members practicing in every region of the United States, including a number of members who represent clients who experience police harassment and intimidation because of their membership in a marginalized group.

Every year, NPAP members litigate the thousands of egregious cases of law enforcement abuse that do not make news headlines as well as the high-profile cases that capture national attention. NPAP provides training and support for these attorneys and resources for non-profit organizations and community groups working on police and corrections officer accountability issues. NPAP also advocates for legislation to increase police accountability and appears regularly as *amicus curiae* in cases, such as this one, presenting issues of particular importance for its members and their clients.

---

[1] Pursuant to Rule 29 of the Federal Rules of Appellate Procedure, *amici curiae* states that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund preparing or submitting this brief, and no person other than *amici curiae*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

1

**The Law Enforcement Action Partnership (LEAP)** is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law enforcement officials advocating for criminal justice and drug policy reforms that will make our communities safer and more just. Founded by five police officers in 2002 with a sole focus on drug policy, today LEAP's speakers bureau numbers more than 200 criminal justice professionals advising on police-community relations, incarceration, harm reduction, drug policy, and global issues. Through speaking engagements, media appearances, testimony, and support of allied efforts, LEAP reaches audiences across a wide spectrum of affiliations and beliefs, calling for more practical and ethical policies from a public safety perspective.

## SUMMARY OF THE ARGUMENT

The District Court's preliminary injunction properly complies with the specificity requirements of Rule 65 of the Federal Rules of Civil Procedure. Contrary to the misguided arguments made by Defendants-Appellants and their *amici*, the preliminary injunction issued below adequately defines the categories of conduct to be enjoined—the enforcement of and threats to enforce San Francisco's unconstitutional sit/lie/sleep laws against the City's involuntarily homeless population. The City, particularly the San Francisco Police Department (SFPD), is able—and is in many ways best-positioned—to determine how to

comply with the preliminary injunction order without step-by-step guidance from the District Court. Indeed, the District Court's preliminary injunction is similar to many other orders enjoining unlawful police threats that have been upheld as adequately specific and workable.

In addition to faithfully applying the relevant legal standards, the District Court's preliminary injunction promotes sound public policy. Punishing the involuntarily unhoused with the force of the criminal legal system will never alleviate homelessness. It only exacerbates the crisis. Accordingly, this Court should uphold the District Court's preliminary injunction.

## ARGUMENT

**I.** **The District Court Is Not Required Under Rule 65 to Outline Every Police-Civilian Interaction That Would Constitute A Prohibited Threat of Enforcement and the San Francisco Police Department Is Capable of Understanding When Its Presence Would Violate The Preliminary Injunction Order.**

Rule 65's specificity requirement does not permit defendants to abdicate their responsibility to devise plans to deliver government services and implement programs in a way that complies with the Constitution. Instead, injunctions that provide government actors with a degree of latitude to remedy their unconstitutional conduct are favored for separation of power and public policy reasons. Law enforcement is capable of, and often best suited for, figuring out the

minutiae of how to comply with an order prohibiting them from engaging in

unconstitutional harassment and threats of enforcement. Accordingly, orders

enjoining police from engaging in unconstitutional enforcement generally do not

detail how officers must carry out policing services. The District Court's order

provides a level of specificity consistent with the typical injunction prohibiting

police from engaging in unconstitutional threats of enforcement and SFPD is

capable of determining how and whether it can provide policing services without

violating the injunction.

### A. Rule 65 Does Not Require Courts to Provide Detailed Plans to Police on How to End Their Illegal Activity.

The specificity provisions of Rule 65(d) do not require courts to provide

defendants with a step-by-step guide on how to stop illegal activity. *Fortyune v.

Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004) (holding Rule 65

does not require the district court to "elucidate how to enforce the injunction.").

In fact, this Court has held that it "will not set aside injunctions under Rule 65(d)

unless they are so vague that they have no reasonably specific meaning." *Id.*

Instead, district courts are permitted, and indeed encouraged, to issue preliminary

injunction orders requiring defendants to craft their own plans to end illegal

activity. *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990) ("[A]uthorizing and

directing local government institutions to devise and implement remedies not

only protects the function of those institutions but, to the extent possible, also places the responsibility for solutions . . . upon those who have themselves created the problems."); *Stone v. City and County of San Francisco*, 1992 U.S. App. LEXIS 15374 at *39-40 (9th Cir. Jul. 9, 1992) (not directing a specific course of action to end jail overcrowding "was consistent with comity and institutional competence concerns that delimit the exercise of the court's equitable discretion."). Orders permitting local governments to determine how they will cease unconstitutional conduct are favored in part because "judges lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions in solving these problems." *Atlantic Coast Demolition v. Board of Chosen Freeholders*, 893 F. Supp. 301, 311-12 (3d. Cir. 1995).

