*No. 23-15087*

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

COALITION ON HOMELESSNESS; TORO CASTAÑO; SARAH
CRONK; JOSHUA DONOHOE; MOLIQUE FRANK; DAVID
MARTINEZ; TERESA SANDOVAL; and NATHANIEL VAUGHN,

*Plaintiffs-Appellees,*

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

*Defendants-Appellants.*

**On Appeal from the U.S.D.C. for the
Northern District of California
Hon. Donna M. Ryu
Case No. 4:22-cv-05502-DMR**

**BRIEF OF *AMICI CURIAE* DISABILITY RIGHTS ADVOCATES,
HOMELESS YOUTH ALLIANCE, COMPASS FAMILY SERVICES,
WESTERN CENTER ON LAW & POVERTY, AND BAY AREA LEGAL
AID IN SUPPORT OF APPELLEES AND AFFIRMANCE OF
PRELIMINARY INJUNCTION**

Fenwick & West LLP
Y. Monica Chan (WSBA No. 58900)
1191 Second Avenue, 11th Floor
Seattle, WA 98101
Tel: 206.389.4510
Fax: 206.389.4511

Molly R. Melcher (CSB No. 272950)
555 California Street, 12th Floor
San Francisco, CA 94014
Tel: 415.875.2300
Fax: 415.281.1350

Legal Aid Foundation of Los Angeles
Shayla Myers (CSB No. 264054)
7000 S. Broadway
Los Angeles, CA 90003
Tel: 213.640.3983
Fax: 213.640.3988

*Attorneys for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the undersigned

counsel states that Disability Rights Advocates ("DRA"), Homeless Youth

Alliance ("HYA"), Compass Family Services ("Compass"), Western Center on

Law & Poverty ("WCLP"), and Bay Area Legal Aid ("BayLegal") are not publicly

held corporations; none has any parent corporation; and no publicly held

corporation owns 10 percent or more of stock in DRA, HYA, Compass, WCLP, or

BayLegal.


Dated: April 11, 2023                     FENWICK & WEST LLP


                                          By: */s/ Y. Monica Chan*
                                              Y. Monica Chan

                                          *Attorney for Amici Curiae*

i

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ......................................................i

INTEREST OF THE *AMICI CURIAE* ......................................................1

INTRODUCTION ......................................................5

ARGUMENT ......................................................10

I.    San Francisco Is in the Midst of a Severe Affordable Housing Shortage. ......................................................10

II.    Lack of Affordable Housing Is a Driver of Homelessness, Which Disproportionately Impacts People of Color or with Disability. .................13

III.    Decades of Bad Policies and Decisions Led to San Francisco's Homelessness Crisis. ......................................................15

      A.    San Francisco Has a Long History of Laws and Practices That Targeted San Franciscans of Color and Created Today's Affordable Housing Crisis. ..................................16

      B.    San Francisco Continues to Underproduce Affordable Housing Units Year After Year. ...........................................23

      C.    San Francisco's Housing Stock Is Largely Inaccessible to People with Disabilities. ...........................................25

IV.    San Francisco Weaponizes the "Service Resistance" Myth to Blame Homeless People for the Homelessness Crisis. .................................27

V.    Affordable and Accessible Housing Is the Solution to Ending and Preventing Homelessness. ......................................................30

CONCLUSION ......................................................32

CERTIFICATE OF COMPLIANCE FOR BRIEFS ................................34

CERTIFICATE OF SERVICE ......................................................34

# TABLE OF AUTHORITIES

CASES                                                                            PAGE(S)

*Buchanan v. Warley*,
    245 U.S. 60 (1917) ..................................................................................15

*Martin v. City of Boise*,
    920 F.3d 584 (9th Cir. 2019) ...............................................................5, 6, 8

STATUTES

42 U.S.C. § 3604 ..............................................................................................24

Cal. Gov. Code § 12955.1.1 .............................................................................25

Cal. Gov. Code § 12955.6 ................................................................................24

S.F. Admin. Code § 37.2(g)(1) ........................................................................24

OTHER AUTHORITIES

*2015 – 2020 Bay Area Building Permit Activity Report*, ASS'N OF
    BAY AREA GOV'TS,
    https://abag.ca.gov/sites/default/files/documents/2021-12/2015-
    2020%20apr_permit_summaries_by_jurisdiction.pdf ..................................22

*2020 Jobs-Housing Fit Report*, S.F. PLANNING DEP'T (Nov. 2021),
    https://sfplanning.org/sites/default/files/resources/2021-
    11/Jobs-Housing_Fit_Report_2020.pdf .......................................................10

*Bay Area Progress in Meeting 1999-2006 Regional Housing Need
    Allocation (RHNA)*, ASS'N OF BAY AREA GOV'TS,
    https://abag.ca.gov/sites/default/files/1999-
    2006_rhna_performance_revised_jan2015.pdf ...........................................22

Carrie Hahnel et al., *Unjust Legacy: How Proposition 13 Has
    Contributed to Intergenerational, Economic, and Racial
    Inequities in Schools and Communities*,
    OPPORTUNITY INST. (June 2022),
    https://theopportunityinstitute.org/publications-
    list/2022/8/3/unjust-legacies ........................................................................21

Chris Glynn et al., *Inflection Points in Community-Level Homeless Rates*, 15 ANN. APPL. STAT. 1037 (June 2021)..............................13

Christina Wusinich et al., *"If You're Gonna Help Me, Help Me"*: *Barriers to Housing Among Unsheltered Homeless Adults*, EVALUATE AND PROGRAM PLANNING, VOL. 76 (Oct. 2019), https://www.sciencedirect.com/science/article/abs/pii/S0149718 918303823?via%3Dihub ........................................................26, 27

Clement Lai, *The Racial Triangulation of Space: The Case of Urban Renewal in San Francisco's Fillmore District*, ANNALS OF THE ASS'N OF AM. GEOGRAPHERS (Jan. 2012), https://www.jstor.org/stable/41412759 ........................................17

*Context: Dismantling San Francisco's Housing Inequities*, S.F. PLANNING DEP'T (Apr. 6, 2021), https://storymaps.arcgis.com/stories/26bc500b5aee4f0281a860a 2144a5998..................................................................................13

David Reiss, *The Federal Housing Administration and African-American Homeownership*, 26. J. AFFORDABLE HOUS. & CMTY. DEV. L., NO. 1 (2017) ..................................................................17

*Disability in San Francisco*, SAN FRANCISCO HUMAN SERVICES AGENCY, DEP'T OF DISABILITY AND AGING SERV., https://cmstrain.sfhsa.org/about/reports-publications/disability-san-francisco ......................................................................14, 23, 24

Eli Moore et al., *Roots, Race, & Place: A History of Racially Exclusionary Housing in the San Francisco Bay Area*, HAAS INST. FOR A FAIR AND INCLUSIVE SOC'Y, UNIV. OF CALIFORNIA, BERKELEY (Oct. 2019), https://belonging.berkeley.edu/sites/default/files/haasinstitute_r ootsraceplace_oct2019_publish.pdf ............................................15

*Final Environmental Impact Report for the Proposed Amendments to the Text of The City Planning Code and to the Zoning Map Relating to Residential Districts and Development*, S.F. PLANNING DEP'T (1978), https://archive.org/details/finalenvironment2719sanf/mode/2up............19, 20

iv

*2022 Housing Element*, S.F. PLANNING DEP'T (Jan. 31, 2023),
https://generalplan.sfplanning.org/I1_Housing.htm ................................10, 12