Here, the District Court issued an unequivocal order for SFPD to cease threats to enforce the City's unconstitutional sit/lie/sleep laws against the City's involuntarily homeless population. SFPD argues that the District Court failed to adequately define "enforcement threats." However, SFPD's argument essentially amounts to a complaint that the District Court did not provide it with a detailed written policy on how its officers should interact with involuntarily unhoused people. To be sure, there are police activities other than explicit warnings of citation or arrest that would amount to a threat of enforcement, including shows of force through officer presence. *See, e.g., Michigan v. Chesternut*, 486 U.S.

567, 575 (1988) (finding police presence can constitute intimidation without accompanying verbal threats under certain circumstances). However, the order is not vague simply because it does not identify and prohibit every possible type of coercive conduct SFPD could authorize that would communicate to involuntarily unhoused people that they risked arrest. The District Court is also less familiar with the range of policing activities SFPD conducts vis-à-vis unhoused people than Defendants-Appellants. SFPD is better equipped to determine which specific programs and services the department provides that would cause their officers to interact with involuntarily unhoused people. The District Court's order empowers SFPD to modify existing services and develop policies so that its officers comply with the preliminary injunction order. Indeed, SFPD is already engaged in the process of devising a solution to its problem by directing officers to affirmatively inform involuntarily unhoused people that there will be no consequences if they choose to remain in a location where there has been a request that they leave and contemplating whether they should reduce police presence at encampment resolutions. *See* App. Br. 26. Just because Defendants-Appellants do not like the new restrictions created by the District Court's order does not mean that they are "in the impossible position of guessing" what they are and implementing them. The District Court's order allowing SFPD to identify and

change practices that constitute threats of enforcement does not violate Rule

65(d)'s specificity requirement and is squarely in line with this Court's precedent.

> ### B. Law Enforcement Agencies Across the Country Have Been Able to Understand Injunctions Prohibiting Law Enforcement Officers from Threatening Enforcement Even When the Term Is Not Defined in the Order.

Courts often issue and uphold injunctions banning police from intimidating

and threatening enforcement in civil rights cases–particularly in cases where

disfavored communities have been targets of government abuse. During the civil

rights movement, courts regularly enjoined police from interfering with protected

First Amendment activity by threats or intimidation. *See, e.g., NAACP v.*

*Thompson*, 357 F.2d 831, 841 (5th Cir. 1966) (enjoining police from prohibiting

or preventing peaceful protest activity by intimidation as well as arrest or threats

of arrest for violations of municipal laws); *Williams v. Wallace*, 240 F. Supp. 100,

103 (M.D. Ala. 1965) (enjoining police from "threatening or in any way

interfering" with the march from Selma to Montgomery); *Houser v. Hill*, 278 F.

Supp. 920, 928 (M.D. Ala. 1968). More recently, police departments across the

country have been able to understand the term "threat" without further definition

in the context of injunctions prohibiting harassment and the enforcement of

unconstitutional ordinances. *See Clary v. City of Cape Girardeau*, 165 F. Supp.

3d 808, 832 (E.D. Mo. 2016) (approving permanent injunction barring police

from threatening to enforce the city's unconstitutional noise ordinance); *Spring Garden United Neighbors v. City of Phila.*, 614 F. Supp. 1350, 1354 (E.D. Pa. 1985) (enjoining officers from arresting or threatening any person in the Spring Garden community without meeting the requirements of the Constitution); *Dempsey v. McQueeney*, 387 F. Supp. 333, 342 (D.R.I. 1975) (enjoining police from threatening people entering an establishment where sex work was suspected). Accordingly, police departments across the country have long been capable of reasonably understanding the meaning of the term "threat" without further definition or direction from courts when it comes to restrictions on their interactions with disfavored groups.