*Housing for Family with Children*, S.F. PLANNING DEP'T (Jan. 17, 2017), https://default.sfplanning.org/plans-and-programs/planning-for-the-city/family-friendly-city/Housing_for_Families_with_Children_Report-011717.pdf .................25

*Housing: Overview*, S.F. HEALTH IMPROVEMENT P'SHIP,
http://www.sfhip.org/chna/community-health-data/housing/ ......................22

*Hundreds of housing units for the homeless are sitting empty. Why can't S.F. fill them?*, SAN FRANCISCO CHRONICLE (Mar. 5, 2023), https://www.sfchronicle.com/opinion/editorials/article/san-francisco-homeless-housing-vacancies-17804113.php ..................................7

Hunter Oatman-Stanford, *Demolishing the California Dream: How San Francisco Planned Its Own Housing Crisis*, COLLECTORS WEEKLY (Sept. 21, 2018), https://www.collectorsweekly.com/articles/demolishing-the-california-dream/ ...............................................................................19

Joaquin Palomino & Trisha Thadani, *'Makes absolutely no sense': S.F. supervisors question evictions from supportive housing*, SAN FRANCISCO CHRONICLE (Mar. 20, 2023), https://www.sfchronicle.com/sf/article/sf-homeless-eviction-sro-breed-oversight-17849572.php ..............................................................29

Kate Anthony et al., *Homelessness in the San Francisco Bay Area: The Crisis and a Path Forward*, MCKINSEY & CO. (July 2019), https://www.mckinsey.com/industries/public-and-social-sector/our-insights/homelessness-in-the-san-francisco-bay-area-the-crisis-and-a-path-forward ......................................................23

Larry Dang, *From Redevelopment to Reconciliation: Housing Mistrust in San Francisco*, MEDIUM (June 2, 2018), https://larrydang.medium.com/from-redevelopment-to-redemption-history-of-housing-mistrust-in-san-francisco-da9f3b10d0d4 ...............................................................................18

Les Picker, *The Lock-in Effect of California's Proposition 13*,
    NATIONAL BUREAU OF ECONOMIC RESEARCH (Apr. 2005),
    https://www.nber.org/digest/apr05/lock-effect-californias-
    proposition-13 .................................................................................21

Leslie Fulbright, *Sad Chapter in Western Addition History Ending*,
    SFGATE (July 21, 2008),
    https://www.sfgate.com/bayarea/article/Sad-chapter-in-
    Western-Addition-history-ending-3203302.php ...........................18

Lexi Pandell, *The Racist Origins of San Francisco's Housing
    Crisis*, TNR (May 31, 2019),
    https://newrepublic.com/article/154028/racist-origins-san-
    franciscos-housing-crisis .......................................................17, 18

Leyla Gulcur et al., *Housing, Hospitalization, and Cost Outcomes
    for Homeless Individuals with Psychiatric Disabilities
    Participating in Continuum of Care and Housing First
    Programmes*, J. COMMUNITY & APPLIED SOC. PSYCHOL., VOL.
    13(2) (Apr. 9, 2003).......................................................................30

*Mapping Inequality: Redlining in New Deal America*, *San
    Francisco, CA*, UNIV. OF RICHMOND,
    https://dsl.richmond.edu/panorama/redlining/#loc=14/37.765/-
    122.432&city=san-francisco-ca.....................................................16

Mary K. Cunningham, *The Homelessness Blame Game*,
    URBAN INST. (Sept. 23, 2019), https://www.urban.org/urban-
    wire/homelessness-blame-game .................................................29

Matthew Green, *How Government Redlining Maps Pushed
    Segregation in California Cities*, KQED (Apr. 27, 2016),
    https://www.kqed.org/lowdown/18486/redlining ........................16

*Out of Reach: California*, NATIONAL LOW-INCOME HOUSING COAL.
    (2022), https://nlihc.org/oor/state/ca ...........................................11

*Pollution and Prejudice: Redlining and Environmental Injustice in
    California*, CALEPA (Aug. 16, 2021),
    https://storymaps.arcgis.com/stories/f167b251809c43778a2f9f0
    40f43d2f5..................................................................................16

*Recent Trends Among the Unsheltered in Three Los Angeles Neighborhoods*, RAND CORP. (2022), https://www.rand.org/pubs/research_reports/RRA1890-1.html ...................27

Samantha Batko, *We Can End Homelessness through Housing First Interventions*, URBAN INST. (Feb. 12, 2020), https://www.urban.org/urban-wire/we-can-end-homelessness-through-housing-first-interventions................................................................30

*San Francisco area rents still steep amid high demand*, AXIOS SAN FRANCISCO (Jan. 31, 2023), https://www.axios.com/local/san-francisco/2023/01/31/san-francisco-high-rent-apartments/..........................11

*San Francisco Bay Area Progress in Meeting 2007-2014 Regional Housing Need Allocation (RHNA)*, ASS'N OF BAY AREA GOV'TS, (Sept. 2015), https://abag.ca.gov/sites/default/files/rhnaprogress2007_2014_0 82815.pdf .........................................................................................22

*San Francisco Homeless Count and Survey: 2022 Comprehensive Report*, S.F. DEP'T OF HOMELESSNESS & SUPPORTIVE HOUSING (2022) ("*2022 S.F. Homeless Count & Survey*"), https://hsh.sfgov.org/wp-content/uploads/2022/08/2022-PIT-Count-Report-San-Francisco-Updated-8.19.22.pdf .....................5, 13, 14, 15

*2020 San Francisco Housing Inventory*, S.F. PLANNING DEP'T (Apr. 2021), https://sfplanning.org/sites/default/files/documents/reports/2020 _Housing_Inventory.pdf................................................................23

*San Francisco Housing Needs and Trends Report*, S.F. PLANNING DEP'T (July 2018), https://default.sfplanning.org/publications_reports/Housing-Needs-and-Trends-Report-2018.pdf..........................................10, 11, 12, 23

*San Francisco Planning Commission Centennial*, S.F. PLANNING DEP'T (Dec. 2017), https://default.sfplanning.org/publications_reports/SF_Planning _Centennial_Brochure.pdf;....................................................17, 18

Sara K. Rankin, *Punishing Homelessness*, 22 NEW CRIM. L. REV. 99, 104 (2019)...............................................................................29

vii

*Social Determinants of Health: Permanent Supportive Housing with Housing First (Housing First Programs)*, CPSTF (June 2019), https://www.thecommunityguide.org/findings/social-determinants-health-housing-first-programs.html ................................. 29, 30

*Stop the Revolving Door*, COAL. ON HOMELESSNESS (Sept. 2020), https://www.cohsf.org/wp-content/uploads/2020/11/Stop-the-Revolving-1.pdf ...................................................................... 26, 27

*Summary and Minutes of the Special Meeting*, S.F. PLANNING DEP'T (June 27, 1978), https://archive.org/details/37minutesofsanfran1978san/page/64/mode/2up .................................................................................. 20

*Summary and Minutes of the Special Meeting*, S.F. PLANNING DEP'T (June 7, 1978), https://archive.org/details/37minutesofsanfran1978san/page/42/mode/2up .................................................................................. 20

*The View from Outside*, TIPPING POINT COMMUNITY (2019), https://tippingpoint.org/wp-content/uploads/2019/03/The-View-from-Outside.pdf ............................................................................ 27

Y. Peng et al., *Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health among Homeless Populations with Disability: A Community Guide Systematic Review*, J. PUBLIC HEALTH MANAG. PRACT. VOL. 25(5) (Sept.-Oct. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8513528/ ......................... 30

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. XIII A, § 1 .............................................................. 21

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici curiae* are services providers and housing justice advocates in the Bay Area and California, whose clients and constituents include those who are or have been deeply impacted by San Francisco's lack of affordable housing and the resulting homelessness crisis.