To the extent Defendants-Appellants claim their concern stems from the District Court's statements at subsequent hearings, the District Court was merely noting that excessive police presence–*i.e.*, the deployment of more officers than needed to support the Homeless Outreach Team–could constitute or contribute to a threat of enforcement. There is nothing confusing about the District Court's statement.[2] It is well established that excessive police presence is threatening and can intimidate people from exercising their rights or engaging in lawful activity.

---

[2] In any event, these arguments are not properly before the Court because they stem from the District Court's statements made during subsequent administrative hearings that are not reviewable on appeal. *See In re Lorillard Tobacco Co.*, 370 F.3d 982, 986-87 (9th Cir. 2004).

*See* Jesse Justin Cuevas, *The Hidden Psychology of Constitutional Criminal Procedure*, 37 Cardozo L. Rev. 2161, 2194 (2016); Ji Seon Song, *Policing the Emergency Room*, 134 Harv. L. Rev. 2646, 2763 (2021) . Courts, lawmakers, and police departments themselves have recognized the need to restrict the number of law enforcement officers to avoid creating a threat of arrest. For instance, an unnecessary number of police officers attending a traffic stop can be coercive and constitute a threat when police are seeking voluntary consent to search. *State v. Davis*, 2013 NMSC 028, 21, 22 (2013) (acknowledging number of officers can be coercive in consent to search cases); *People v. Springer*, 92 A.D. 2d 209, 213 (NY 2d App. Div. 1983); *Cavalier v. Cnty. Of San Diego*, 2015 U.S. Dist. LEXIS 80754 at *8 (S.D. Cal. May 13, 2015) (number of officers intimidating during strip search); Marcus Green, *New LMPD traffic stop policy seeks to improve 'perception' of bias*, WRDB (May 13, 2019) (reporting on new Louisville police department traffic stop policy advising against more than two officers on-scene during an ordinary traffic stop).[3] Too many officers can have a similarly threatening effect when it comes to police questioning. *See e.g. United States v. Craighead*, 539 F.3d 1073, 1084-85 (9th Cir. 2008) (noting the number of officers present can convert voluntary questioning into a custodial interrogation);

---

[3] Available at: https://www.wdrb.com/in-depth/new-lmpd-traffic-stop-policy-seeks-to-improve-perception-of-bias/article_b5bc5ac6-727d-11e9-8c21-870e6ffb7731.html.

*see* North Dakota Highway Patrol, Criminal Investigation Policy 4-3(G) (Oct. 29, 2018).[4] Similarly, excessive police response to protests communicates a threat and can have an impermissible chilling effect on First Amendment activity. *Dayton v. City & Cnty. of Denver*, 2023 U.S. Dist. LEXIS 1957 at *13-14 (D. Colo. Jan. 5, 2023) (increased police presence could communicate threat of enforcement and chill activity); *Doe v. Village of Mamaroneck*, 462 F Supp. 2d 520, 546-7 (S.D.N.Y. 2006); *The Police Response to Mass Demonstrations*, POLICE EXECUTIVE RESEARCH FORUM 25-26 (2018).[5] Moreover, legislatures have strictly limited police officer presence at polling locations due to the threat of arrest created by the presence of police officers. Cal. Elec. Code § 18544 (West 2020) (only officers with written authorization from election official may be present at a polling location); *see also* N.J. Stat. § 19:6-15.1(b) (only permitting officer presence at polling locations when requested by an election official to address a specific threat).

In each of these contexts, how many officers are too many depends on the totality of the circumstances including the threat to which the officers are responding. Police are expected to evaluate the situation and provide a police

---

[4] Available at: https://www.docr.nd.gov/sites/www/files/documents/prea/Policies-Procedures/NDHP%20Criminal%20Investigation%20Policy.pdf.

[5] Available at: https://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf.

response that is proportionate to the potential threat. That is essentially what Defendants-Appellants are expected to do under the District Court's order. Defendants-Appellants are able to modulate the number of officers vis-à-vis civilians to avoid constitutional violations on a regular basis and they are certainly capable of making these adjustments for encampment resolutions without explicit restrictions in a preliminary injunction order.

## II. The District Court's Order Promotes the Valid Public Policy Goal of Limiting Police Presence in Interactions with Unhoused People.