Disability Rights Advocates ("DRA") is a nonprofit public interest center that specializes in high-impact civil rights litigation and other advocacy on behalf of people with disabilities throughout the United States.  DRA works to end discrimination in areas such as access to public accommodations, public services, employment, transportation, education, employment, technology, and housing. Based in Berkeley, California, with offices in New York City and Chicago, DRA has extensive litigation experience and is recognized for its expertise in the interpretation of civil rights laws affecting individuals with disabilities including the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.  DRA has long championed the rights of people with disabilities to use sidewalks as essential

---

[1] Counsel for the parties have not authored this brief in whole or in part.  No one other than *Amici* Disability Rights Advocates, Homeless Youth Alliance, Compass Family Services, Western Center on Law & Poverty, and Bay Area Legal Aid's counsel has contributed money intended to fund preparing or submitting this brief.

to independence and integration, including in *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002) and *American Council of the Blind of New York, Inc. v. City of New York*, 495 F. Supp. 3d 211 (S.D.N.Y. 2020). DRA also engages in systemic and impact litigation to protect the rights of unhoused people with disabilities to be free from discrimination and harassment on account of their status and their disabilities. *See Where Do We Go Berkeley v. California Dep't of Transportation*, 32 F.4th 852 (9th Cir. 2022); *Bloom v. City of San Diego*, Case No.: 17-cv-2324-AJB-NLS, 2018 WL 9539238 (S.D. Cal. June 8, 2018); *Navarro v. City of Mountain View*, No. 21-CV-05381-NC, 2021 WL 5205598 (N.D. Cal. Nov. 9, 2021); *Geary v. City of Pacifica*, No.3:21-cv-01780-VC (N.D. Cal.).

Founded in 2006, Homeless Youth Alliance's ("HYA") mission is to empower young people experiencing homelessness in San Francisco's Haight-Ashbury neighborhood to protect themselves, to educate each other, to reduce harm within the community, and, when they are ready, to transition off the streets. As a participant-centered nonprofit corporation, HYA believes in allowing young people to define their own lives, set their own goals, and change at their own pace. HYA supports its participants in these efforts by providing mental health and medical care, harm reduction supplies, hygiene products, warm clothes, tents, tarps, sleeping bags, and other necessities, which HYA distributes through street-

2

based outreach and out of its pop-up drop-in sites. Every year, HYA makes more than 10,000 contacts with young people experiencing homelessness, providing one-on-one case management for upwards of 500 different individuals. Additionally, HYA's frontline staff consists entirely of individuals who have shared lived experiences similar to its participants, with a number of HYA's participants eventually becoming outreach counselors themselves.

The mission of Compass Family Services ("Compass") is to help homeless and at-risk families achieve housing stability, economic self-sufficiency, and family well-being. Compass strives for all children to grow up in safe and stable homes so that they can truly thrive. Each year, Compass serves approximately 2,600 families or 6,500 individual children and parents across a highly supported continuum of care ranging from emergency shelter to permanent supportive housing. Compass uplifts and supports a homelessness response system that affirms the safety and dignity of all of San Francisco's residents and a move towards a highly responsive safety net that leads to lasting exits from homelessness.

Western Center on Law and Poverty ("WCLP") advocates on behalf of low-income Californians in every branch of government—from the courts to the Legislature. Through the lens of economic and racial justice, WCLP litigates,

3

educates, and advocates around health care, housing, public benefits, and economic justice.  Eliminating policies that criminalize Californians for their poverty and ensuring low-income and unhoused Californians have adequate shelter and financial resources so that they can thrive and not just survive is critical to WCLP's anti-poverty mission.

Bay Area Legal Aid ("BayLegal") is the largest provider of free legal services to low-income residents of the San Francisco Bay Area.  BayLegal serves more than 60,000 low-income individuals each year through wraparound legal services in housing preservation, domestic violence and sexual assault prevention, economic security, consumer protection, and healthcare access.  Bay Legal assists individuals and families who are unstably housed or at risk of homelessness in order to prevent homelessness and increase housing stability.  BayLegal also helps unhoused adults and youth address legal barriers that prevent them from exiting homelessness.  BayLegal uses a mix of strategies, including direct legal services, coalition building and partnerships, policy advocacy, and litigation to advocate for systems change that will help people maintain housing, exit homelessness, and protect unhoused persons' civil rights.

**INTRODUCTION**

Each of the parties in this case, and even all *amici curiae* to date, agree that there is a homelessness crisis in San Francisco, and indeed, throughout California. Defendants-Appellant, the City and County of San Francisco ("San Francisco" or the "City"), acknowledge that its "[w]idespread homelessness is the result of a severe shortage in affordable housing."[2]  Affordable housing is scarce in San Francisco.  The recent economic boom has brought an influx of jobs and population growth, driving up housing demand and costs.  But the City has consistently failed to produce enough affordable units for its lower income residents.  Even as the City has picked up construction on market-rate housing, many, especially people of color and people with disabilities, have been priced out of San Francisco's expensive market-rate homes and rental units and ended up homeless.  Coupled with an underfunded and oversubscribed homeless services system, individuals who are shut out of the housing market are consistently left with no alternatives (other than public spaces) to simply exist in San Francisco.

---

[2] *San Francisco Homeless Count and Survey: 2022 Comprehensive Report*, S.F. DEP'T OF HOMELESSNESS & SUPPORTIVE HOUSING (2022) ("*2022 S.F. Homeless Count & Survey*"), at 35, https://hsh.sfgov.org/wp-content/uploads/2022/08/2022-PIT-Count-Report-San-Francisco-Updated-8.19.22.pdf.

Both the preliminary injunction order at issue in this appeal ("Order") and this Court's ruling in *Martin v. City of Boise*—upon which the Order is based—are rooted in this realistic assessment of the homelessness crisis. The Order places a straightforward limitation on the government's attempt to address the crisis, a limitation rooted in the U.S. Constitution's prohibition on cruel and unusual punishment: unhoused people with nowhere to live, often because they simply cannot afford a home, cannot be punished for conduct that "is involuntary and inseparable from [the] status" of homelessness. *Martin v. City of Boise*, 920 F.3d 584, 617 (9th Cir. 2019) (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1136 (9th Cir. 2006)).[3] But, instead of abiding by the district court's limitation and *Martin*'s clear pronouncement, San Francisco attempts in its opening brief to erase its role in creating the homelessness crisis and justify its punitive enforcement-first approach. This attempt ignores the scope of the affordable housing crisis in San Francisco, its relationship to the homelessness crisis on the streets, and the City's ongoing role in creating and perpetuating these crises.

---

[3] Consistent with *Martin*, the district court's Order enjoined the City from enforcing "laws and ordinances to prohibit involuntarily homeless individuals from sitting, lying, or sleeping on public property . . . as long as there are more homeless individuals in San Francisco than there are shelter beds available." 1-ER-0051.