The preliminary injunction granted below not only reflects the District Court's faithful application of the relevant legal standards but also promotes sound public policy. Defendants'-Appellants' unconstitutional practices do nothing but ensnare unhoused San Franciscans in the criminal legal system and separate them from their few possessions, which they need to survive. Far from alleviating San Francisco's homelessness crisis, Defendants'-Appellants' practices exacerbate it by forcing unhoused people to expend time and resources to avoid enforcement that would be better spent towards accessing and maintaining benefits that could help them get off of the streets. Criminalization of homelessness also breeds mistrust of the police and other government workers, thus eroding public safety. Finally, policing involuntary homelessness squanders

law enforcement resources, diverting officers' time and attention from addressing

crime.

### A. Criminalizing the involuntarily unhoused and indiscriminately destroying their unabandoned property is a counterproductive strategy for addressing homelessness.

The leading causes of homelessness—lack of affordable housing, stagnant

wages, poverty, and, to a lesser extent, mental illness and addiction—are social

ills that police officers are not equipped nor expected to address. Gary Warth,

*Cause of homelessness? It's not drugs or mental illness, researchers say*, LOS

ANGELES TIMES (Jul. 11, 2022).[6] The sole purpose of police presence at

encampment sweeps is to arrest or issue citations to unsheltered people lodging in

public spaces. But it is not a crime to be poor and unsheltered. The SFPD's own

Bulletin 19-080 recognizes as much, as it prohibits officers from enforcing the

City's camping bans "[i]f there is no shelter or navigation center bed available."

ER-2030. Nevertheless, SFPD routinely penalizes the unhoused who have no

access to shelter, in violation of its own policy. *See, e.g.*, ER 1746-47

(Declaration of Damon Bennett in support of Plaintiffs' Motion for Preliminary

Injunction); ER 1756 (Declaration of Todd Bryant in support of Plaintiffs'

Motion for Preliminary Injunction).

---

[6] Available at: https://www.latimes.com/california/story/2022-07-11/new-book-links-homelessness-city-prosperity.

Arrests and encampment sweeps do not alleviate homelessness but simply move unhoused people from one place to another. Experts on homelessness have observed that "anti-homeless laws and enforcement fail to reduce urban disorder, but create instead a spatial churn in which homeless people circulate between neighborhoods and police jurisdictions rather than leaving public space." Chris Herring, Dilara Yarbrough, and Lisa Marie Alatorre, *Pervasive Penalty: How the Criminalization of Poverty Perpetuates Homelessness*, 67 SOC. PROBLEMS 1, 1 (2019). So long as there is a shortage of affordable housing and shelter space—which, in San Francisco, is undisputed and severe[7]—there will be people surviving in public spaces. Investing in police-led sweeps rather than affordable housing and living wages, among other policy solutions, is a very expensive way to perpetuate homelessness.

The criminalization of homelessness not only fails to alleviate the crisis but exacerbates it. Move-along orders destroy the social networks created between neighbors at encampments—networks which unhoused people rely upon to keep their belongings, and their persons, safe. Herring et al., *supra*, at 10. *See also* ER-0022 (describing the ways unhoused Plaintiffs relied on their neighbors to keep

---

[7] It is undisputed that San Francisco "currently lacks shelter space for at least 4,000 individuals," though the actual deficit is likely higher. ER-006 n.6 (Order Granting Motion for Preliminary Injunction).

their belongings safe when they had to leave their encampment for a doctor appointment). Encampment sweeps "disrupt[] the security and trust established within existing encampments . . . and . . . forc[e] people into new territories of strangers surviving without housing," leaving displaced people vulnerable to violence. Herring et al., *supra*, at 12. The City's destruction of unabandoned property during sweeps forcefully separates unsheltered people from their survival belongings, forcing them to endure unnecessary stress and spend scarce money to replace their necessities.[8] Citations wreak additional havoc, as they saddle already-impoverished unsheltered people with fines they cannot afford to pay. HOUSING NOT HANDCUFFS 2019: ENDING THE CRIMINALIZATION OF HOMELESSNESS IN U.S. CITIES, NATIONAL LAW CENTER ON HOMELESSNESS & POVERTY 15 (2019). The failure to pay a fine may result in the issuance of a bench warrant and incarceration. Herring et al., *supra*, at 10. The mark of a criminal record can also make it very difficult for individuals to secure housing and employment. Sean E. Goodison et al., *The Law Enforcement Response to Homelessness: Identifying High-Priority Needs to Improve Law Enforcement*

---

[8] The law enforcement activity identified by Plaintiffs-Appellees illustrates the point. For example, Plaintiff David Martinez described a sweep in June 2022 in which Defendants-Appellants confiscated his life-saving congestive heart failure medication. ER-0022 (citing Declaration of David Martinez). Plaintiff Teresa Sandoval, a double amputee, was in her wheelchair attempting to gather her belongings when Defendants-Appellants dumped her prosthetics, which she has been unable to replace. ER-0023 (citing Declaration of Teresa Sandoval).