6

First, San Francisco touts that it has made "major commitments of resources to address [the] crisis," such as acquiring around 900 permanent supportive housing units. Appellants' Br. at 1, 9. But the City's vague and insubstantial assurances to this Court are little more than an attempt to conceal the somber reality of the crisis. San Francisco is admittedly in a deep affordable housing deficit, with around 53,000 affordable units needed but not built. *Infra* I. Thus, the 900 units that San Francisco promises, even if fulfilled and occupied,[4] would address less than 2% of this deficit. *See* Appellants' Br. at 9 (promising more than 625 additional permanent supportive housing units and 256 units of supporting housing at 1064 Mission Street). If San Francisco continues its current housing production trajectory, it will still have a shortfall of more than 56,000 affordable units by the end of 2040.

Second, the City's policy choices over decades have culminated in the crisis today; it is these policies that impede low-income individuals' access to housing

---

[4] As of February 2023, San Francisco reported that 912 of its permanent supportive housing units, or 10 % of its total stock, remain vacant. There is no lack of demand for these units; rather, the City has blamed the vacancy on software issues, to a shortage of case managers, to an abundance of paperwork. *See Hundreds of housing units for the homeless are sitting empty. Why can't S.F. fill them?*, SAN FRANCISCO CHRONICLE (Mar. 5, 2023), https://www.sfchronicle.com/opinion/editorials/article/san-francisco-homeless-housing-vacancies-17804113.php.

and inflate housing costs, which is the largest driver of homelessness in cities like San Francisco. Many of San Francisco's housing policies over the last century have displaced communities of color and targeted their neighborhoods for "redevelopment." Then, San Francisco implemented laws in the 1970s that broadly imposed height, density, design, and other zoning restrictions. At the time, the City predicted that these restrictions would eliminate almost 200,000 housing units that could otherwise be legally built and would displace its lower income residents. *Infra* III.A. These predictions came true. Today, three quarters of San Francisco's homeless population were living in San Francisco when they became homeless. Moreover, in recent decades, San Francisco has consistently unproduced and deprioritized affordable housing units for its lower income residents. *Infra* III.B. Housing opportunities for people with disabilities are even more limited. Three quarters of San Francisco are zoned exclusively for single-family and two-unit housing, which are not required to meet federal and state accessibility design requirements. The City has also designed its rent control program to effectively exclude people with disabilities because the vast majority of privately-owned rent-controlled units are inaccessible. *Infra* III.C.

Third, San Francisco tries to justify its enforcement-first approach on the basis that it does not have the budget to house its homeless population.

8

Appellants' Br. at 2. This not only represents a deeply-flawed understanding of *Martin*—which limits the City's criminalization of "homeless individuals for 'involuntarily sitting, lying, and sleeping in public,'" 920 F.3d at 617—but it is also a misdirection. Research consistently shows that permanent supportive housing offers a cost-effective solution to homelessness, as opposed to San Francisco's *more costly* enforcement-first approach. *Infra* V.

Finally, San Francisco tries to shift responsibility to those most affected by the crisis, suggesting that homeless people "choose[] to sleep on the street." Appellant's Br. at 51. This too ignores the reality of San Francisco's shelter safety net, which is simply insufficient for the thousands of homeless residents on the streets of San Francisco and can be inaccessible and unaccommodating to homeless individuals with disabilities. And, as the district court found, "[i]t is beyond dispute that homeless San Franciscans have no voluntary 'option of sleeping indoors,' and as a practical matter 'cannot obtain shelter.'" 1-ER-0042. Instead, the false "service resistance" narrative stems from harmful stereotypes, apathy for the unique needs of homeless individuals, and ignorance of the realities of homelessness. *Infra* IV. In short, homeless San Franciscans do not "choose[] to sleep on the street."

Responding to the crisis that exists on the streets of San Francisco, the district court rightly enjoined San Francisco's criminalization of involuntary homelessness. San Francisco should not be permitted to use its enforcement powers to violate the constitutional rights of its homeless population, the very people who had been most harmed by the decades of failed policies. Accordingly, and for the reasons discussed below, the Court should affirm the district court's Order.

## ARGUMENT

### I. San Francisco Is in the Midst of a Severe Affordable Housing Shortage.

It is no secret that San Francisco severely lacks affordable housing. As of 2019, San Francisco has "an affordable unit deficit of 53,500," or a 87% "unmet need" in affordable units.[5] San Francisco admits it does not expect to "reverse the historical deficits" anytime soon but instead anticipates "an unmet affordable need for 56,500 units (68%)"—*even by the end of 2040*.[6]

Concurrent with the shortage of affordable housing units, San Francisco's rent unaffordability in market-rate housing has also spiraled out of control. San

---

[5] *2020 Jobs-Housing Fit Report*, S.F. PLANNING DEP'T (Nov. 2021), at 1, 16, https://sfplanning.org/sites/default/files/resources/2021-11/Jobs-Housing_Fit_Report_2020.pdf.

[6] *Id.* at 1-2.

Francisco is largely a city of renters: around two thirds of San Francisco's households rent.[7] Rent burden, a standard metric of housing affordability, has steadily worsened in San Francisco.[8] The average rent for a modest two bedroom apartment in the San Francisco metropolitan area at the end of 2022 was a staggering $3,224 per month.[9] To afford the average apartment in San Francisco in 2022, a family would need a household income of $127,920 per year or an hourly wage of $61.50; in comparison, a worker earning the hourly minimum wage can only afford $780 per month in rent.[10] To afford the average two bedroom apartment in San Francisco, they would need to work 164 hours per week.[11]

---

[7] *2022 Housing Element*, S.F. PLANNING DEP'T (Jan. 31, 2023), https://generalplan.sfplanning.org/I1_Housing.htm.

[8] Households are considered rent burdened if they spend more than 30% of income on housing and severely rent burdened if they spend more than 50%. *San Francisco Housing Needs and Trends Report*, S.F. PLANNING DEP'T (July 2018), at 42-43, https://default.sfplanning.org/publications_reports/Housing-Needs-and-Trends-Report-2018.pdf.

[9] *San Francisco area rents still steep amid high demand*, AXIOS SAN FRANCISCO (Jan. 31, 2023), https://www.axios.com/local/san-francisco/2023/01/31/san-francisco-high-rent-apartments/.

[10] *Out of Reach: California*, NATIONAL LOW-INCOME HOUSING COAL. (2022), https://nlihc.org/oor/state/ca.

[11] *Id.*

As rents have increased over time, so has the large number of renters who are impacted by the unaffordability. For instance, the number of severely rent burdened households increased from roughly 38,000 in 1990 to 49,000 in 2015.[12] Extremely low-income and very low-income households are the most vulnerable to rent burden.[13] As of 2015, more than 80% of extremely low-income households and around 75% of low-income households were rent burdened.[14] And more than 60% of extremely low-income households and over 40% of very low-income households were severely rent burdened.[15] Rent burden is particularly salient for very low- and extremely low-income households, who already have limited disposable income for necessary expenses like food and medical care and who lack a safety net if an unexpected expense arises.

San Francisco's affordable housing crisis does not impact its residents equally; people with disabilities and communities of color have long borne the brunt of the crisis. Around 10% of the City's extremely low-income households

---

[12] *San Francisco Housing Needs and Trends Report*, *supra* note 8, at 43.

[13] San Francisco defines low income as those earning between 50-80% of area median income ("AMI"), very low income as those earning between 30-50% of AMI, and extremely low income as those earning less than 30% of AMI. *Id.* at 29.

[14] *Id.* at 43.