14

*Strategies for Addressing Homelessness*, RAND CORPORATION 12 (2020). By needlessly entangling unhoused people in the criminal legal system, law enforcement responses to homelessness compound the stress, instability, and scarcity of resources unhoused people already experience. This heightened vulnerability in turn severely impedes the efforts of unsheltered people to escape homelessness.

Finally, police enforcement of camping bans exacerbates the homelessness crisis by breeding distrust of government. It can be difficult or even impossible for government-employed service providers to connect unhoused people with shelter and other welfare services, because negative interactions with law enforcement have left unhoused people skeptical of all government workers. Herring et. al, *supra*, at 16. This distrust also makes unhoused people much less likely to report crimes or cooperate with the police as witnesses. HOUSING NOT HANDCUFFS, *supra*, at 65. This suspicion of law enforcement and lack of cooperation ultimately erodes public safety.

### B. Criminal enforcement of camping bans is a poor use of law enforcement resources.

As the homelessness crisis has exploded in recent years, city leaders and civilians alike have called upon police officers to address the crisis. But homelessness is a social issue, not a crime, and is best addressed by social service

providers. Police officers have been called upon to address homelessness simply because they are the default first responders, not because they have relevant expertise or training. Aaron Ross Coleman, *Police reform, defunding, and abolition, explained*, VOX (Jul. 16, 2020).[9] It is imprudent, wasteful, and even dangerous to task police officers, trained to fight serious crime, with solving social issues like homelessness. *See* Roge Karma, *We train police to be warriors—and then send them out to be social workers*, VOX (Jul. 31, 2020)[10]

Law enforcement resources should be used judiciously, with a focus on combatting actual threats to public safety. Police officers typically spend only a fraction of their time responding to violent crimes like homicide, robbery, rape, and aggravated assault. Jeff Asher and Ben Horwitz, *How Do the Police Actually Spend Their Time?*, THE NEW YORK TIMES (Nov. 8, 2021).[11] But these violent crimes are precisely the issues we train and expect police officers to focus on. Restricting police enforcement of camping bans enables them to prioritize

---

[9] Available at: https://www.vox.com/21312191/police-reform-defunding-abolition-black-lives-matter-protests.

[10] Available at: https://www.vox.com/2020/7/31/21334190/what-police-do-defund-abolish-police-reform-training.

[11] Available at: https://www.nytimes.com/2020/06/19/upshot/unrest-police-time-violent-crime.html.

combatting serious and violent crimes over the issues for which they are ill-suited and ill-prepared to address.

## CONCLUSION

For the foregoing reasons, *amici curiae* National Police Accountability Project and Law Enforcement Action Partnership respectfully request the Court uphold the District Court's preliminary injunction.

Dated: April 11, 2023

/s/ Eliana Y. Machefsky

Eliana Y. Machefsky
*Attorney for Amici Curiae*

17

## CERTIFICATE OF COMPLIANCE

I am an attorney for *amici curiae*. This brief contains 3,467 words, excluding the items exempted by Fed. R. App. P. 32(f) and Cir. R. 32(f). This brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 29-2(c)(2).

Dated: April 11, 2023

/s/ Eliana Y. Machefsky

Eliana Y. Machefsky
*Attorney for Amici Curiae*

**CERTIFICATE OF SERVICE**

I, Eliana Machefsky, hereby certify that I filed the foregoing Brief of *Amici Curiae* National Police Accountability Project and Law Enforcement Action Partnership on April 11, 2023, via the Court's CM/ECF system, which delivered an electronic copy to all counsel of record for all parties.


Dated: April 11, 2023

/s/ Eliana Y. Machefsky

Eliana Y. Machefsky
*Attorney for Amici Curiae*