[15] *Id.*

are Black, while Black residents made up around 5% of the City's population.[16] And more than a third of San Franciscans with disabilities are extremely low income and another 31% are very low or low income.[17]  Many of these households cannot afford the rent in San Francisco.  More than half of the City's Black households are rent burdened, and households of color are generally more likely to be rent burdened compared to white households.[18]  Likewise, San Franciscans with disabilities are more likely than other renters to be rent burdened, with more than half experiencing rent burden and 30% experiencing severe rent burden.[19]

## II.    Lack of Affordable Housing Is a Driver of Homelessness, Which Disproportionately Impacts People of Color or with Disability.

There is a direct link between San Francisco's affordable housing crisis and its homelessness crisis.  Rent burden is a direct predictor of homelessness. Research shows that "the expected homeless rate in a community begins to quickly increase once median rental costs exceed 30% of median income, providing a statistical link between homelessness and . . . housing cost burden."[20]  San

---

[16] *Id.* at 50.

[17] *Id.* at 67.

[18] *2022 Housing Element*, *supra* note 7.

[19] *San Francisco Housing Needs and Trends Report*, *supra* note 8, at 69.

[20] *See* Chris Glynn et al., *Inflection Points in Community-Level Homeless Rates*, 15 ANN. APPL. STAT. 1037, 1037-1053 (June 2021).

Francisco is well-aware that "housing is a scarce resource," and so "prices rise based on what the highest earners can afford," while "[l]ower income households are left paying unsustainably high shares of their income to stay in the city—*if they can secure housing at all*."[21]  Moreover, once an individual becomes homeless, the lack of affordable housing also operates to keep those individuals from moving back inside.  In fact, most homeless individuals in San Francisco consistently identify unaffordable or unavailable housing as the main obstacle to ending their homelessness.[22]

Because San Francisco's affordable housing crisis has profoundly impacted people with disabilities and communities of color, it is (as expected) also reflected in the City's homeless population.  As of 2022, Black people made up around 5% of San Francisco's overall population but comprised 35% of all homeless people in the City.[23]  Moreover, compared to the overall population, Black San Franciscans

---

[21] *Context: Dismantling San Francisco's Housing Inequities*, S.F. PLANNING DEP'T (Apr. 6, 2021), https://storymaps.arcgis.com/stories/26bc500b5aee4f0281a860a2144a5998 (emphasis added).

[22] *2022 S.F. Homeless Count & Survey*, *supra* note 2, at 36.  With its housing shortage and unaffordability, it is no surprise that a staggering 71% of the City's homeless population lived in San Francisco when they became homeless.  *Id.* at 30.

[23] *Id.* at 28.

are more than twice as likely to be a person with a disability, and about 27% of Black San Franciscans are people with disabilities.[24]  People with disability are also overrepresented in the homeless population: almost two-thirds of the homeless population identify as having mental health conditions and chronic physical illnesses, and about a quarter identify as having a physical disability.[25]  These statistics show that San Francisco's affordable housing shortage has had a dire and disproportionate impact on its historically-disadvantaged residents.

## III.  Decades of Bad Policies and Decisions Led to San Francisco's Homelessness Crisis.

San Francisco's current affordable housing crisis and the resulting homelessness crisis did not happen overnight.  It is the result of myriad policies and decisions at the state and local levels and a legacy of exclusion and discrimination.  These policy decisions over the past century have been devastating to the City's most vulnerable residents and led to people of color and people with disabilities disproportionately experiencing homelessness.

---

[24] *Disability in San Francisco*, S.F. HUMAN SERV. AGENCY, DEP'T OF DISABILITY AND AGING SERV., https://cmstrain.sfhsa.org/about/reports-publications/disability-san-francisco.

[25] *2022 S.F. Homeless Count & Survey*, *supra* note 2, at 41, 53.

A. **San Francisco Has a Long History of Laws and Practices That Targeted San Franciscans of Color and Created Today's Affordable Housing Crisis.**

San Francisco admits that its "history of structural racism and housing discrimination has disparately impacted People of Color, resulting in significant over-representation in people experiencing homelessness."[26]  In fact, San Francisco's exclusionary policies date back to the 1870s, when it implemented a series of zoning ordinances meant to fine, jail, and segregate its Chinese residents.[27]  In 1917, the Supreme Court rejected as unconstitutional explicitly race-based zoning and property ownership exclusions.  *See Buchanan v. Warley*, 245 U.S. 60, 82 (1917).  Rather than adhering to the spirit of the *Buchanan* ruling, policymakers instead turned to practices that implicitly exclude people of color.

The era of redlining began in the 1930s.  The government ranked neighborhoods by desirability and lending risk, from A (best) to D (worst),

---

[26] *2022 S.F. Homeless Count & Survey*, *supra* note 2, at 1.

[27] Eli Moore et al., *Roots, Race, & Place: A History of Racially Exclusionary Housing in the San Francisco Bay Area*, HAAS INST. FOR A FAIR AND INCLUSIVE SOC'Y, UNIV. OF CALIFORNIA, BERKELEY (Oct. 2019), at 15, https://belonging.berkeley.edu/sites/default/files/haasinstitute_rootsraceplace_oct2019_publish.pdf (discriminatory ordinances included the 1870 Cubic Air Ordinance, the 1880 Laundry Ordinance, and the 1890 Bingham Ordinance).

ostensibly to stabilize the housing market in the wake of the Great Depression.[28]

Because predominantly white neighborhoods ranked higher, the government

subsided white homeownership with long-term low-interest loans; but non-white

neighborhoods were often considered "hazardous" for investment.[29]  San

Francisco's 1937 redlining map had a distinctly racial undertone.  One redlined

neighborhood contained "[m]ore than half the Negro population of San Francisco"

and was thus "considered a highly hazardous area."[30]  Another redlined

neighborhood was "affected by the racial situation" due to a "congested population

consisting of Japanese, Russians, Mexicans, Negroes, etc. having a very low

income level."[31]  Financial institutions and businesses either entirely avoided

investments and loans in these redlined neighborhoods or offered unfavorable

---

[28] Matthew Green, *How Government Redlining Maps Pushed Segregation in California Cities*, KQED (Apr. 27, 2016), https://www.kqed.org/lowdown/18486/redlining.

[29] *See id.*; *Pollution and Prejudice: Redlining and Environmental Injustice in California*, CALEPA (Aug. 16, 2021), https://storymaps.arcgis.com/stories/f167b251809c43778a2f9f040f43d2f5.

[30] *Mapping Inequality: Redlining in New Deal America*, *San Francisco, CA*, UNIV. OF RICHMOND, at D1, https://dsl.richmond.edu/panorama/redlining/#loc=14/37.765/-122.432&city=san-francisco-ca&area=D1.

[31] *Id.* at D3, https://dsl.richmond.edu/panorama/redlining/#loc=14/37.773/-122.458&city=san-francisco-ca&area=D3.

17

terms—effectively denying many non-white communities the American dream of homeownership.[32]

In 1945, San Francisco identified the Western Addition, South of Market, Chinatown, the Mission, and areas surrounding Hunters Point and Bay View— neighborhoods that were homes to the City's largest non-white communities—for widespread demolition and redevelopment to reduce "blight."[33] In 1947, a nonprofit planning and housing organization called for redevelopment of the Western Addition (which included the majority Black Fillmore District) because it was "gray, brown, and an indeterminate shade of dirty black."[34] That same year, the City commissioned its own report, echoing that the Western Addition should

---

[32] *See* Lexi Pandell, *The Racist Origins of San Francisco's Housing Crisis*, TNR (May 31, 2019), https://newrepublic.com/article/154028/racist-origins-san-franciscos-housing-crisis ("Poor neighborhoods and areas dominated by non-white residents were also redlined, meaning that developers and banks avoided investing in those areas or loaning to those who lived there"); David Reiss, *The Federal Housing Administration and African-American Homeownership*, 26. J. AFFORDABLE HOUS. & CMTY. DEV. L., NO. 1 (2017), at 123-25.

[33] *San Francisco Planning Commission Centennial*, S.F. PLANNING DEP'T (Dec. 2017), https://default.sfplanning.org/publications_reports/SF_Planning_Centennial_Brochure.pdf; *see also* Pandell, *supra* note 32.

[34] *See* Clement Lai, *The Racial Triangulation of Space: The Case of Urban Renewal in San Francisco's Fillmore District*, ANNALS OF THE ASS'N OF AM. GEOGRAPHERS (Jan. 2012), https://www.jstor.org/stable/41412759.

be redeveloped. The City's report warned that "[i]n view of the characteristically low income of colored and foreign-born families, only a relatively small proportion of them may be expected to occupy quarters in the new development."[35]

In June 1948, San Francisco approved the redevelopment of the Western Addition.[36] Destruction and mass displacement followed over the next two decades. Between 20,000 to 30,000 residents of the Western Addition were scattered and forced from their homes.[37] From the Fillmore District alone, the redevelopment project ejected almost 1,000 businesses and 5,000 households.[38] Displaced residents had limited options for replacement housing, even while redevelopment languished and the Western Addition sat empty.[39]

This was by no means an isolated incident. From 1940s through the 1970s, the City destroyed and displaced many communities of color in the name of

---

[35] Larry Dang, *From Redevelopment to Reconciliation: Housing Mistrust in San Francisco*, MEDIUM (June 2, 2018), https://larrydang.medium.com/from-redevelopment-to-redemption-history-of-housing-mistrust-in-san-francisco-da9f3b10d0d4.

[36] *Id.*

[37] *Id.*

[38] *See* Leslie Fulbright, *Sad Chapter in Western Addition History Ending*, SFGATE (July 21, 2008), https://www.sfgate.com/bayarea/article/Sad-chapter-in-Western-Addition-history-ending-3203302.php; Pandell, *supra* note 32.

[39] Fulbright, *supra* note 38.

redeveloping so-called "blight" areas. The word "blight" refers to "impoverished neighborhoods that planners believed needed to be completely rebuilt."[40] But as the City's Planning Commission now admits, "blight" was "a deeply political term firmly rooted in structural racism, which relied on fears of white flight and urban disinvestment to justify the wholesale removal of communities of color."[41]

After displacing many of its low-income communities of color in the interest of preventing "blight," the City began to severely restrict what could be built or re-built. In 1978, San Francisco passed the Residential Rezoning of 1978. This rezoning project proposed 40-foot building height limits for most residential neighborhoods (*i.e.*, around just three stories), setback rules, restrictions on housing unit density, and specific design guidelines.[42] Before the City approved the project, it conducted an environmental impact report.[43] The City's report

---

[40] *San Francisco Planning Commission Centennial*, *supra* note 33.

[41] *Id.*

[42] Hunter Oatman-Stanford, *Demolishing the California Dream: How San Francisco Planned Its Own Housing Crisis*, COLLECTORS WEEKLY (Sept. 21, 2018), https://www.collectorsweekly.com/articles/demolishing-the-california-dream/.

[43] *Final Environmental Impact Report for the Proposed Amendments to the Text of The City Planning Code and to the Zoning Map Relating to Residential Districts and Development*, S.F. PLANNING DEP'T (1978), https://archive.org/details/finalenvironment2719sanf/mode/2up.

predicted these changes to eliminate "approximately180,000 estimated [] housing units [that] could legally be built in San Francisco," which may "limit[] supply in some neighborhoods" and "displace low- and moderate-income and elderly households."[44]  San Franciscans voiced concerns that the rezoning project would "impact [] poor and low income persons," "drive up costs," and "create even more of a housing shortage"; that "middle income households would not be able to afford living in San Francisco"; and that "what was needed was better, not less apartments."[45]  The City's commissioners ignored these prophetic concerns and voted to approve the rezoning project.  In doing so, the City foreshadowed that "the cost of housing may increase, and that with increasing housing costs, some population groups may find it difficult to live in San Francisco," but "[t]he proposed zoning will affect the low- and moderate-income households more than any other group."[46]

---

[44] *Id.* at 122-23.

[45] *See Summary and Minutes of the Special Meeting*, S.F. PLANNING DEP'T (June 7, 1978), at 6-8, https://archive.org/details/37minutesofsanfran1978san/page/42/mode/2up.

[46] *Summary and Minutes of the Special Meeting*, S.F. PLANNING DEP'T (June 27, 1978), at 5, https://archive.org/details/37minutesofsanfran1978san/page/64/mode/2up.

San Francisco's 1978 Residential Rezoning coincided with California's passage of Proposition 13 that same year. Proposition 13 limited the rate of property tax increase to no more than 2% per year until the property changes hands, when the value of the property would be reassessed. *See* Cal. Const. art. XIII A, § 1. This law invariably created downward pressure on the State's (and San Francisco's) available housing supply. First, Proposition 13 created a "lock-in effect" that reduced property turnover in the State. Existing homeowners are incentivized to remain in their homes because they would pay lower taxes than if they bought a different house of the same value.[47] Second, cities would be motivated to zone for retail and other commercial uses to generate sales tax revenue, rather than produce more housing units that generate capped property tax revenue.[48]

Together, San Francisco's historical policies and its "redevelopment" of low-income communities to remove "blight," coupled with zoning restrictions and tax

---

[47] *See* Les Picker, *The Lock-in Effect of California's Proposition 13*, NATIONAL BUREAU OF ECONOMIC RESEARCH (Apr. 2005), https://www.nber.org/digest/apr05/lock-effect-californias-proposition-13.

[48] Carrie Hahnel et al., *Unjust Legacy: How Proposition 13 Has Contributed to Intergenerational, Economic, and Racial Inequities in Schools and Communities*, OPPORTUNITY INST. (June 2022), at 7, https://theopportunityinstitute.org/publications-list/2022/8/3/unjust-legacies.

policies, have severely restricted San Francisco's affordable housing stock and continue to have negative consequences today.

**B.   San Francisco Continues to Underproduce Affordable Housing Units Year After Year.**

San Francisco is not calibrated to address the scale of this crisis, as it has consistently failed to provide enough affordable housing units for its lower income residents.  From 2015 to 2017, 69% of housing production was targeted to the highest earners in San Francisco (those earning 120% or more of AMI), compared to only 30% targeting very low-, low-, and moderate-income residents.[49]  In fact, for at least the past two decades, San Francisco has consistently missed its affordable housing targets, which the State and the Bay Area region deemed necessary to meet residents' housing needs.  From 1999 through 2006, San Francisco produced only 80% of the goal for very low-income units and 52% of the goal for low-income units.[50]  San Francisco's affordable housing deficit has only worsened over time.  From 2007 through 2014, San Francisco produced just

---

[49] *Housing: Overview*, SF HEALTH IMPROVEMENT P'SHIP, http://www.sfhip.org/chna/community-health-data/housing/.

[50] *Bay Area Progress in Meeting 1999-2006 Regional Housing Need Allocation (RHNA)*, ASS'N OF BAY AREA GOV'TS, https://abag.ca.gov/sites/default/files/1999-2006_rhna_performance_revised_jan2015.pdf.

59% and 27% of the targets for very low-income and low-income units.[51] And from 2015 through 2020, San Francisco produced only 33% and 58% of its targets for very low-income and low-income units.[52] During the two decades from 1999 through 2020, San Francisco missed the State's and the Bay Area's targets by a total of 15,000 affordable units. Evidently, the City deprioritized affordable housing, as these units accounted for only a quarter of San Francisco's total housing production during that period.

Even worse, San Francisco has lost affordable housing units at the rate of "more than one from its existing inventory" "for every two affordable housing units created" due to "units being permanently withdrawn from the protection of rent control."[53] In sum, the City's affordable housing shortfall undoubtedly contributed to the homelessness crisis.

---

[51] *San Francisco Bay Area Progress in Meeting 2007-2014 Regional Housing Need Allocation (RHNA)*, ASS'N OF BAY AREA GOV'TS, (Sept. 2015), https://abag.ca.gov/sites/default/files/rhnaprogress2007_2014_082815.pdf.

[52] *2015 - 2020 Bay Area Building Permit Activity Report*, ASS'N OF BAY AREA GOV'TS, https://abag.ca.gov/sites/default/files/documents/2021-12/2015-2020%20apr_permit_summaries_by_jurisdiction.pdf; *2020 San Francisco Housing Inventory*, S.F. PLANNING DEP'T (Apr. 2021), at 15, https://sfplanning.org/sites/default/files/documents/reports/2020_Housing_Inventory.pdf.

[53] Kate Anthony et al., *Homelessness in the San Francisco Bay Area: The Crisis and a Path Forward*, MCKINSEY & CO., (July 2019), https://www.mckinsey.com/industries/public-and-social-sector/our-

**C.     San Francisco's Housing Stock Is Largely Inaccessible to People with Disabilities.**

About 96,000 San Franciscans (or 10%) have a disability; 60% of those with a disability are renters.[54]  Most have lower income and cannot afford the market-rate rent in San Francisco;[55] yet San Francisco's rent control regulations make the City's rent-controlled housing stock effectively unavailable and inaccessible to those with disabilities.

San Francisco's rent control ordinance only covers rental units in buildings with a certificate of occupancy that predates June 13, 1979.  S.F. Admin. Code § 37.2(g)(1).  But it was not until 1991 that the federal Fair Housing Amendments Act ("FHAA") mandated that certain multi-unit housing be constructed in an accessible and adaptable manner, and not until 1994 that the California Fair Employment and Housing Act ("FEHA") was amended to prescribe the federal FHAA accessibility provisions as the minimum statewide housing standards.[56]  As

---

insights/homelessness-in-the-san-francisco-bay-area-the-crisis-and-a-path-forward.

[54] *Disability in San Francisco*, *supra* note 24.

[55] San Francisco reports that 37%, 14%, and 17% of residents with disabilities are extremely low income, very low income, and low income, respectively.  *San Francisco Housing Needs and Trends Report*, *supra* note 8, at 67.

[56] 42 U.S.C. § 3604(f)(3)(C) (applying to buildings certified for first occupancy on or after March 13, 1991); Cal. Gov. Code § 12955.6 (as amended Jan. 1, 1994).

25

a result, around 82% of the private rental units that are subject to San Francisco's rent control ordinance, and thereby price stabilized, are *inaccessible* because these units were constructed before the government adopted accessible design standards in the 1990s.[57]  San Francisco does not require private landlords to retrofit older rent-controlled units for FHAA- and FEHA-compliance, rendering the vast majority of rent-controlled units inaccessible for people with vision or mobility disabilities.

Additionally, around 72% of the City's privately owned parcels are zoned for single-family and two-unit housing.[58]  But single-family and two-unit housing are not required to comply with FHAA and FEHA's design and construction mandates for accessible housing; these mandates only apply to larger multifamily units.  *See* 42 U.S.C.S. § 3604(f)(3); Cal. Gov. Code § 12955.1.1.  As a result, only a small fraction of the City's new construction meets accessibility requirements.

In sum, people with disabilities have very limited affordable and accessible housing options due to San Francisco's policy choices and failure to apply its rent control ordinance to all private housing units.

---

[57] *See Disability in San Francisco*, *supra* note 24.

[58] *See Housing for Family with Children*, S.F. PLANNING DEP'T (Jan. 17, 2017), at 2, https://default.sfplanning.org/plans-and-programs/planning-for-the-city/family-friendly-city/Housing_for_Families_with_Children_Report-011717.pdf.

**IV.   San Francisco Weaponizes the "Service Resistance" Myth to Blame Homeless People for the Homelessness Crisis.**

San Francisco attempts to shift responsibility for the crisis it created to the City's homeless population.  According to the City, homeless people "choose[] to sleep on the street" even when they have "a shelter bed assigned to them," insinuating that their homelessness is self-inflicted.  *See* Appellants Br. at 15 n.5, 51.  This "service resistance" narrative is unfounded and harmful.

It is undisputed that there are simply not enough shelter beds in San Francisco for the number of people who are living on the streets.  San Francisco concedes, and does not contest the district court's finding on, "the existence of long-standing shelter bed shortfalls."  1-ER- 0039.  In fact, San Francisco is short by thousands of beds, with up to approximately 4,300 beds needed but not available to the City's homeless population.  1-ER-0006.

Moreover, those beds that are available are frequently inaccessible to the City's unsheltered population.  In fact, most homeless individuals in San Francisco have used or tried to access shelter in the past.[59]  But there are many well-documented barriers to shelter access.  Homeless individuals often cannot access

---

[59] *Stop the Revolving Door*, COAL. ON HOMELESSNESS (Sept. 2020), at 27, https://www.cohsf.org/wp-content/uploads/2020/11/Stop-the-Revolving-1.pdf.

shelters because of lack of available beds, excessive wait times, and complicated

procedures for access.[60]  Evidence in the record confirms additional barriers to

accessing San Francisco's shelters, such as "strict curfews that prevent evening

hours of employment and familial obligations; meagre limits on the amount of

personal property allowed; widespread theft due to an inability to secure

belongings; violence; abusive staff; a lack of privacy; long waiting periods or

lines; prohibitions against people bringing in their pets, and unhealthy and

unsanitary conditions."  7-ER-1605.[61]  Further barriers for homeless people with

disabilities include lack of accessible shelter, exclusion of caregivers, strict rules

around medication, and eviction when hospitalized.  Some congregate shelters may

---

[60] *Id.*; *see also* Christina Wusinich et al., "*If You're Gonna Help Me, Help Me*": *Barriers to Housing Among Unsheltered Homeless Adults*, EVALUATE AND PROGRAM PLANNING, VOL. 76 (Oct. 2019), https://www.sciencedirect.com/science/article/abs/pii/S0149718918303823?via%3Dihub ("the most common barriers" to housing and services for unhoused individuals include "obtaining required identification documents, lack of accessibility of shelters amid complex healthcare needs, waiting as part of the process, and exclusion of pets from shelters and housing options").

[61] *See also Stop the Revolving Door*, *supra* note 59, at 28 (around a third of the survey respondents left shelters because of mistreatment by the staff); Wusinich, *supra* note 60 ("individuals experiencing homelessness have learned to be suspicious of outreach based on past negative experiences such as shelters being more dangerous than the streets").

be unaccommodating, even hostile, to the specific needs, conditions, and status of those with disabilities.

On the other hand, the City presents no evidence in the record to support its position that individuals choose to remain unsheltered and on the streets. Research shows that homeless individuals do accept offers of stable private housing and services when they accommodate their individual needs.[62] For example, when San Francisco offered Shelter-in-Place hotel and motel rooms during the pandemic, data showed "about 90% accepted assistance." 7-ER-1606. There were similar acceptance rates when the first Navigation Centers became operational in 2015 and 2016, before they were overloaded. *Id.*

Just as the City attempts to discount the scope of its affordable housing crisis and its causal relationship to the homelessness crisis, it likewise tries to divert the Court's attention from the severe lack of available shelter beds. At

---

[62] *See, e.g.*, *The View from Outside*, TIPPING POINT COMMUNITY (2019), at 13, https://tippingpoint.org/wp-content/uploads/2019/03/The-View-from-Outside.pdf (survey respondents strongly prioritize independent, stable housing that offers basic amenities like a private bathroom and kitchen for cooking); Jason M. Ward et al., *Recent Trends Among the Unsheltered in Three Los Angeles Neighborhoods*, RAND CORP. (2022), https://www.rand.org/pubs/research_reports/RRA1890-1.html (80% of unhoused respondents surveyed would accept a private shelter or hotel room, a permanent stay in a motel- or hotel-like setting, or permanent supportive housing).

bottom, the City does not have enough shelter beds to serve as a safety net for the

thousands of San Franciscans who have been priced out of the City's housing

market.  As a result, thousands of San Franciscans, disproportionately Black and

Latino residents and residents with disabilities, have no alternative but to live on

the streets of San Francisco.

## V.   Affordable and Accessible Housing Is the Solution to Ending and Preventing Homelessness.

Finally, San Francisco claims that it is too expensive to build enough units

to house its homeless population (*see* Appellant's Br. at 2), yet the City's

enforcement-first approach is *more* costly and *less* effective.  Criminalization

forces homeless people to cycle through streets, temporary shelters, hospitals, and

jails—costing the City millions every year in enforcement, healthcare, and other

downstream costs.[63]  Criminalization also endangers the wellbeing of homeless

---

[63] For instance, San Francisco spends millions of taxpayer dollars annually to evict hundreds of formerly-homeless people from the City's housing programs, forcing them back into homelessness.  Joaquin Palomino & Trisha Thadani, *'Makes absolutely no sense': S.F. supervisors question evictions from supportive housing*, SAN FRANCISCO CHRONICLE (Mar. 20, 2023), https://www.sfchronicle.com/sf/article/sf-homeless-eviction-sro-breed-oversight-17849572.php.  *See also, e.g.*, Mary K. Cunningham, *The Homelessness Blame Game*, URBAN INST. (Sept. 23, 2019), https://www.urban.org/urban-wire/homelessness-blame-game ("Research shows that criminalizing homelessness increases costs and strain on police, jails, and prisons—placing a heavy toll on state and local budgets").

people, while failing to address the root cause of homelessness: unaffordability and unavailability of appropriate housing.

On the other hand, permanent supportive housing is an effective solution to homelessness.[64] The Community Preventive Services Task Force ("CPSTF"), an independent panel of public health and prevention experts appointed by the CDC, agrees.[65] The CPSTF recommends permanent supportive housing, which research consistently shows decreases homelessness, increases housing stability, decreases hospitalization, and improves quality of life for homeless people generally and especially for those with disabilities.[66] One recent study found that permanent

---

[64] Sara K. Rankin, *Punishing Homelessness*, 22 NEW CRIM. L. REV. 99, 104 (2019) ("[N]on-punitive alternatives, such as permanent supportive housing, are the most cost-effective ways to solve chronic homelessness."); Samantha Batko, *We Can End Homelessness through Housing First Interventions*, URBAN INST. (Feb. 12, 2020), https://www.urban.org/urban-wire/we-can-end-homelessness-through-housing-first-interventions.

[65] *Social Determinants of Health: Permanent Supportive Housing with Housing First (Housing First Programs)*, CPSTF (June 2019), https://www.thecommunityguide.org/findings/social-determinants-health-housing-first-programs.html.

[66] *See, e.g.*, Leyla Gulcur et al., *Housing, Hospitalization, and Cost Outcomes for Homeless Individuals with Psychiatric Disabilities Participating in Continuum of Care and Housing First Programmes*, J. COMMUNITY & APPLIED SOC. PSYCHOL., VOL. 13(2) (Apr. 9, 2003) (finding that participants randomly assigned to independent housing "spent significantly less time homeless and in psychiatric hospitals, and incurred fewer costs than controls.").

supportive housing decreased homelessness by 88% and improved housing stability by 41%.[67]  Permanent supportive housing is also a great investment, with a societal cost savings of $1.44 for every $1 invested.[68]  Thus, the City's budgetary constraints argument is misplaced and does not support, let alone legally justify, its punitive approach to the homelessness crisis.

## CONCLUSION

San Francisco's current homelessness crisis is the result of a long history of failed housing policies, institutional racism, and mass displacement, which continues to force the City's most vulnerable residents into homelessness.  San Francisco's failure, even now, to rectify its severe lack of affordable housing has only fueled the crisis.  The City may argue that, from a policy standpoint, it can continue to make these zoning, housing, and budgetary decisions, and nothing in the district court's Order prevents it from doing so.  The only thing that the Order prohibits is the City's punishment of its most vulnerable residents who have been failed by those policies.  The district court rightfully restricted the City from

---

[67] Y. Peng et al., *Permanent Supportive Housing with Housing First to Reduce Homelessness and Promote Health among Homeless Populations with Disability: A Community Guide Systematic Review*, J. PUBLIC HEALTH MANAG. PRACT. VOL. 25(5), 404-411 (Sept.-Oct. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8513528/.

[68] *Social Determinants of Health*, *supra* note 65.

misusing its police power in this way.  *Amici* therefore request the Court to uphold the district court's Order, which preliminarily enjoins the City's enforcement-first approach to homelessness.

Respectfully submitted,

Dated: April 11, 2023                                    FENWICK & WEST LLP


By: */s/ Y. Monica Chan*
    Y. Monica Chan


LEGAL AID FOUNDATION OF
LOS ANGELES


By: */s/ Shayla Myers*
    Shayla Myers

*Attorneys for Amici Curiae*

33

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   23-15087

I am the attorney or self-represented party.

**This brief contains**   6,617   **words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[**X**] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**   */s/ Y. Monica Chan*   **Date**   April 11, 2023

34

## CERTIFICATE OF SERVICE

I, Y. Monica Chan, hereby certify that I filed the foregoing **BRIEF OF**

***AMICI CURIAE* DISABILITY RIGHTS ADVOCATES, HOMELESS**

**YOUTH ALLIANCE, COMPASS FAMILY SERVICES, WESTERN**

**CENTER ON LAW & POVERTY, AND BAY AREA LEGAL AID IN**

**SUPPORT OF APPELLEES AND AFFIRMANCE OF PRELIMINARY**

**INJUNCTION** on April 11, 2023, via the Court's CM/ECF system, which

delivered an electronic copy to all counsel of record for all parties.

Dated: April 11, 2023                          */s/ Y. Monica Chan*
                                               Y. Monica Chan
                                               *Attorney for Amici Curiae*

35